**ZIMMERMAN REED LLP**
Ryan J. Ellersick (SBN 357560)
Caleb Marker (SBN 269721)
Jessica M. Liu (SBN 358713)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel (877) 500-8780
Fax (877) 500-8781
ryan.ellersick@zimmreed.com
caleb.marker@zimmreed.com
jessica.liu@zimmreed.com

*Attorneys for Plaintiffs and the Classes*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEDRO RIOS, JR., and CHRISTIAN MARQUEZ, individually, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HRB DIGITAL, LLC, a Delaware Corporation, HRB TAX GROUP, INC., a Missouri Corporation,<br><br>Defendants. | CASE NO.: 3:25-CV-03530<br><br>**CLASS ACTION COMPLAINT**<br><br>1. **VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511(1),** *et seq.*<br>2. **VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, Cal. Penal Code § 630,** *et seq.*<br>3. **VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code § 17200,** *et seq.*<br>4. **VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT, Cal. Civil Code § 1750,** *et seq.*<br><br>(JURY TRIAL DEMANDED) |

Plaintiffs Pedro Rios Jr. and Christian Marquez ("Plaintiffs"), on behalf of themselves and all other similarly situated persons in the Classes defined below, file this Class Action Complaint against Defendants HRB Digital LLC, and HRB Tax Group, Inc. (collectively, "H&R Block" or "Defendants"), and in support state the following:

## **INTRODUCTION**

1.      This is a class action lawsuit brought on behalf of classes of taxpayers against H&R Block for unlawfully sharing private and sensitive taxpayer data with Meta Platforms, Inc. ("Meta")**,** Google LLC ("Google"), and/or other third-parties without the taxpayers' knowing and voluntary consent.

2.      Without taxpayers' knowledge and consent, H&R Block deployed various tracking tools on its website, https://www.hrblock.com, and related subpages (hereinafter the "Website"), where taxpayers prepared and filed their federal and state tax returns. The tracking tools included the use of "pixels"— pieces of code that website developers like H&R Block install on their websites—to intercept and disclose tax return information to Meta and Google.

3.      Defendants' unlawful disclosures were first outlined in the November 2022 report by *The Markup*.[1] In response to The Markup's report, the U.S. Senate initiated an investigation into H&R Block's unlawful data-sharing practices, which revealed that the disclosures were much more serious than previously reported.  *See*, *Attacks on Tax Privacy: How the Tax Prep Industry Enabled Meta to Harvest Millions of Taxpayers' Sensitive Data*, U.S. Senate, July 2023 at 5-6 (available at https://www.warren.senate.gov/imo/media/doc/Attacks%20on%20Tax%20Privacy_Final.pdf) ("Senate Report").

4.      The Senate Report confirmed that H&R Block's use of the tracking tools resulted in the interception and disclosure of confidential tax return information to Meta and Google. The confidential and personal tax return information H&R Block unlawfully intercepted and disclosed to third parties included, but was not limited to, taxpayers' names, personal identifiers, health savings account

---

[1]  *See* The Markup, Tax Filing Websites Have Been Sending Users' Financial Information to Facebook (Nov. 22, 2022), https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook (last accessed Dec. 30, 2024).

contributions, college tuition grants, scholarships, educational expenses, and the specific pages visited by the taxpayers, such as those relating to dependents, certain types of income, and certain tax credits and deductions. *Id.*

5.      The Senate investigation found that "[t]hrough the Meta Pixel and Google's business tools, the tax prep companies investigated in this report--TaxAct, TaxSlayer, and H&R Block-- recklessly disclosed and misused the personal tax return information of potentially millions of taxpayers." *Id.* at 39.

6.      In response to the congressional inquiry, H&R Block told Senate investigators that H&R Block had been using the Meta Pixel for "at least a couple of years." *Id.* at 11. According to H&R Block, "Meta's default settings of their pixel allowed them to collect additional information, including page title information from our online tax filing service." *Id.* at 12. In addition, "[s]ome of those page titles included a subset of information related to the customer and his or her tax situation, including the first name of the taxpayer and aggregate amounts relating to HSA contributions, scholarships, and education expenses." *Id.* at 12. H&R Block also revealed that "the Pixel transmitted information on page headers- meaning that the Pixel would transmit information on whether taxpayers had visited pages for many broad categories, such as dependents, certain types of income (such as rental income or capital gains), and certain tax credits or deductions." *Id.*

7.      The Senate investigation also found that H&R Block disclosed protected tax return information to Google. According to the Senate Report, "H&R Block representatives communicated that they were 'not aware' of any other pixels used on their website, 'past or present,' despite Google confirming that H&R Block did have [Google Analytics] installed on their website - which was also previously unreported and raises the concern that tax prep companies themselves are unaware of what pixels they are using and how this may be affecting taxpayer privacy." *Id.* at 11.

8.      H&R Block indicated that these disclosures potentially impacted every person who used its online tax preparation services. According to the Senate Report, "although the companies initially dissembled when it came to revealing how many taxpayers had their data shared with Big Tech firms, they ultimately indicated that - because of the way the pixels were set up and implemented - **every single**

**taxpayer who used their websites to file their taxes could have had at least some of their data shared.**" *Id.* at 13 (emphasis added).

9.      Further, the Senate Report explained that "'under the law 'a tax return preparer may not disclose or use a taxpayer's tax return information prior to obtaining a written consent from the taxpayer,' – and they failed to do so when it came to the information that was turned over to Meta and Google." *Id.* at 3, 23-24[2], 32-35 ("Review of H&R Block's privacy policy and disclosure agreements also strongly suggests that H&R Block did not obtain valid consent for its disclosures of taxpayer data to Meta and Google.").

10.     By intercepting and disclosing sensitive taxpayer data—including protected tax return information—to Meta, Google and/or other third-parties, H&R Block violated the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*, the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; and the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et. seq.* H&R Block's practices should be enjoined to protect the Classes as well as the general public who may deal with Defendants in the future. On behalf of the Classes, Plaintiffs seek damages, including all statutory damages, private injunctive relief, public injunctive relief, declaratory relief, reasonable attorneys' fees and costs, and all other relief that may be just and equitable under the circumstances.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed classes, and at least one member of the classes is a citizen of a state different from Defendants.

12.     This Court has personal jurisdiction over H&R Block. First, H&R Block operates approximately 750 tax offices in California, making California the state with the most H&R Block tax offices in the country.[3] Thus, H&R Block has purposefully availed itself of the privilege of doing

_____

[2] Senate Report at 23 ("Treasury Regulation 301.7216-3 describes specific instances when a tax return preparer may disclose or use TRI with the consent of the taxpayer – but the tax prep companies failed to meet the detailed requirements for consent.")

[3] https://www.scrapehero.com/location-reports/H%26R%20Block-USA/

business in California. Second, H&R Block's Website (and the interception of taxpayer information through the tracking tools) is directly linked to H&R Block's physical operations in California, in that consumers can prepare and file their taxes through the Website, but can also interact with and set up appointments to speak with tax professionals at one of H&R Block's tax offices located in California. Thus, the conduct at issue regarding the tracking of taxpayer activity on the Website is directly related to Defendants' business in California. *See Kauffman v. Papa John's Int'l, Inc.*,2024 WL 171363, at *3-4 (S.D. Cal. Jan. 12, 2024). Finally, Plaintiffs and Class Members were harmed in California because that is where Plaintiffs' and Class Members' information was intercepted.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to lead Plaintiff Rios's claims occurred in this District.

14.    Pursuant to Civil L.R. 3-2(c), this matter should be assigned to the San Francisco Division because a substantial portion of the events giving rise to lead Plaintiff Rios's claims occurred in Contra Costa County, where Plaintiff Rios resides.

15.    In accordance with California Civil Code 1780(d), Plaintiff Rios concurrently files herewith a declaration establishing that he paid money to file his tax returns online through H&R Block's Website from Bay Point, California.

16.    Defendants' Online Services Agreement ("OSA") includes a provision that disputes against H&R Block shall be brought in arbitration before the American Arbitration Association ("AAA"). But because the arbitration clause is unconscionable and unenforceable, this case is properly brought in this Court for several reasons, including the following. First, because the OSA contains a mass-arbitration protocol—including batching of claims, use of bellwethers, and delayed/staged filings—the arbitration agreement is unenforceable under *Heckman v. Live Nation Entertainment, Inc.* 120 F.4th 670 (9th Cir. 2024) and *Discover Bank v. Superior Court*, 36 Cal.4th 148, 30 Cal.Rptr.3d 76 (2005). As explained in *Heckman*, mass arbitration protocols do not involve bilateral arbitration proceedings and are therefore not subject to any Federal Arbitration Act ("FAA") provision that preempts California's *Discover Bank* rule prohibiting the waiver of class actions through arbitration agreements. *Heckman*, 120 F.4th at 689-90 ("Arbitration, as understood by Congress when it enacted the FAA, was designed to be a fair and efficient alternative to bilateral judicial proceedings. It may not

be too much to say that this method of dispute resolution contemplated by New Era's Rules is unworthy even of the name of arbitration. It is certainly beyond dispute that it is not arbitration as envisioned by the FAA in 1925. Accordingly, we hold that the application of California law to Ticketmaster's Terms and New Era's Rules is not preempted by the FAA. *Discover Bank* therefore applies.") (cleaned up).

17.     The arbitration provision is also unconscionable because the staged bellwether process prevents the filing of claims—potentially for many years—based solely on the identity of a claimant's chosen legal counsel. *See Pandolfi v. AviaGames, Inc.*, No. 23-CV-05971-EMC, 2024 WL 4051754, at *11 (N.D. Cal. Sept. 4, 2024) ("[T]here is another troubling aspect to the bellwether provision. The bellwether provision is triggered – causing delay – when twenty-five or more claims are asserted against Avia by the same or coordinated counsel. As Plaintiffs argue, to avoid the bellwether provision, players would have to find different counsel, which affects the right to counsel of their choice or indeed, the ability to find any counsel at all: where the individual claims are small (as consumer claims often are), it may be difficult to find an attorney who represents only a single or small number of similarly situated clients.").

18.     Such a provision in the OSA is also unconscionable because it interferes with the client's relationship with their counsel of choice, the client's ability to retain their counsel of choice, and the client's ability to consider retaining experienced and/or qualified legal counsel over counsel with less experience or qualifications. The clause aims to direct persons with claims against Defendants (here Plaintiffs and members of the Classes) to counsel who are less qualified and less experienced in handling the type of claims presented, but who may not be burdened by the mandatory delays and staged processes because they do not represent other clients with similar claims and can proceed directly with filings and prosecution of the claims in the designated arbitration forum.

19.     The staged bellwether provision in the OSA is further unconscionable as it functions as a prospective waiver of users' rights to pursue statutory remedies—including remedies for privacy violations under federal and state law. *See American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 235 (2013) (explaining the "effective vindication" doctrine allows courts "to invalidate, on public policy grounds, arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies") (cleaned up). The OSA's staged bellwether provision prevents Plaintiffs

and the Classes from even filing their claims in arbitration for potentially many years—and realistically, indefinitely—based solely on the identity of their chosen legal counsel. Plaintiffs and the Classes are therefore unable to exercise their rights to pursue important statutory remedies available to them for the harm caused by Defendants.

20.     The OSA is procedurally unconscionable as it is an adhesion contract, between parties' of unequal relative bargaining positions (large corporation vs. individual taxpayers), and presented in a complex, 21-page single-spaced document, drafted in small font and dense legalese that is difficult for ordinary laypersons to understand. The actual terms are not seen by website users unless one clicks on hyperlink to access the OSA. Persons seeking to use Defendants' services generally do so when facing a pending time deadline to file their tax returns on risk of financial or criminal penalties if they are late. There is no notice to class members in the OSA that Defendants and third parties engage in the privacy practices challenged below so they would be aware of the need to review the OSA found behind the hyperlink. Defendants' failure to disclose this information was an omission of material fact to Plaintiffs and other reasonable consumers in the class. The arbitration clause in the OSA is designed to delay the initiation and adjudication of claims and to create a process aimed at discouraging consumers from vindicating their rights.

21.     The staged bellwether provision is further procedurally unconscionable because it constitutes procedural surprise. "Procedural surprise focuses on whether the challenged term is ... beyond the reasonable expectation of the weaker party." *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1321, 27 Cal. Rptr. 3d 797, 808 (2005). Even if Plaintiffs had the opportunity to read and understand the OSA, the fact that they must wait an indiscernible number of years to even file their claims in the arbitration forum is a procedural surprise. Plaintiffs and class members also lack the ability to know the identity of their counsel, their counsel's other clients and the nature of those other clients' claims so to be able to anticipate having their individual claims delayed or suspended indefinitely by having similar claims.

22.     Defendants' OSA is also procedurally unconscionable to the extent Defendants attempt to use its provisions to conduct prefiling discovery and interrogation of Plaintiffs. Through the prefiling conference clause in the OSA, Defendants seek to improperly interrogate represented claimants (without

the consent of claimants' counsel) before claimants may initiate their claims, contrary to Rule 4.2 of the California Rules of Professional Conduct. The prefiling provision of the OSA requiring claimants to appear personally and submit to Defendants' questioning against the advice and without the consent of claimants' counsel violates the UCL, CLRA, Cal. Civil Code §§ 1608, 1670.5 and/or other laws. Plaintiffs lack the reciprocal ability to interrogate or take prefiling discovery of Defendant regarding the challenged practices.

23.     Finally, prejudice results from the staged bellwether provision as consumers' claims are not tolled, and claimants are prevented from moving forward and filing their claims in court or the designated arbitration forum, based solely on Defendant's subjective determination regarding claimants' compliance with the prefiling procedures set forth in the OSA. Defendant can therefore attempt to use non-material factors to prevent or delay claim filings and otherwise prejudice Claimants seeking to timely present and preserve claims within applicable limitations periods. This adds to the unconscionability of the OSA.

24.     For these and other reasons, Defendants' arbitration provision is unenforceable, and Plaintiffs' claims are properly brought in this Court.[4]

25.     Plaintiffs provided their initial notice of the violations to Defendants by letter dated September 20, 2024, which Defendants received on September 27, 2024.

26.     Plaintiffs have materially complied with any conditions precedent for filing their claims. Plaintiffs provided signed Notices of Dispute to Defendants through the September 20, 2024, letter that Defendants received on September 27, 2024. Defendants did not timely request any pre-filing conference with Plaintiffs within 60 days of their receipt of Plaintiffs' pre-filing Notices of Dispute. After Plaintiffs presented their claims for arbitration, Defendants attempted to postpone and frustrate the claims resolution process in a manner contrary to *Heckman*, making the filing of this case in this forum appropriate.

---

[4] While a prior case involving Defendants was compelled to arbitration, that decision is distinguishable as it was decided prior to the Ninth Circuit's decision in *Heckman*, and the plaintiff there presented limited arguments establishing some level of procedural unconscionability. *Hunt v. Meta Platforms, Inc.*, 729 F.Supp.3d 964 (N.D. Cal., 2024). Substantive unconscionability was not addressed by the court.

27.    According to Defendants, pursuant to the OSA, Plaintiffs and other members of the Classes are unable to file their claims in AAA at this time due to the existence of 25 other customers' cases being currently on file in AAA represented by the same legal counsel. OSA § 11.6. Any tolling of the limitations period for Plaintiffs' claims during this period is uncertain as Defendants have not unconditionally agreed to tolling but instead have reserved all rights including the ability to argue the lack of tolling. This prejudices Plaintiffs and the Classes, renders the arbitration provision in the OSA unconscionable, and makes this class action appropriate and necessary to file in this Court at this time.

## **PARTIES**

28.    Plaintiff Pedro Rios Jr. is a natural person domiciled in the State of California.  At all relevant times, he resided in Bay Point, California. Plaintiff Rios used H&R Block's online tax preparation and filing services to file his taxes from 2020 to 2023. Plaintiff Rios also maintained accounts with Facebook and Instagram during that time period. Plaintiff Rios paid money to use H&R Block's online tax preparation and filing services. Plaintiff Rios did not knowingly and voluntarily consent to H&R Block's interception and disclosure of his confidential tax return information. Nor did Plaintiff Rios knowingly and voluntarily consent to the disclosure, dissemination, and sharing of his confidential tax return information with third parties Meta and Google and their resulting use of his confidential tax return information.

29.    Plaintiff Christian Marquez is a natural person domiciled in the State of California.  At all relevant times, he resided in Riverside, California. Plaintiff Marquez used H&R Block's online tax preparation and filing services to file his taxes in 2022. Plaintiff Marquez also maintained accounts with Facebook and Instagram during that time period. Plaintiff Marquez paid money to use H&R Block's online tax preparation and filing services. Plaintiff Marquez did not knowingly and voluntarily consent to H&R Block's interception and disclosure of his confidential tax return information. Nor did Plaintiff Marquez knowingly and voluntarily consent to the disclosure, dissemination, and sharing of his confidential tax return information with third parties Meta and Google and their resulting use of his confidential tax return information.

30.    Plaintiffs reasonably expected that their online communications—including communications related to their protected tax return information—with H&R Block would remain

private, and would not be shared with third parties without their consent.  Plaintiffs never consented to H&R Block disclosing their private tax return information to Meta and Google.

31.    Defendant HRB Digital LLC is a Delaware limited liability company with its principal place of business located at One H&R Block Way, Kansas City, Missouri 64105.  HRB Digital LLC has control over, is responsible for, and owns content provided to consumers through the www.hrblock.com website.

32.    Defendant HRB Tax Group, Inc. is a Missouri corporation with its principal place of business located at One H&R Block Way, Kansas City, Missouri 64105.  HRB Tax Group, Inc. oversees and implements H&R Block's online tax filing products and is responsible for services provided to consumers via the www.hrblock.com website.

## FACTUAL BACKGROUND

**A.    H&R Block provides federal and state tax preparation services to taxpayers.**

33.    H&R Block provides taxpayers, including Plaintiffs and the Classes, with "assisted and do-it-yourself (DIY) tax preparation solutions through multiple channels (including in-person, online and mobile applications, virtual, and desktop software)."[5]

34.    H&R Block develops, maintains, offers, and operates online tax preparation software on the internet at http://www.hrblock.com as well as other mobile and computer platforms for the purpose of assisting taxpayers in preparing and filing federal and state tax returns.

35.    H&R Block also offers a variety of other financial services, including small business management, loan issuance, and a "Tax Identity Shield" program to assist users in protecting and restoring their tax identity information—for an additional fee.[6]

36.    For fiscal year 2024, H&R Block prepared "11.4 million U.S. assisted tax returns," and processed another "3.8 million DIY online paid tax returns" which generated $3.6 billion in consolidated revenues and $598 million in net income.[7]

---

[5] H&R Block Form 10-K at 3, filed Aug. 15, 2024, https://investors.hrblock.com/node/32116/html (last accessed April 14, 2025).
[6] *Id*. at 4; *see also* H&R Block, "Protect your refund with Tax Identity Shield®", https://www.hrblock.com/tax-offices/product-services/tax-identity-shield/?srsltid=AfmBOoqfR9Xu6rXNycJYJH6CY9wxAHf7PHm8VUNw83oNYcBkiDW9nD9Y
[7] H&R Block Form 10-K at 2.

37.    In its 2024 10-K, H&R Block acknowledged that "[d]ue to the nature of [its] business," it "collect[s], use[s], and retain[s] large amounts of personal information and data pertaining to clients, including tax return information, financial product and service information, and social security numbers."[8]

38.    H&R Block also acknowledged that it is "subject to laws, rules, and regulations relating to the collection, use, disclosure, and security of such consumer and employee personal information, which have drawn increased attention from U.S. federal, state, and foreign governmental authorities in jurisdictions in which [it] operate[s]."[9]

39.    As stated in its 2024 10-K, H&R Block is aware that "the IRS generally requires a tax return preparer to obtain the written consent of the taxpayer prior to using or disclosing the taxpayer's tax return information for certain purposes other than tax preparation, which may limit our ability to market revenue-generating products to our clients."[10]

40.    In the 2024 10-K, H&R Block further acknowledged that its "current privacy and data protection policies and practices may not be consistent with all of those requirements, interpretations, or applications."[11]

**B.    H&R Block, as a tax return preparer, is subject to strict federal regulations.**

41.    Federal law mandates that tax "returns and return information shall be confidential."  26 U.S.C. § 6103(a).  As explained herein, H&R Block's deployment of the tracking tools on its Website violates this mandate.

42.    The Internal Revenue Code prohibits tax return preparers from disclosing "any information furnished to him for, or in connection with, the preparation of any such return" or use "any such information for any purpose other than to prepare, or assist in preparing, any such return." 26 U.S.C. § 7216(a).

43.    A "tax return preparer" is "[a]ny person who is engaged in the business of preparing or assisting in preparing tax returns," including "[a]ny person who is engaged in the business of providing

---

[8] *Id.* at 14-15.
[9] *Id.* at 15.
[10] *Id.* at 15.
[11] *Id.*

auxiliary services in connection with the preparation of tax returns, including a person who develops software that is used to prepare or file a tax return and any Authorized IRS e-file Provider[.]" 26 C.F.R. § 301.7216-1(b)(2)(i).

44.    At all relevant times, H&R Block was a "tax return preparer" under 26 C.F.R. § 301.7216-1(b)(2)(i) as it is engaged in the business of providing auxiliary services in connection with the preparation of tax returns as a developer, owner, and operator of software used to prepare and file tax returns.  As a "tax return preparer," H&R Block is subject to federal laws governing the use of confidential tax return information.

45.    Federal law provides criminal penalties for tax return preparers that "knowingly and recklessly . . . disclose[] any information furnished to [them] for, or in connection with, the preparation of any such return, or use[] any such information for any purpose other than to prepare, or assist in preparing, any such return." 26 U.S.C. § 7216(a).

46.    Indeed, following the congressional inquiry into H&R Block's deployment of the tracking tools and disclosure of taxpayer information to Meta and Google, the Senate Report concluded, "This potentially illegal misuse of taxpayer data should be immediately investigated by the DOJ, IRS, TIGTA, and FTC, and liable actors should be duly prosecuted."[12]

**C.    H&R Block intercepted and disclosed confidential tax return information to Meta and Google.**

47.    Through the tracking tools deployed on its Website, H&R Block systematically intercepted and disclosed the confidential tax return information of Plaintiffs and the Classes to Meta, Google, and other potential third parties.

48.    Tracking pixels are snippets of code that, once inserted into a website's source code, trigger the real-time interception of user activities on the website, revealing the substance of a user's website communications to unauthorized third parties like Meta and Google.

49.    When a user accesses a website containing a tracking pixel from Meta or Google, the embedded code directs the user's browser to contemporaneously send a separate message to Meta or

---

[12] Senate Report at 39.

Google that duplicates in real-time the user's activities on the website. The tracking tools also transmit a user's unique identifiers to Meta and Google, which the tech companies can use to link a user's online communications with their accounts at Meta and Google for purposes of ad retargeting. *See* Senate Report at 6-7 ("Once placed on the website, the pixel downloads more code from Meta and Google, which then gathers valuable information about website visitors and their activity. This information allows advertisers to understand their users' behaviors and shopping patterns, measure the performance of ad campaigns, and build an audience-base for future ad targeting. But 'Facebook' [Meta] also retains that data and can use it for its own advertising purposes . . . . Through this data collection process, Meta is able to provide its marketing partners with deep insights into their user's activities, allowing them the ability to track visitors' actions define custom audiences to better target ads to potential customers, and create lookalike audiences to 'reach new people who are likely to be interested in [their] business because they share similar characteristics to [the businesses'] existing customers.'").

50.    In this way, the information collected through tracking pixels allows advertisers to understand consumers' behaviors and online patterns. It also allows advertisers to measure the performance of their websites and advertising campaigns and build an audience base for future targeted advertising.

51.    The only way to install the Meta Pixel on a website is through deliberate action by the website developer, in this case H&R Block. Meta offers its pixel to companies, including H&R Block, "to make sure [their] ads are shown to the right people" and "drive more sales."[13] Meta's pixel is made available to third parties, like H&R Block, for free with the recommendation that the developer add the pixel "between the opening and closing <head> tags on every page where [they] will be tracking website visitor actions."[14] Meta recommends that its pixel be inserted in this way to "reduce[] the chance" that consumers can protect themselves through the use of ad-blocking technologies and to execute the code sooner, thereby increasing the chance that visitor information is tracked and collected.[15]

---

[13] The Markup, Applied for Student Aid Online? Facebook Saw You (Apr. 28, 2022), https://themarkup.org/pixel-hunt/2022/04/28/applied-for-student-aid-online-facebook-saw-you (last accessed Dec. 30, 2024).
[14] Meta, Meta Pixel – Get Started, https://developers.facebook.com/docs/meta-pixel/get-started/ (last accessed Jan. 14, 2025).
[15] *Id.*

52.    According to the third-party tech companies, the express purpose for deploying the tracking tools is to intercept and disclose a user's activities on a website, identify that individual user, and retarget that individual with advertising. For example, Meta tells web developers to "[i]nstall the Facebook pixel if you want to retarget your website visitors."[16]  Meta explains that "[t]he Facebook pixel is a small snippet of code that you, your website engineer or a Facebook Business Partner can paste in your code. It tracks the people and the types of actions they take when they engage with your brand, including any of your Facebook ads they saw before going to your website, the pages of your site they visit and the items they add to their carts."[17]

53.    Once Meta's pixel is enabled on a website, the pixel collects information about the user's activity and matches it with the user's unique "c_user cookie."[18]  The "c_user cookie" enables Meta to record and organize a user's activities and communications, which it can attribute to the individual user's account with Meta.  The "c_user cookie" thus allows Meta to effectively create a "dossier" for each individual.[19]

54.    Even if a user does not have a Facebook or Instagram account or is not logged in to Facebook or Instagram when browsing the H&R Block website, the Meta Pixel transmits the user's web communications with the Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie. Meta can then use that unique identifier to link the user's web communications with the user's Facebook ID.

55.    Meta's Business Tools Terms make clear that the pixel is meant to "match the Contact Information" of users "against user IDs . . . as well as to combine those user IDs with corresponding Event Data."[20]

---

[16] https://www.facebook.com/business/goals/retargeting

[17] *Id.*

[18] Senate Report at 7; *see also*, Meta Privacy Center, Cookies Policy, https://www.facebook.com/privacy/policies/cookies/?entry_point=cookie_policy_redirect&entry=0 (last accessed Jan 14, 2025); Meta, Meta Pixel – Conversion Tracking, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last accessed Jan 14, 2025).

[19] Senate Report at 7.

[20] Meta Business Tool Terms, Section 2(a)(i)(1), https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr (last visited April 14, 2025).

56.     After Meta is finished processing users' intercepted information, it makes the relevant analytics available to H&R Block through Meta's Events Manager tool. Using the Events Manager, H&R Block can and is intended to review a summary of users' activity, including the pages, parameters and URLs sent through the pixel,[21] as well as any included metadata.[22]

57.     The default settings for the Meta Pixel trigger the interception of URLs visited, domains visited, and the devices used by visitors. "The URLs, by virtue of including the particular document within a website that a person views, . . . divulg[e] a user's personal interests, queries, and habits." *Brown v. Google LLC*, 685 F. Supp. 3d 909, 936 (N.D. Cal. 2023). Here, H&R Block admitted to Senate investigators that the Meta Pixel triggered the disclosure of "page title information from [its] online tax filing service," which revealed the substance of a taxpayer's return information.

58.     Because the Meta Pixel can only be installed on a website through deliberate action of adding the pixel code to the website, and because the default settings for the Meta Pixel trigger the disclosure of URL and pageview information revealing the substance of user activities on a website, H&R Block did not act by mistake or accident in intercepting and disclosing protected tax return information via the Meta Pixel. Indeed, H&R Block intentionally deployed the Meta Pixel for its intended purpose: to intercept its customers' activities on the Website—including communications regarding the substance of protected tax return information—and disclose those communications to Meta for purposes of ad retargeting.

59.     Like the Meta Pixel, Google's tracking code intercepts a user's activities on a website in real-time, revealing the substance of the user's online communications, and discloses that information to Google along with the user's unique identifiers for purposes of ad retargeting. Further, like the Meta Pixel, the Google tracking code can be installed on a website only through deliberate actions by the

---

[21] *How to view pages, parameters and URLs in Meta Events Manager*, https://www.facebook.com/business/help/815029860145251 ("In Meta Events Manager, you can see a summary of pages, parameters and URLs recently sent through the Meta Pixel . . . .") (last visited April 14, 2025).

[22] A web developer using the Events Manager can "[c]lick on the filter icon to select what activity types and details are display." Developers can sort by activity types, including "automatically logged pixel events," which may contain metadata. *Test your app or web browser events using the test events tool*, https://www.facebook.com/business/help/2040882565969969?id=1205376682832142 (last visited April 14, 2025).

website developer—in this case, H&R Block.

60.    According to the Senate Report, H&R Block confirmed that it had used the Meta Pixel for "at least a couple of years."[23] Congressional investigators also found that H&R Block had deployed Google Analytics on the Website.[24]

61.    By deploying the tracking tools with default settings designed to intercept substantive content like "page views," H&R Block acted intentionally in intercepting and disclosing its users' protected tax return information to Meta and Google. Because the express purpose of the tracking tools is to disclose a user's website activities to third parties, and the default settings triggered the disclosure of substantive content like "page views," H&R Block did not act out of mistake or accident when disclosing its users' protected tax return information, including pages visited on the Website that revealed details about users' taxes.

62.    H&R Block admitted to Congressional investigators that "Meta's default settings of their pixel allowed them to collect additional information, including page title information from our online tax filing service…[S]ome of those pages titles included a subset of information related to the customer and his or her tax situation, including the first name of the taxpayer and the aggregate amounts relating to HSA contributions, scholarships, and education expenses."[25] H&R Block also admitted that the Pixel transmitted information on its "page headers," which included information on whether taxpayers had visited certain pages for many broad categories of tax information, including dependents, certain types of income, and certain tax credits and deductions.[26]

63.    All of this information constituted protected tax return information, which H&R Block knew it was prohibited from disclosing to third parties without consent. Yet H&R Block took the deliberate step to deploy the tracking tools anyway.

64.    By intentionally deploying the tracking tools on its Website, H&R Block was able to monetize its users' protected tax return information through targeted advertising. For example, H&R Block has recently run the following ads on Facebook:

---

[23] Senate Report at 11.
[24] *Id.*
[25] *Id.* at 12.
[26] *Id.*

65.     Meta and Google were also able to monetize the data harvested from Plaintiffs and the Classes by incorporating the data into their algorithms, building custom audiences, and selling advertising to other companies that want to target individuals like Plaintiffs and the Class Members with advertising based on individual interests, hobbies, and demographics.[27]

**D.     H&R Block violated federal law by sharing tax return information with Meta and Google without valid taxpayer consent.**

66.     H&R Block is a tax return preparer subject to strict regulations regarding its use and disclosure of tax return information.

67.     "Tax return information" is "any information, including, but not limited to, a taxpayer's name, address, or identifying number, which is furnished in any form or manner for, or in connection with, the preparation of a tax return of the taxpayer[,]" including information that "the taxpayer would not have furnished…to the tax return preparer but for the intention to engage…the tax return preparer to prepare the tax return." 26 C.F.R. § 301.7216-1(b)(3)(i).

---

[27] *See* Senate Report at 7.

68.    The definition of "tax return information" is intentionally broad to "provide taxpayers with the most protection."[28] All information provided by Plaintiffs and other taxpayers to H&R Block in connection with preparing and filing their taxes qualifies as "tax return information."

69.    Any information that Plaintiffs provided to H&R Block was solely for the purpose of preparing or assisting in preparing their tax returns, and was intended to be private and confidential and not disclosed to third-parties such as Meta and Google. H&R Block's disclosure of private tax information to third parties through the tracking tools was not for purposes of helping or assisting with the preparation of its customers' tax returns. Rather, the purpose was to enhance H&R Block's advertising and marketing efforts and ultimately increase H&R's profits. Plaintiffs would not have provided their tax return information to H&R Block if they were not using H&R Block for tax return preparation services.

70.    The "use" of taxpayer return information includes "any circumstance in which a tax return preparer refers to, or relies upon, [tax return information] as a basis to take or permit an action." 26 C.F.R. § 301.7216-1(b)(4).

71.    "Disclosure" of tax return information is "the act of making [tax return information] known to any person in any manner whatsoever." 26 C.F.R. § 301.7216-1(b)(5).

72.    H&R Block's disclosure of tax return information to Meta and Google constituted both a "use" and "disclosure" of the information under the above-described federal regulations.

73.    The Internal Revenue Code authorizes tax return preparers to disclose or use taxpayer return information only with the written consent of the taxpayer and only under certain narrowly prescribed circumstances. 26 C.F.R. § 301.7216-3(a)(1). Specifically, "a tax return preparer may not disclose or use a taxpayer's tax return information prior to obtaining a written consent from the taxpayer," which must be "knowing and voluntary." *Id*. Additionally, if a tax return preparer conditions its services on the taxpayer giving consent, the consent is considered involuntary.

---

[28] TaxNotes, The Facebook Pixel and Unauthorized Use and Disclosure of Tax Return and Tax Return Information (Nov. 29, 2022) https://www.taxnotes.com/procedurally-taxing/facebook-pixel-and-unauthorized-use-and-disclosure-tax-return-and-tax-return-information/2022/11/29/7h6v7 (last accessed Dec. 30, 2024).

74. For consent to be valid, at least six conditions must be met, including: (1) the consent must include the name of the tax return preparer and the name of the taxpayer; (2) the consent must identify the purpose of the disclosure and the intended recipients; (3) the consent must describe the particular use authorized; (4) the consent must specify the tax return information to be disclosed; (5) the consent must be signed and dated by the taxpayer; and, (6) the consent must specify a duration of time where it is valid; if no time is specified, then the consent is limited to one year. 26 C.F.R. § 301.7216-3(a), (b).

75. H&R Block did not satisfy these conditions when it used and disclosed Plaintiffs' and Class Members' tax return information to Meta and Google.

76. H&R Block thus failed to obtain valid consent from Plaintiffs and other taxpayers in the Classes before using and disclosing their tax return information to Meta and Google and/or before using the tax return information for non-preparation purposes, such as ad retargeting and profiting off private tax return information.

**E.      Plaintiffs' and the Classes' tax return information is valuable.**

77. The tax return information of Plaintiffs and the Classes is valuable. Indeed, one of the world's most valuable resources is the exchange of personal data.[29]

78. Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[30] Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[31]

---

[29] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[30] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 5, 2022; updated Aug. 25, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html

[31] *Id.*

79.    The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success.  Research shows that organizations that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[32]

80.    In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[33]  In this paper, the OECD measured prices demanded by companies for user data derived from "various online data warehouses."[34]

81.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record.  A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[35]

82.    A robust marketplace exists for users' online data, and multiple companies pay users for the privilege to collect device usage data, browsing histories, and more.[36]

83.    Third-party technology companies, like Meta and Google, generate a substantial portion of their revenue through highly targeted advertising—a valuable service that is enabled by entities like H&R Block sharing information about their users.  Entities like H&R Block likewise benefit financially from the collection and sharing of user data by increasing sales or customer acquisitions while also reducing advertising costs.[37]

---

[32] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[33] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220, OECD PUBLISHING PARIS, (Apr. 2, 2013), https://www.oecd.org/en/publications/exploring-the-economics-of-personal-data_5k486qtxldmq-en.html

[34] *Id.* at 25.

[35] *Id.*

[36] https://millennialmoneyman.com/get-paid-for-your-data/

[37] *See* Meta Pixel Case Studies, https://www.facebook.com/business/tools/meta-pixel/case-studies (last visited Oct. 29, 2024)

84.    Through H&R Block's conduct described herein, Plaintiffs and the Classes were injured and lost the benefit and financial value of their private data, while H&R Block unjustly benefitted.

**F.    Plaintiffs and the Classes had a reasonable expectation of privacy in their interaction with Defendants' website.**

85.    Consumers are concerned about entities like H&R Block collecting their data, and they assume the data they provide, particularly highly sensitive tax return information, will be kept secure and private, as required by law.

86.    The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.[38] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.

87.    Taxpayers and website users act consistently with their expectation of privacy.  For example, following a new rollout of iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[39]

88.    Like the greater population, H&R Block's users, including Plaintiffs, would expect the highly sensitive tax return information they provided to Defendants to be kept secure and private.

89.    Plaintiffs paid H&R Block to prepare and file their tax returns with the reasonable expectation that H&R Block would not disclose their tax return information to third parties without consent. At the time they used H&R Block's services, Plaintiffs were unaware of H&R Block's unlawful interception and disclosure of their protected tax return information.

90.    Had Plaintiffs known that H&R Block had tracking tools embedded in its Website or that H&R Block would be disclosing their personal tax return information to third parties such as Meta and Google, Plaintiffs would not have paid or used H&R Block for its tax preparation services.

---

[38] *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/.
[39] Margaret Taylor, *How Apple screwed Facebook*, WIRED, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

1

## CLASS ALLEGATIONS

2      91.    Plaintiffs brings this class action pursuant to Rule 23 of the Federal Rules of Civil

3  Procedure and any other applicable rules on behalf of themselves and all others similarly situated, as

4  representatives of the following Classes:

5      Nationwide Class
       All persons who, during the Relevant Time Period, used H&R Block's online tax preparation
6      services and had their tax return information disclosed to third-parties, including Meta and/or
       Google. (the "Class")
7
       California Subclass
8      All persons residing in California who, during the Relevant Time Period, used H&R Block's
       online tax preparation services and had their tax return information disclosed to third-parties,
9      including Meta and/or Google. (the "Subclass")

10      92.    Excluded from the Classes are Defendants; officers, directors, and employees of

11  Defendants; any entity in which Defendants have a controlling interest in, is a parent or subsidiary of,

12  or which is otherwise controlled by Defendants; Defendants' affiliates, legal representatives, attorneys,

13  heirs, predecessors, successors, and assignees; and counsel for any party.  Also excluded are the Judges

14  and Court personnel in this case and any members of their immediate families.

15      93.    The Relevant Time Period dates back to the length of any statute of limitations on the

16  claims presented from the date of filing, plus any period when the claims were subject to tolling.

17  Plaintiffs reserve the right to modify and/or amend the Class definitions as necessary.

18      94.    All members of the proposed Class and Subclass are readily identifiable through

19  Defendants' records.

20      95.    All requirements of Fed.R.Civ.P. 23(a) and 23(b)(2) and (3) are satisfied, making class

21  certification appropriate.

22      96.    **Numerosity.**  The members of the Class and Subclass are so numerous that joinder of all

23  members of the Classes is impracticable.  H&R Block prepares taxes for millions of people per year.

24  According to the Senate Report, H&R Block acknowledged that, "every single taxpayer who used their

25  website[] to file their taxes could have had at least some of their data shared." The proposed Class and

26  Subclass therefore likely include at least tens of thousands and potentially millions of taxpayers. The

27

28

precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendants' records.

97. **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiffs and Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

   a.   Whether Plaintiffs' and Class Members' communications with Defendants' Website were unlawfully intercepted and disclosed to third parties;

   b.   Whether Defendants acted with a criminal or tortious purpose in intercepting Plaintiffs' and Class Members' communications;

   c.   Whether Plaintiffs and Class Members consented to the disclosure;

   d.   Whether Defendants' acts and omissions harmed Plaintiffs and Class Members;

   e.   Whether Plaintiffs and the Classes are entitled to recover damages; and

   f.   Whether Plaintiffs and the Classes are entitled to other appropriate remedies including injunctive relief.

98. Defendants engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Classes. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

99. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' tax return information, like that of every other Class member, was improperly disclosed by Defendants. Defendants' misconduct impacted all Class Members in a similar manner. Plaintiffs' claims are typical of those of the Class Members having used H&R Block's online tax preparation services to prepare and file tax returns during the relevant period, resulting in the unauthorized disclosure of their tax return information.

100. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interest of the members of the Classes and have retained counsel experienced in complex class action litigation and intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class or Subclass.

101.    **Superiority.**    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual taxpayers like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

102.    Additionally, Defendants have acted or refused to act on grounds that apply generally to the Classes, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. Because the sensitive tax return information of Plaintiffs and the Classes remains exposed to third-party technology companies, including Meta and Google, the risk of future harm to Plaintiffs, the Class and Subclass (as well to future customers of Defendants within the general public) remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with dealings and contracts similar to Plaintiffs', even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual taxpayers, which would establish potentially incompatible standards of conduct for Defendants, and/or (b) adjudications with respect to individual taxpayers which would, as a practical matter, be dispositive of the interests of the other taxpayers not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Classes. Further, the claims of individual taxpayers in the defined Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

103.    Based on the foregoing, all requirements of Fed.R.Civ.P. 23(a) and 23(b)(2) and (3) are satisfied, making class certification appropriate.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS, CONCEALMENT, AND ESTOPPEL

104.    Each unauthorized transmission of Plaintiffs' and the Class Members' confidential tax return information constitutes a separate act, which triggers anew any statute of limitations.

105.    Any applicable statutes of limitations have been tolled by (l) the discovery doctrine, as Plaintiffs and the Class Members could not reasonably have discovered H&R Block's conduct, including the use of unseen tracking code to intercept and disclose their tax return information; and (2) the fraudulent concealment doctrine, due to H&R Block's knowing, purposeful, and active concealment of all facts alleged herein, including the surreptitious deployment of tracking pixels to impermissibly intercept and disclose tax return information of its users.

106.    With respect to its taxpayer clients, H&R Block had exclusive knowledge that its Website incorporated pixels and other tracking tools, which information it failed to disclose to Plaintiffs and the Class Members.

107.    H&R Block had a duty to disclose to its tax clients the nature, significance, and consequences of its interception and disclosure of tax return information, including that pixels were present on the Website and being used to share protected tax return information with Meta and Google. *See* 26 C.F.R. § 301.7216-3(a), (b). As H&R Block has not conceded, acknowledged, or otherwise indicated to its customers and other website visitors that it has disclosed confidential tax return information without valid consent, it is estopped from relying on any statute of limitations.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT

### ("ECPA") 18 U.S.C. § 2511(1), *et seq.*

### (*On Behalf of Plaintiffs and the Nationwide Class*)

108.    Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

109.    The primary purpose of ECPA is to protect the privacy of communications.

110.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of ECPA.

111.     <u>Electronic Communications.</u> The transmission of tax return information between Plaintiffs and Class Members and Defendant's Website are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

112.     <u>Content.</u> ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

113.     <u>Interception.</u> ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

114.     <u>Electronical, Mechanical, or Other Device.</u> ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

115.     The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   Plaintiffs' and Class Members' browsers;

b.   Plaintiffs' and Class Members' computing devices;

c.   Defendants' web-servers; and,

d.   The tracking technology code deployed by Defendants to effectuate acquiring and disclosing taxpayer communications.

116.     By deploying the tracking tools on its Website, Defendants intentionally intercepted the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a). The intercepted communications included the content of substantive communications from Plaintiffs and Class Members to Defendants regarding tax return information.

117.     <u>Crime/Tort Exception.</u> Defendants intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing tortious or criminal acts in violation

of the Constitution or laws of the United States or of any State. Specifically, H&R Block intercepted or acquired the contents of its users' communications for the purpose of disclosing those communications to third parties for ad retargeting in violation of the Internal Revenue Code.

118.     The Internal Revenue Code prohibits tax return preparers from disclosing "any information furnished to him for, or in connection with, the preparation of any such return" or use "any such information for any purpose other than to prepare, or assist in preparing, any such return." 26 U.S.C. § 7216(a).

119.     26 U.S.C. §§ 6713 and 7216 of the Internal Revenue Code provide criminal penalties against a tax return preparer that discloses or uses tax return information "for any purpose other than to prepare, or assist in preparing" tax returns.

120.     The express purpose of the tracking tools is to disclose a website visitor's activities on a website, identify that individual, and retarget that individual with advertising based on the user's website activities. By secretly deploying the tracking tools on its Website, H&R Block acted with the purpose of knowingly disclosing tax return information without users' consent in violation of the Internal Revenue Code and related laws and regulations. Disclosure of tax return information to Meta and Google was not necessary to prepare or assist in preparing Plaintiffs' and the Classes' tax returns. Rather, H&R Block deployed the tracking tools for their intended purpose—to disclose taxpayer information to the third-party tech companies for ad retargeting, and, ultimately, to increase H&R Block's profits.

121.     The communications intercepted by the tracking technologies constituted tax return information under 26 C.F.R. § 301.7216-1(b)(3)(i).

122.     Because the purpose of H&R Block's interception of Plaintiffs' communications was to engage in conduct that violated criminal provisions of the Internal Revenue Code, and also constituted tortious conduct (including invasion of privacy and intrusion upon seclusion), H&R Block cannot claim immunity under ECPA's party exception.

123.     Defendants were not acting under color of law to intercept Plaintiffs' and the Class Members' electronic communications.

124.     A person who violates § 2511(1)(a) is liable for $10,000 in statutory damages to any person whose wire, oral, or electronic communications are unlawfully intercepted. Because H&R Block

intercepted Plaintiffs' and Class Members' communications for a purpose that was criminal and/or tortious, the interceptions were unlawful, and Plaintiffs and the Classes are entitled to all available statutory damages under ECPA.

125.     Based on the foregoing, Plaintiffs and Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**

**("CIPA") Cal. Penal Code § 630, *et seq.***

**(*On Behalf of Plaintiffs and the California Subclass*)**

126.     Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

127.     The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

128.     CIPA begins with its statement of purpose:
The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Pen. Code § 630.

129.     California Penal Code § 631(a) imposes liability on:
Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . .

130.     At all relevant times, H&R Block was a "person" within the scope of CIPA. Cal. Penal Code § 631(a).

131.     H&R Block aided, employed, agreed with, and conspired with third-parties, including Meta and Google, to track and intercept Plaintiffs' and the Class Members' internet communications in transit while using Defendants' Website. Defendants' conduct allowed unauthorized third parties to read and learn about the contents or meaning of any message, report, or communication from Plaintiffs and the California Subclass while the same was in transit or passing over any wire, line, or cable, or was being sent from, or received at any place within California.

132.     Defendants intentionally inserted an electronic device on their Website (the tracking pixel code) that, without the knowledge and consent of Plaintiffs and the California Subclass, recorded and transmitted their confidential communications with Defendants to third parties.

133.     Defendants willfully facilitated and aided the interception and collection of Plaintiffs and the California Subclass's tax return information by embedding the tracking code on the Website.

134.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the tracking code falls under the broad catch-all category of "any other manner":

a.     The computer codes and programs Meta and Google used to track Plaintiffs' and the Class's communications while they were navigating the Website;

b.     Plaintiffs' and the Class's browsers;

c.     Defendants' Website and webserver;

d.     Plaintiffs' and the Class's computing and mobile devices;

e.     The web and ad servers from which Meta, Google, and other third parties tracked and intercepted Plaintiffs' and the Class's communications while they were using a web browser to access or navigate the Website;

f.     The computer codes and programs used by Meta, Google, and other third parties to effectuate its tracking and interception of Plaintiffs' and the Class's communications while they were using a browser to visit the Website; and

g.     The plan Defendants, Meta, Google, and/or other third parties carried out to effectuate their tracking and interception of Plaintiffs' and the Class's communications while they were using a web browser to visit the Website.

28

135.    As a result of the above violations and pursuant to CIPA Section 637.2, Defendants are liable to Plaintiffs and the California Subclass for the greater of: a) treble actual damages related to their loss of privacy in an amount to be determined at trial; or b) for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

136.    Under the statute, Defendants are also liable for reasonable attorneys' fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendants in the future.

137.    Based on the foregoing, Plaintiffs and the California Subclass seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

<div align="center">

**THIRD CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**Cal. Bus. & Prof. Code § 17200, *et seq.* – Unlawful Business Practices**

(***On Behalf of Plaintiffs and the California Subclass***)

</div>

138.    Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

139.    The California Unfair Competition Law ("UCL") prohibits, inter alia, "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code §§ 17200, 17203-04, 17206.

140.    Plaintiffs, Class Members, and Defendants are each a "person" under Cal. Bus. & Prof. Code § 17201.

141.    The acts, omissions, and conduct of Defendants as alleged herein constitute "business practices" within the meaning of the UCL.

142.    Defendants' conduct described herein violates the UCL's unlawful and unfair prongs.

143.    Plaintiffs and Class Members bring their claims for injunctive relief as they have no confidence that Defendants have altered their privacy practices, and their personal tax return information continues to be in the hands of third parties.

144.    Plaintiffs and Class Members bring their claims for restitution and injunctive relief in the alternative to their claims for damages in the event they have an inadequate remedy at law.

145.    Plaintiffs and Class members paid fees to Defendants for services performed on the understanding that private information would not be intercepted by or disclosed to third-parties.  Such fees should be returned to Plaintiffs and the members of the Class as restitution or disgorgement.

146.    Defendants engaged in unlawful business practices by disclosing Plaintiffs' and Class Members' private tax return information to unauthorized third parties, including Meta and Google, without prior consent in violation of the ECPA, the Internal Revenue Code, and privacy laws alleged herein.

147.    Defendant's unlawful and unfair acts and practices include violations of Plaintiffs' and Class Members' rights to privacy, the EPCA, CLRA, Cal. Penal Code § 630, *et seq*., and other violations of law alleged herein.

148.    In addition to violation of Plaintiffs' and Class Members' privacy rights, as described herein, Defendants' procedural practices H&R Block seeks to enforce through the OSA violate the UCL's unlawful and unfair prongs. As described above, Defendants seek to unfairly delay and hinder the filing and presentation of claims through the batched filing and bellwether provisions in the OSA's arbitration clause.  Further, through the prefiling conference clause in the OSA, Defendants seek to improperly interrogate represented claimants (without the consent of claimants' counsel) before they file claims, contrary to Rule 4.2 of the California Rules of Professional Conduct. The foregoing provisions of the OSA therefore violate the UCL, CLRA, as well as Cal. Civil Code §§ 1608, 1670.5.

149.    Plaintiffs' request appropriate injunctive and declaratory relief against the continuation of the practices described and complained herein. Such relief will create a public benefit. Plaintiffs separately seek public injunctive relief on behalf of the general public of California who have yet to deal with Defendants in the manner described herein, but are likely to in the future, and therefore, are in need of protection provided by the public injunctive relief sought. Such public injunctive relief will create additional public benefits.

150.    As a direct result of Defendants' violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property including, but not limited to, loss of the benefit

of the bargain in using Defendants' services. Specifically, Plaintiffs and Class Members paid money to Defendants in exchange for tax preparation services with the expectation that their personal tax return information would remain confidential. Had Plaintiffs known the truth that Defendants secretly disclosed their private information to third parties, they would have used the services of a different tax return preparer.

151.    The unauthorized access to Plaintiffs' and Class Members' private and personal data also diminished the value of that information by making it available for free to Meta, Google, and other third parties for their use in marketing and advertising and generating profits.

152.    To the extent Defendants received any benefits or things of value from Meta, Google, and other third parties for helping to provide Plaintiffs' and Class Members' private data, Defendants have been unjustly enriched as have those third parties, at Plaintiffs' and the Class Members' expense. Any benefits or things of value received should have been provided to Plaintiffs and the Class, not retained by Defendants or third parties and any such amounts should be disgorged.

153.    As a direct result of its unlawful practices, Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, disgorgement of all profits accruing to Defendants because of the unlawful business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5) and injunctive or other equitable relief.

<div align="center">

**FOURTH CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**

**Cal. Civil Code § 1750, *et seq.***

**(*On Behalf of Plaintiff and the California Subclass*)**

</div>

154.    Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

155.    The California Consumer Legal Remedies Act ("CLRA") prohibits deceptive business practices.

156.    Section 1770 provides, in part: "The unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful":

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have.

(14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law.

(19) Inserting an unconscionable provision in the contract.

157.    Through its conduct, acts, and material omissions described above, Defendants violated the foregoing provisions of the CLRA. Defendants deceptively disclosed private tax information to third parties in violation of subsections (5), (14), and/or (19).

158.    Under federal law, H&R Block was required to disclose to its customers whether it shared tax return information with third parties and obtain its customers' knowing and voluntary consent before sharing such information. In violation of its duty to disclose, H&R Block secretly deployed the tracking tools, which triggered the interception and disclosure of protected tax return information to Meta and Google for purposes of ad retargeting. H&R Block's omission was material because a reasonable consumer would deem it important to know whether their tax preparer was secretly disclosing protected tax return information to two of the largest advertising companies in the world, Meta and Google. H&R Block's conduct therefore violates subsections (5) and (14).

159.    Defendants' arbitration provision in the OSA, including the class waiver, batched filing/staged bellwether provision, and prefiling conference requirement constitute unconscionable provisions that also violate subsections (14) and (19). Through these provisions of the OSA, Defendants seek to improperly prohibit class proceedings. *See Heckman*, 120 F.4th at 689-92 (holding that the FAA does not apply to preempt state law where arbitration agreements include requirements for bellwether proceedings and batched filings). Defendants also seek to hinder the prompt progression of claims and prejudice class members based on the identity of their chosen legal counsel. And through the prefiling conference requirement, Defendants seek to improperly interrogate represented claimants (without the

consent of claimants' counsel) before they file claims, contrary to Rule 4.2 of the California Rules of Professional Conduct. The foregoing provisions of the OSA therefore violate the CLRA, as well as Cal. Civil Code §§ 1608, 1670.5.

160.    The above-described conduct of H&R Block also constitutes unlawful conduct under the UCL.

161.    At least 30 days prior to filing these claims, Plaintiffs provided any required notice to Defendants of the substantive violations pursuant to Civil Code §1782. Written notice was sent on September 20, 2024, and received by Defendants on September 27, 2024.

162.    As a result of Defendants' violations of the CLRA, Plaintiffs and the California Subclass seek actual damages, statutory damages, punitive damages, reasonable attorneys' fees and costs, and all other relief available and just under the circumstances.  In the alternative to their claims for damages, Plaintiffs and the Subclass seek declaratory relief and injunctive relief (public and private) prohibiting the continuation of H&R Block's unlawful data disclosure practices, which threaten to harm the members of the California Subclass as well as members of general public who may attempt to transact with Defendants in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes respectfully pray for judgment in their favor on all Counts as follows:

   a.    Certification of the Classes pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and an order that notice be provided to all Class Members;

   b.    Designation of Plaintiffs as representatives of the Classes and the undersigned counsel as Class Counsel;

   c.    An award of damages or other monetary relief in an amount to be determined at trial or by this Court;

   d.    An award of restitution and/or disgorgement in an amount to be determined at trial or by this Court;

   e.    An order for injunctive relief, enjoining Defendants from engaging in the wrongful and unlawful acts described herein;

f.    An order for declaratory relief as may be appropriate;

g.    An award of statutory interest and penalties;

h.    An award of costs and attorneys' fees; and

i.    All such other relief the Court may deem just and proper in law or equity.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

**ZIMMERMAN REED LLP**

Dated: April 22, 2025                    By:    *s/ Ryan J. Ellersick*
                                                Ryan J. Ellersick (SBN 357560)
                                                Caleb Marker (SBN 269721)
                                                Jessica M. Liu (SBN 358713)
                                                6420 Wilshire Blvd., Suite 1080
                                                Los Angeles, CA 90048
                                                Tel (877) 500-8780
                                                Fax (877) 500-8781
                                                ryan.ellersick@zimmreed.com
                                                caleb.marker@zimmreed.com
                                                jessica.liu@zimmreed.com

                                                *Attorneys for Plaintiffs and the Classes*