MAYER BROWN LLP
ARCHIS A. PARASHARAMI (SBN 321661)
*aparasharami@mayerbrown.com*
MAYER BROWN LLP
575 Market Street, Suite 2500
San Francisco, CA 94105
Telephone: (415) 874-4230

DANIEL E. JONES (*pro hac vice to be filed*)
*djones@mayerbrown.com*
1999 K Street, N.W.
Washington, DC 20006-1101
Telephone: (202) 263-3000

*Attorneys for Defendants HRB Digital, LLC and HRB Tax Group, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

PEDRO RIOS, JR., and CHRISTIAN MARQUEZ, individually, and on behalf of those similarly situated,

Plaintiffs,

v.

HRB DIGITAL, LLC, a Delaware Corporation, HRB TAX GROUP, INC., a Missouri Corporation,

Defendants.

Case No. 3:25-cv-03530-EMC

Assigned to the Hon. Edward M. Chen

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY LITIGATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Date: August 28, 2025
Time: 1:30 P.M.
Location: Courtroom 5, 17th Floor

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

A. Plaintiffs Agreed To Arbitrate Their Disputes With Defendants........ 2

B. The Terms Of Plaintiffs' Arbitration Agreements. ........ 4

C. Plaintiffs Have Repeatedly Invoked The Arbitration Process, Including Through Submissions By Multiple Other Counsel. ........ 5

D. Plaintiffs' Notices Are Part Of A Group Of Similar Claims, Many Of Which Are Wholly Untenable. ........ 6

E. Plaintiffs Filed This Lawsuit Notwithstanding Their Arbitration Agreements And Multiple Notices Of Dispute. ........ 7

ARGUMENT ........ 7

I. The FAA Requires Enforcement Of Plaintiffs' Arbitration Agreements. ........ 7

A. Plaintiffs Agreed To Arbitrate. ........ 8

B. Plaintiffs' Claims Are Covered By Their Arbitration Agreements. ........ 9

II. Plaintiffs' Arbitration Agreements Are Not Unconscionable. ........ 9

A. The Arbitration Agreement Is Not Procedurally Unconscionable. ........ 10

B. The Arbitration Agreement Is Not Substantively Unconscionable. ........ 12

1. The pre-arbitration dispute resolution process is enforceable. ........ 12

2. The bellwethering procedures are enforceable. ........ 15

*a. H&R Block's arbitration agreement does not offend Heckman.* ........ 16

*b. The substantive unconscionability holding in Pandolfi is erroneous and distinguishable in any event.* ........ 17

*c. The FAA preempts plaintiffs' unconscionability challenge.* ........ 20

3. The challenged terms are severable. ........ 21

III. Plaintiffs Cannot Evade Arbitration By Invoking *McGill*. ........ 22

A. Plaintiffs Request Private, Not Public, Injunctive Relief. ........ 23

B. Any Requests By Plaintiffs For Public Injunctive Relief Must Be Severed And Stayed Pending The Outcome Of Arbitration. ........ 24

IV. This Action Should Be Stayed Pending Arbitration. ........ 25

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ........ 12, 19, 21

*Baltazar v. Forever 21, Inc.*,
367 P.3d 6 (2016) ........ 9

*In re Barker*,
839 F.3d 1189 (9th Cir. 2016) ........ 8

*Bartholomew v. Burger King Corp.*,
2014 WL 7419854 (D. Haw. Dec. 30, 2014) ........ 12

*Barzi v. Equinox Holdings, Inc.*,
2024 WL 5185395 (C.D. Cal. Sept. 18, 2024) ........ 13

*Bielski v. Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023) ........ 7, 13

*Blair v. Rent-A-Center, Inc.*,
928 F.3d 819 (9th Cir. 2019) ........ 24

*Bonhomme v. Uber Techs., Inc.*,
2025 WL 1745729 (N.D. Cal. June 24, 2025) ........ 10, 11

*Briggs v. Merck Sharp & Dohme*,
796 F.3d 1038 (9th Cir. 2015) ........ 18

*Brooks v. WarnerMedia Direct, LLC*,
2024 WL 3330305 (S.D.N.Y. July 8, 2024) ........ 13, 16

*Caimano v. H&R Block*,
2024 WL 3295589 (E.D. Pa. July 3, 2024) ........ *passim*

*Cottrell v. AT&T Inc.*,
2021 WL 4963246 (9th Cir. Oct. 26, 2021) ........ 23

*Delamater v. Anytime Fitness, Inc.*,
722 F. Supp. 2d 1168 (E.D. Cal. 2010) ........ 13

*Doctor's Assocs., Inc. v. Casarotto*,
517 U.S. 681 (1996) ........ 11

*George v. eBay, Inc.*,
71 Cal. App. 5th 620 (2021) ........ 20

*Hakopian v. Mukasey*,
551 F.3d 843 (9th Cir. 2008) ........ 8

*In re Hanford Nuclear Reservation Litig.*,
534 F.3d 986 (9th Cir. 2008) ..... 18

*Heckman v. Live Nation Entertainment, Inc.*,
120 F.4th 670 (9th Cir. 2024) ..... 16, 17, 22

*Hodges v. Comcast Cable Commc'ns, LLC*,
21 F.4th 535 (9th Cir. 2021) ..... 23, 24

*HomeQuest Mortg., LLC v. HRB Tax Grp., Inc.*,
2014 WL 3845147 (D. Kan. Aug. 5, 2014) ..... 7

*Houtchens v. Google LLC*,
649 F. Supp. 3d 933 (N.D. Cal. 2023) ..... 10

*Hunt v. Meta Platforms, Inc.*,
729 F. Supp. 3d 964 (N.D. Cal. 2024) ..... 2, 8, 9, 10, 11

*Jones v. Starz Ent., LLC*,
129 F.4th 1176 (9th Cir. 2025) ..... 17

*Kaplan v. Athletic Media Co.*,
705 F. Supp. 3d 992 (N.D. Cal. Dec. 8, 2023) ..... 10

*Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*,
581 U.S. 246 (2017) ..... 21

*Kloussing v. ThoughtFocus, Inc.*,
2025 WL 221345 (C.D. Cal. Jan. 16, 2025) ..... 12

*Lag Shot LLC v. Facebook, Inc.*,
545 F. Supp. 3d 770 (N.D. Cal. 2021) ..... 24

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019) ..... 9

*Lend Lease (U.S.) Constr., Inc. v. El Camino Comm. Coll. Dist.*,
2014 WL 12564348 (C.D. Cal. Oct. 16, 2014) ..... 13

*Marathon Ent., Inc. v. Blasi*,
174 P.3d 741 (Cal. 2008) ..... 21

*Martinez v. City of West Sacramento*,
2022 WL 2227830 (E.D. Cal. June 2, 2021) ..... 14

*McGill v. Citibank, N.A.*,
2 Cal. 5th 945 (2017) ..... 23

*Meadows v. Cebridge Acquisition, LLC*,
132 F.4th 716 (4th Cir. 2025) ..... 13

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ..... 8

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016)....2, 9, 10, 11

*Moser v. Bret Harte Union High Sch. Dist.*,
366 F. Supp. 2d 944 (E.D. Cal. 2005)....14

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)....9

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023)....8

*Oblix, Inc. v. Winiecki*,
374 F.3d 488 (7th Cir. 2004)....21

*Painters Joint Committee v. J.L. Wallco*,
2013 WL 3930485 (D. Nev. July 26, 2013)....13

*Pandolfi v. AviaGames, Inc.*,
2024 WL 4051754 (N.D. Cal. Sept. 4, 2024)....16, 18, 19, 22

*Poublon v. C.H. Robinson Co.*,
846 F.3d 1251 (9th Cir. 2017)....21, 22

*Ramirez v. Charter Commc'ns, Inc.*,
551 P.3d 520 (Cal. 2024)....22

*Ruiz v. CarMax Auto Superstores, Inc*.,
2024 WL 1136332 (C.D. Cal. Jan. 18, 2024)....15, 16

*Sanchez v. Valencia Holding Co.*
353 P.3d 741 (Cal. 2015)....9, 12, 15, 19

*Serpa v. Cal. Surety Investigations, Inc.*,
215 Cal. App. 4th 695 (2013)....13, 14

*Smith v. Spizzirri*,
601 U.S. 472 (2024)....25

*Stout v. Grubhub, Inc.*,
2021 WL 5758889 (N.D. Cal. Dec. 3, 2021)....23, 24

**Statutes and Rules**

9 U.S.C. § 2....7

9 U.S.C. § 3....1, 25

Cal. Civ. Code § 1599....21

Cal. Civ. Code § 1782....13

Cal. Com. Code § 2607(3)(A)....13

Cal. R. Ct. 3.501-50....21

Fed. R. Civ. P. 11(b) ....................14

**Other Authorities**

ABA Model Rule 3.1 ....................14

Hon. Eldon E. Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323 (2008) ....................15

Hon. Stephen R. Bough & Anne E. Case-Halferty, *A Judicial Perspective on Approaches to MDL Settlement*, 89 UMKC L. Rev. 971 (2021) ....................19

*Manual for Complex Litigation, Fourth* (2004) ....................19

NYU Center on Civil Justice, *What the Data Show: Mapping Trends in Multidistrict Litigation* (Sept. 2015) ....................19

U.S. Chamber of Commerce Institute for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* (Feb. 2023) ....................20

U.S. J.P.M.L., *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2021* (2021) ....................19

## NOTICE OF MOTION AND MOTION

TO THE COURT, PLAINTIFFS, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on August 28, 2025, at 1:30 p.m., or as soon thereafter as possible, in the Courtroom of the Hon. Edward M. Chen, U.S. District Judge, at the U.S. District Court for the Northern District of California at 450 Golden Gate Avenue, San Francisco, CA 94102, defendants HRB Digital, LLC and HRB Tax Group, Inc. will move and hereby do move under Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, for an order (1) compelling arbitration of plaintiffs' claims on an individual basis; and (2) staying this litigation pending the outcome of arbitration.

This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the Declarations of Valerie Schuessler, Bobbie Crew, Daniel Murdock and exhibits; and any such testimony, evidence, or argument that may be submitted to the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs allege that when they used H&R Block online tax filing services, their data was impermissibly shared with third parties via tracking technology. But despite filing this lawsuit, plaintiffs acknowledge that they agreed to H&R Block's Online Services Agreement ("OSA"), which requires them to resolve their claims by individual arbitration. Compl. ¶ 16.

Indeed, plaintiffs admit that they each have invoked their right to arbitrate under the OSA and, based on the OSA's terms, counsel of record here submitted a Notice of Dispute to H&R Block asserting plaintiffs' intent to arbitrate. Compl. ¶ 25; *see also* Decl. of Bobbie Crew Exs. 2, 5. In fact—although the complaint fails to mention it—two other law firms have submitted additional Notices of Dispute to H&R Block on behalf of these same plaintiffs asserting the same types of claims against H&R Block and also purporting to represent plaintiffs. *See id.* Exs. 1, 3, 4, 6.

For obvious reasons, these multiple Notices of Dispute raise questions about who really represents plaintiffs and whether plaintiffs themselves have authorized the filing of this lawsuit. But even setting those critical questions aside, one thing is clear: plaintiffs have repeatedly invoked

H&R Block's arbitration process, and thus it strains credulity to now claim that the process is unfair or improper.

Plaintiffs nevertheless allege in their complaint that their arbitration agreements are "unconscionable." Compl. ¶ 16. But their arguments are wholly without merit. To begin with, plaintiffs cannot show procedural unconscionability. Plaintiffs fail to disclose in their complaint that they had a right to opt out of arbitration within 30 days after agreeing to the OSA and they did not exercise that right. Under controlling Ninth Circuit precedent, *the ability to opt out is dispositive*, defeating any assertion of procedural unconscionability. An "arbitration agreement is not adhesive if there is an opportunity to opt out of it." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016). That is reason enough to reject plaintiffs' unconscionability arguments. Indeed, both Judge Pitts and a Pennsylvania federal court recently enforced H&R Block's arbitration agreement because the plaintiffs could opt out—thereby negating plaintiffs' attempt to show procedural unconscionability. *See Hunt v. Meta Platforms, Inc.*, 729 F. Supp. 3d 964, 967 (N.D. Cal. 2024) (California law); *Caimano v. H&R Block*, 2024 WL 3295589, at *12-13 (E.D. Pa. July 3, 2024) (Pennsylvania law).

Because plaintiffs cannot show procedural unconscionability, the Court's inquiry can stop there. *See Mohamed*, 848 F.3d at 1211. But in any event, plaintiffs' substantive unconscionability challenges also fail. Their complaint attacks terms relating to the pre-arbitration notice of dispute and informal settlement process, as well as a staged bellwethering process for handling large numbers of similar claims in arbitration, but those challenges are all misguided for the reasons discussed below.

In sum, plaintiffs' arbitration agreements with H&R Block are fully enforceable, and the Court accordingly should grant defendants' motion.

## BACKGROUND

### A. Plaintiffs Agreed To Arbitrate Their Disputes With Defendants.

The complaint alleges, and H&R Block's records confirm, that plaintiffs Rios and Marquez used H&R Block's online tax filing services. Compl. ¶¶ 28-29. H&R Block's records indicate that Rios and Marquez each created accounts for H&R Block online tax filing services in 2017 and have

used those services for several years. Decl. of Valerie Schuessler ¶¶ 4-5, 10. To use H&R Block's online tax filing services, plaintiffs agreed to the H&R Block Online Services Agreement under the same process. *Id.* ¶¶ 6-8.[1]

When Rios logged into his online account on January 5, 2024 and when Marquez logged into his online account on January 26, 2024, they each clicked a check box next to an acknowledgment stating: "I agree to the terms and conditions of the Electronic Communications Consent and the Online Services Agreement, which includes the requirement that any dispute be resolved through binding arbitration." *Id.* ¶¶ 7-8 & Ex. 2. Rios and Marquez were able to view the complete OSA by clicking on the green, underlined hyperlink, "Online Services Agreement" immediately next to the check box; that link takes the client to a web page containing the complete document, including the expressly referenced arbitration agreement. *Id.* ¶ 7. They each then clicked the "Next" button at the bottom of the screen. *Id.* ¶¶ 7-8 & Ex. 2.

If a returning client like Rios or Marquez clicked the "Next" button at the bottom of the screen without clicking the check box or by later deselecting the check box (by clicking on it a second time), the client would not be able to move past the screen; instead, the screen would display an error message in red font saying: "In order to continue, you must agree to the above terms and conditions." *Id.* ¶ 8 & Ex. 3.

Like the acknowledgement screen, the OSA itself calls attention to the arbitration agreement, including through a bolded, capitalized notice on the first page:

> **THIS AGREEMENT INCLUDES A MUTUAL BINDING ARBITRATION AGREEMENT IN SECTION 11 THAT REQUIRES RESOLUTION OF DISPUTES BY INDIVIDUAL ARBITRATION UNLESS YOU OPT-OUT AS PROVIDED IN SECTION 11.**

*Id.* Ex. 4 § 1.3. The clause itself is under the conspicuous heading: "**ARBITRATION IF A DISPUTE ARISES ('Arbitration Agreement').**" *Id.* Ex. 4 § 11.

Notably, the OSA contains an all-bold provision—in a conspicuous box titled "**Arbitration Agreement Opt Out**"—allowing users to opt out of arbitration within 30 days after accepting the

[1] H&R Block's records show that plaintiffs agreed to the then-current H&R Block Online Services Agreement, including an arbitration agreement, each year that they used H&R Block's online services. For purposes of this motion, defendants focus on the most recent version of the OSA that plaintiffs agreed to prior to the Notices of Dispute referenced in the complaint.

OSA by filling out an online form or mailing a simple letter. *Id.* Ex. 4 § 11; *see also* Crew Decl. ¶ 5. Neither plaintiff did so. *Id.*

**B. The Terms Of Plaintiffs' Arbitration Agreements.**

Plaintiffs' arbitration agreements require arbitration of "all disputes and claims between you and the H&R Block Parties"—defined to include H&R Block, Inc. and HRB Tax Group, Inc., the defendants here. Schuessler Decl. Ex. 4 § 11.1.

The agreement calls for arbitration conducted by the American Arbitration Association under its Consumer Arbitration Rules. *Id.* § 11.3. The agreement also allows a claimant to file an individual action in small claims court instead. *Id.* § 11.1. And the agreement contains a severability clause. *Id.* § 11.7.

The clause requires arbitration on an individual basis; it expressly prohibits class actions and representative claims. *Id.* § 11.4. It further states that "any relief" awarded by the arbitrator "must be individualized to you and will not affect any other client." *Id.*

The arbitration agreement also affords the parties an opportunity to resolve their claims through informal procedures before the need to file an arbitration. Specifically, the agreement includes a pre-arbitration notice of dispute process, under which the party who intends to invoke arbitration first mails a Notice of Dispute to the other party that includes some basic identifying information, "the nature or basis of the dispute or claim," and the "specific relief sought." *Id.* § 11.2. The agreement also gives the parties 60 days to request an informal settlement conference (by phone or videoconference, such as by Zoom) to attempt to reach a resolution. *Id.* For claimants who comply with the arbitration provision (including the informal dispute-resolution procedures), H&R Block will reimburse customers for their share of the fees of an arbitration so long as the arbitration is not deemed frivolous. *Id.* § 11.5.

Finally, the agreement contains procedures for arbitrations of similar claims:

> **Arbitration of similar claims**. If 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (regardless of whether the cases are submitted simultaneously), all of the cases must be resolved in arbitration in stages using staged bellwether proceedings if they are not resolved during the Informal Resolution Period. You agree to this process even though it may delay the arbitration of your claim. In the first stage, each side shall select 10 cases (20 cases total) to be filed in arbitration and resolved

> individually by different arbitrators, with each case assigned to an arbitrator from the claimant's home state. In the meantime, no other cases may be filed in arbitration, and the AAA shall not accept, assess or demand fees for, or administer arbitrations that are commenced in violation of this section. The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible, consistent with principles of fundamental fairness. If the remaining cases are unable to be resolved after the conclusion of the first stage bellwether proceeding, each side shall select up to another 10 cases (20 cases total) to be filed in arbitration and resolved individually in accordance with this Arbitration Agreement. During this second stage, no other cases may be filed in arbitration. If any claims remain after the second stage, the process will be repeated until all claims are resolved through settlement or arbitration, with two alterations. First, a total of 50 cases may be filed each round (unless a higher number of cases is mutually agreed upon in writing). Second, arbitrators who were assigned cases in previous rounds may be appointed to new cases. If this section 11.6 applies to a Notice, the statute of limitations applicable to the claims and relief set forth in that Notice shall be tolled from the beginning date of the Informal Resolution Period until that Notice is selected for a bellwether proceeding, withdrawn, or otherwise resolved.

*Id.* § 11.6.

### C. Plaintiffs Have Repeatedly Invoked The Arbitration Process, Including Through Submissions By Multiple Other Counsel.

Well before this lawsuit was filed, different law firms submitted multiple Notices of Dispute on behalf of both Rios and Marquez. Those Notices, like the complaint in this case, assert that plaintiffs' data was allegedly transmitted to Meta or Google when plaintiffs used H&R Block's online services. Crew Decl. Exs. 1-6.

The complaint filed with this Court acknowledges that the Zimmerman Reed firm, counsel of record here, sent Notices of Dispute to H&R Block on behalf of each plaintiff. Compl. ¶ 25. Rios's Zimmerman Reed Notice was dated July 19, 2024 (Crew Decl. Ex. 2), and Marquez's Zimmerman Reed Notice was dated July 18, 2024 (*id.* Ex. 5).

The complaint fails to mention, however, that both *before* and *after* the Zimmerman Reed Notices of Dispute were sent, *other* law firms submitted Notices of Dispute raising similar allegations on behalf of the same plaintiffs. Specifically:

***Rios***. In a Notice dated August 4, 2023—almost a year prior to his Zimmerman Reed Notice—Rios claimed to be represented by a different firm. *Id.* Ex. 1. Rios executed yet another Notice dated September 26, 2024—two months after his Zimmerman Reed Notice—now allegedly represented by a third firm. *Id.* Ex. 3.

***Marquez.*** Like Rios, different law firms submitted three separate Notices of Dispute to H&R Block on behalf of Marquez. And, also like Rios, Zimmerman Reed is not the law firm on either Marquez's first Notice or his most recent Notice. Rather, Marquez claimed to be represented by another law firm both *before* and *after* his Zimmerman Reed Notice. His first Notice, dated March 16, 2023, claims that Marquez is represented by another law firm. *Id.* Ex. 4. Then, two months *after* Marquez executed his Zimmerman Reed Notice, that original law firm submitted a second Notice on behalf of Marquez, again stating that Marquez had retained that firm. *Id.* Ex. 6.

### D. Plaintiffs' Notices Are Part Of A Group Of Similar Claims, Many Of Which Are Wholly Untenable.

Plaintiffs' Zimmerman Reed notices are part of a group of Notices of Dispute submitted on behalf of claimants purporting to be represented by Zimmerman Reed; the Notices allege that the claimants used H&R Block's online tax filing services during the 2021 or 2022 tax seasons to file their taxes. Decl. of Daniel Murdock ¶ 4. While H&R Block denies that any of the claims have merit, what is striking about the Notices is that H&R Block's records show that this basic factual allegation is inaccurate for 40% of the Notices. Specifically, based on H&R Block's review of those Notices (after excluding a handful of duplicate entries (*id.* ¶ 6(a)), H&R Block's records show that 20.7% of the claimants *have never been an H&R Block customer* or have never used H&R Block's *online* tax filing services (a necessary predicate to asserting an online tax-filing claim). *Id.* ¶¶ 6(b)-6(c). Further, H&R Block's records show that an additional 2.4% of the claimants never completed a tax filing transaction with H&R Block (*id.* ¶ 6(d)); while an additional 16.9% of the claimants filed their taxes using H&R Block's online tax filing services, but not during the 2021 or 2022 tax seasons (*id.* ¶ 6(e)).

Taken together, this means that only around 60% of the Notices of Dispute are submitted on behalf of non-duplicate claimants who can even potentially satisfy the factual allegation being made in the Notices (*id.* ¶ 7)—raising serious questions about whether Zimmerman Reed undertook a reasonable pre-claim investigation prior to asserting the claims.

### E. Plaintiffs Filed This Lawsuit Notwithstanding Their Arbitration Agreements And Multiple Notices Of Dispute.

Notwithstanding their arbitration agreements and the multiple Notices of Dispute submitted through different law firms demanding to arbitrate plaintiffs' claims, plaintiffs filed this lawsuit on April 22, 2025. Dkt. No. 1. Plaintiffs allege that defendants allowed their data to be improperly transmitted to Meta or Google through tracking technology when plaintiffs were using H&R Block's online tax filing services. Compl. ¶¶ 1-2. Plaintiffs allege violations of the federal Electronic Communications Privacy Act and California's Invasion of Privacy Act, Unfair Competition Law, and Consumers Legal Remedies Act. *Id.* ¶¶ 108-162. They also seek to challenge the enforceability of their arbitration agreements. *Id.* ¶¶ 16-24.

## ARGUMENT

### I. The FAA Requires Enforcement Of Plaintiffs' Arbitration Agreements.

The FAA governs any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Both criteria are met here: (i) plaintiffs' arbitration agreements are in writing (*see* pages 2-5, *supra*); and (ii) contracts for federal tax filing and related services involve commerce. *See, e.g.*, *HomeQuest Mortg., LLC v. HRB Tax Grp., Inc.*, 2014 WL 3845147, at *5 (D. Kan. Aug. 5, 2014) ("The general practice of preparing federal tax returns for customers nationwide clearly impacts the national economy, which makes evident Congress' power to regulate that activity under the Commerce Clause."). Indeed, the arbitration provision itself states that "[t]his Arbitration Agreement shall be governed by, and interpreted, construed, and enforced in accordance with, the Federal Arbitration Act and other applicable federal law." Schuessler Decl. Ex. 4 § 11.7.

Under the FAA, plaintiffs' arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. On a motion to compel arbitration, the court considers "(1) whether a valid agreement to arbitrate exists, and, if it does, (2) whether the agreement encompasses the dispute at issue." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023) (quotation marks omitted). Here, as

evidenced by plaintiffs' repeated Notices of Dispute, there is no dispute that plaintiffs agreed to arbitrate and that their claims fall within the scope of their arbitration agreements.

**A. Plaintiffs Agreed To Arbitrate.**

It is undisputed that plaintiffs agreed to H&R Block's OSA, including its arbitration agreement. Their complaint repeatedly acknowledges that they used H&R Block's online tax filing services subject to the H&R Block "Online Services Agreement." Compl. ¶ 16. And they acknowledge that the OSA's terms include an "arbitration clause." *Id.* In fact, they allege that plaintiffs have invoked that clause and submitted Notices of Dispute. *Id.* ¶¶ 25-26. While plaintiffs contend (incorrectly) that the arbitration agreement is "unconscionable and unenforceable" (*id.* ¶ 16), they do not deny agreeing to it.

These admissions are binding. "Allegations in a complaint are considered judicial admissions." *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008). Such admissions "dispens[e] wholly with the need for proof of the [admitted] fact." *In re Barker*, 839 F.3d 1189, 1195 (9th Cir. 2016) (quotation marks omitted).

Even putting aside those admissions, plaintiffs validly agreed to arbitrate. Each plaintiff clicked a check box right next to an acknowledgment that he was agreeing to "the Online Services Agreement, which includes the requirement that any dispute be resolved through binding arbitration"—with the phrase "Online Services Agreement" in a green, underlined hyperlink that linked to the full terms—and then clicked a "Next" button at the bottom of the screen. *See* Schuessler Decl. ¶¶ 6-8 & Ex. 2.

That process formed a valid contract. Courts "routinely uphold" agreements "which require users to click an 'I agree' box after being presented with a list of terms and conditions of use." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (applying California law); *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (applying similar principles). Indeed, other courts have recently enforced H&R Block's OSA when the plaintiffs used a materially identical process to agree to its terms. *See, e.g.*, *Hunt*, 729 F. Supp. 3d at 967; *Caimano*, 2024 WL 3295589, at *9-11.

There is no dispute that plaintiffs agreed to the OSA, including its arbitration agreement.

**B. Plaintiffs' Claims Are Covered By Their Arbitration Agreements.**

Plaintiffs' arbitration agreements easily encompass their claims in this lawsuit. The arbitration agreement requires arbitration of "all disputes and claims" between Plaintiff and "the H&R Block Parties," which are defined to include "HRB Digital LLC [and] HRB Tax Group, Inc." (the defendants here). Schuessler Decl. Ex. 4 § 11.1.

Moreover, plaintiffs' claims are directly related to their use of H&R Block's online tax filing services—the very services governed by the OSA. *See* Compl. ¶¶ 28-29; *see also Hunt*, 729 F. Supp. 3d at 970 (noting that claims based on similar factual allegations "all relate to [Hunt's] use of H&R Block's products and services"). Indeed, plaintiffs have conceded that their claims are arbitrable by each asserting an intent to arbitrate in three different Notices of Dispute.

If there were any doubt—there isn't—"as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019).

In short, plaintiffs' claims are arbitrable.

## II. Plaintiffs' Arbitration Agreements Are Not Unconscionable.

Plaintiffs' complaint challenges their arbitration agreements with H&R Block as "unconscionable." Compl. ¶¶ 16-24. Under California law, plaintiffs have the burden of demonstrating that the contract is *both* procedurally and substantively unconscionable. *Sanchez v. Valencia Holding Co.* 353 P.3d 741, 748-49 (Cal. 2015). Procedural unconscionability "focus[es] on oppression or surprise due to unequal bargaining power," and substantive unconscionability addresses "overly harsh or one-sided results." *Id.* (quotation marks omitted).

Unconscionability is a demanding standard. "[T]he California Supreme Court has emphasized that 'unconscionability requires a substantial degree of unfairness.'" *Mohamed*, 848 F.3d at 1210 (quoting *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 12 (2016)). After all, "[c]ommerce depends on the enforceability, in most instances, of a duly executed written contract." *Baltazar*, 367 P.3d at 12. Neither form of unconscionability (much less both) is present here.

### A. The Arbitration Agreement Is Not Procedurally Unconscionable.

Plaintiffs' complaint alleges that the arbitration provision in the OSA is procedurally unconscionable. But plaintiffs conspicuously omit the key fact that they could opt out of the arbitration agreement within 30 days of accepting the OSA. *See* page 4, *supra*; Crew Decl. ¶ 5. The Ninth Circuit has squarely held that, under California law, "an arbitration agreement is not adhesive"—and thus "not procedurally unconscionable"—"if there is an opportunity to opt out of it." *Mohamed*, 848 F.3d at 1211; *see also, e.g.*, *Bonhomme v. Uber Techs., Inc.*, 2025 WL 1745729, at *3 (N.D. Cal. June 24, 2025) (following *Mohamed* in rejecting procedural unconscionability challenge); *Kaplan v. Athletic Media Co.*, 705 F. Supp. 3d 992, 1005 (N.D. Cal. Dec. 8, 2023) (ability to "opt out by mailing written notice within 30 days" negates procedural unconscionability); *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 944 (N.D. Cal. 2023) (same for email opt out).

*Mohamed* is controlling precedent that is dispositive here. As Judge Pitts held, "[b]ecause the [OSA's arbitration] agreement included a clear opt-out provision, it cannot be deemed procedurally unconscionable solely on grounds of adhesiveness." *Hunt*, 729 F. Supp. 3d at 970 (citing *Mohamed*, 848 F.3d at 1211); *see also Caimano*, 2024 WL 3295589, at *13 (applying Pennsylvania law and concluding that "[t]he Online Services Agreement clearly and explicitly provided a simple step to opt out of arbitration."). The opt-out provision completely undermines plaintiffs' allegation that the arbitration agreement is "procedurally unconscionable" as "an adhesion contract." Compl. ¶ 20.

Plaintiffs allege that defendants were required to give heightened notice of the bellwether procedures in particular. Compl. ¶ 21. But those procedures are clearly disclosed under a descriptive heading "**Arbitration of similar claims**," and the procedures expressly inform clients that "You agree to this process even though it may delay the arbitration of your claim." Schuessler Decl. Ex. 4 § 11.6. The court in *Caimano* rejected a similar argument: "Plaintiffs were not subject to an 'unfair surprise' concerning what they refer to as a 'mass arbitration provision,'" because "just as they did for the entirety of the Online Services Agreement, Plaintiffs had reasonable notice of this provision." 2024 WL 3295589, at *12. Indeed, Rios and Marquez have repeatedly invoked arbitration under the terms of their arbitration agreements by submitting Notices of Dispute through

separate law firms—making it unreasonable to claim that they were surprised by the terms. *See* pages 5-6, *supra*.

Plaintiffs' allegation is not only factually inaccurate but also finds no support in California law, which does not require specific disclosure of every contract term. If it did, it would be preempted by the FAA, which prohibits states from imposing a "special notice requirement" only on arbitration clauses. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). And because the FAA prevents states from requiring heightened notice of an arbitration clause, states also can't require heightened notice of specific terms in the clause. In all events, plaintiffs had 30 days to review the OSA and decide whether to opt out; as in *Mohamed*, they did not do so.

Finally, plaintiffs also assert that the pre-arbitration notice of dispute and informal settlement provisions in their arbitration agreements are "procedurally unconscionable." Compl. ¶ 22. Their challenges are meritless for the reasons discussed below (at 12-21), but, in any event, because they are attacking the *substance* of those provisions, their challenges go to substantive rather than procedural unconscionability.

In sum, plaintiffs cannot show procedural unconscionability. And because California law requires both procedural and substantive unconscionability to invalidate a contract, the Court's analysis can stop here. The Ninth Circuit in *Mohamed* declined to "reach the question whether the agreements here were substantively unconscionable" because plaintiffs could not show procedural unconscionability due to the opt-out provision in Uber's arbitration clause. *Mohamed*, 848 F.3d at 1211; *see also*, *e.g.*, *Bonhomme*, 2025 WL 1745729, at *3 (citing *Mohamed* in declining to reach substantive unconscionability).

Just last year, Judge Pitts and a Pennsylvania federal court agreed that the absence of procedural unconscionability defeated an unconscionability challenge directed at a materially identical version of H&R Block's OSA. *See Hunt*, 729 F. Supp. 3d at 970 ("[B]ecause a contract can be invalidated under California law only where there is both procedural and substantive unconscionability, the arbitration agreement is enforceable whether or not its terms are substantively unconscionable."); *Caimano*, 2024 WL 3295589, at *13 (same under Pennsylvania law, which also requires both procedural and substantive unconscionability).

This Court should follow the same path here and grant defendants' motion without the need to reach substantive unconscionability.

**B. The Arbitration Agreement Is Not Substantively Unconscionable.**

To the extent the Court reaches plaintiffs' substantive unconscionability arguments (which it need not), those arguments fail as well. The substantive-unconscionability inquiry asks whether a contract term is "overly harsh," "unduly oppressive," or "so one-sided as to shock the conscience." *Sanchez*, 353 P.3d at 748-49 (quoting *Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 202 (Cal. 2013)). "[U]nconscionability requires a substantial degree of unfairness beyond a simple old-fashioned bad bargain." *Id.* at 749 (quotation marks omitted).

Plaintiffs' complaint challenges two provisions in the OSA's arbitration agreement: (1) the pre-arbitration notice of dispute and informal settlement process; and (2) the bellwethering procedures for arbitration of similar claims. Compl. ¶¶ 16-24. Neither provision is "overly harsh," "unduly oppressive," or "so one-sided as to shock the conscience." *Sanchez*, 353 P.3d at 748-49.

**1. The pre-arbitration dispute resolution process is enforceable.**

There is nothing unfair, much less conscience-shocking, about the pre-arbitration notice of dispute and informal settlement process in the OSA. It applies mutually to both parties (*see* Schuessler Decl. Ex. 4 § 11.2) and gives the parties a cost-free opportunity to resolve disputes informally. A similar requirement was part of the clause in *AT&T Mobility LLC v. Concepcion*, in which the Supreme Court treated that requirement as a *benefit* to consumers, not a burden. 563 U.S. 333, 336-37, 352 (2011). Moreover, plaintiffs' attack on the pre-arbitration process falls especially flat because they have each demanded to participate in that process *three separate times*—including through different lawyers. *See* pages 5-6, *supra*.

Nor can plaintiffs legitimately object to the requirement that the parties themselves must participate in the informal settlement process. Courts routinely mandate party participation in settlement discussions because it increases the chance of reaching agreement. *See, e.g.*, *Kloussing v. ThoughtFocus, Inc.*, 2025 WL 221345, at *1 (C.D. Cal. Jan. 16, 2025) (describing order requiring parties to attend settlement conference); *Bartholomew v. Burger King Corp.*, 2014 WL 7419854, at *1 (D. Haw. Dec. 30, 2014) (describing court order for parties to attend settlement conference

and noting "the dynamics of a settlement conference are much different when the parties themselves attend"); *Painters Joint Committee v. J.L. Wallco*, 2013 WL 3930485, at *3 (D. Nev. July 26, 2013) (sanctioning parties for failure to attend because "[a] settlement conference without all of the necessary parties present is not productive"). And parties commonly agree in their contracts to engage in mediation (informal or otherwise) before arbitration.[2]

A pre-arbitration notice of dispute process, with its accompanying potential for "informal" resolution, "is both reasonable and laudable in an [arbitration] agreement[.]" *Serpa v. Cal. Surety Investigations, Inc.*, 215 Cal. App. 4th 695, 710 (2013). Indeed, when a district court held that it was unconscionable for Coinbase to require that consumers confer with customer support and submit a detailed notice of dispute before arbitration, the Ninth Circuit *reversed*, describing these requirements as "commonplace" and not "beyond the reasonable expectations of the user." *Bielski*, 87 F.4th at 1014; *see also, e.g., Brooks v. WarnerMedia Direct, LLC*, 2024 WL 3330305, at *18 n.9 (S.D.N.Y. July 8, 2024) ("detailed notice of dispute" requirement not unconscionable under California law). The Fourth Circuit recently upheld a pre-arbitration process similar to the one here under West Virginia law, holding that there is "nothing unreasonable, let alone unconscionable, about such a provision," which "serves a commercially reasonable purpose by allowing both parties the opportunity to resolve disputes informally without incurring the expense of arbitration." *Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716, 732 (4th Cir. 2025).[3]

These holdings—including from the Ninth Circuit—are for good reason: consumers benefit from pre-arbitration procedures. Here, H&R Block clients possess the contractual right to "request an individualized discussion" with a "business representative." Schuessler Decl. Ex. 4 § 11.2(B).

---

[2] *See, e.g., Barzi v. Equinox Holdings, Inc.*, 2024 WL 5185395, at *1-2 (C.D. Cal. Sept. 18, 2024) (describing contracts requiring pre-arbitration mediation and citing cases); *Lend Lease (U.S.) Constr., Inc. v. El Camino Comm. Coll. Dist.*, 2014 WL 12564348, at *5 (C.D. Cal. Oct. 16, 2014) (enforcing "plain, unambiguous language requiring that mediation precede binding arbitration"); *Delamater v. Anytime Fitness, Inc.*, 722 F. Supp. 2d 1168, 1172, 1181 (E.D. Cal. 2010) (enforcing clause requiring parties to attend mediation prior to initiating a lawsuit or arbitration).

[3] Nor is there anything unusual about pre-filing notice and informal resolution requirements. For instance, the CLRA requires consumers seeking damages to give the defendant 30 days' notice and an opportunity to cure the alleged violation. Cal. Civ. Code § 1782. Likewise, California requires pre-suit notice for breach of express warranty claims. Cal. Com. Code § 2607(3)(A).

Moreover, the pre-arbitration process serves an especially important role in the mass arbitration setting, where, despite a lawyer's professional obligations to investigate his or her clients' claims *before* asserting them (*see* ABA Model Rule 3.1; Fed. R. Civ. P. 11(b)), lawyers often submit a significant number of illegitimate or unvetted claims.[4]

This case is a stark example of that problem. As noted above (at 6), only 60% of the Notices of Dispute in the Zimmerman Reed portfolio are submitted on behalf of non-duplicate claimants who can potentially satisfy the factual allegation being made in their Notices of Dispute. Indeed, more than one in five Notices are patently frivolous, because they appear to be asserted on behalf of claimants who have never used H&R Block's online tax filing services at all. Murdock Decl. ¶¶ 6b-6c. A pre-arbitration process like the one here affords the parties the opportunity to discuss and resolve disputes *before* either side incurs arbitration fees or wastes the time of the arbitrator and arbitration provider on illegitimate or inadequately vetted claims.

Moreover, as discussed above (at 5-6), *different* law firms have submitted multiple Notices of Dispute on behalf of both Rios and Marquez, with each firm purporting to independently represent them. If the parties had engaged in a pre-arbitration settlement conference, they might have addressed questions about which lawyers really represent the plaintiffs *before* any potentially unauthorized filing took place in an arbitral (or judicial) tribunal.[5]

In sum, the pre-arbitration process here "plainly does not 'shock the conscience' so as to vitiate the arbitration agreement." *Serpa*, 215 Cal. App. 4th at 710.

---

[4] Rule 11 also "creates and imposes on a party or counsel an affirmative duty to investigate the law and facts *before* filing." *Moser v. Bret Harte Union High Sch. Dist.*, 366 F. Supp. 2d 944, 950 (E.D. Cal. 2005). "The lawyer may not delegate this duty to another person." *Martinez v. City of West Sacramento*, 2022 WL 2227830, at *14 (E.D. Cal. June 2, 2021). But that is essentially what Zimmermann Reed has done here, as it has been left to H&R Block to review the Zimmerman Reed claimant pool and determine that a substantial number of the claims are patently frivolous.

[5] This is likely not the first time that Zimmerman Reed's efforts to pursue mass arbitrations have improperly overlapped with mass-arbitration campaigns brought by other law firms. In May 2024, WarnerMedia filed a petition in New York state court seeking to disqualify Zimmerman Reed, alleging that a Zimmerman Reed partner and other professionals at the firm unethically and fraudulently posed as mass arbitration claimants in campaigns brought by other law firms to obtain confidential information from those proceedings and use that information against the company in their own mass arbitration. *See WarnerMedia Direct, LLC v. Zimmerman Reed LLP*, No. 652500/2024 (N.Y. Sup. Ct., N.Y. Cnty. filed May 15, 2024).

**2. The bellwethering procedures are enforceable.**

Plaintiffs fare no better in arguing that it is substantively unconscionable to agree to resolve similar arbitrations of 25 or more claims through staged bellwether proceedings. *See* Schuessler Decl. Ex. 4 § 11.6. The bellwether process for administering large numbers of individual arbitrations is modeled on the approach used by MDL courts to resolve large numbers of individual lawsuits—*i.e.*, to provide for bellwether trials designed to inform the parties about whether and how to settle the claims. One federal judge has described such trials as "one of the most innovative and useful techniques for the resolution of complex cases." Hon. Eldon E. Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2323 (2008). Under the MDL process, representative cases are selected from the numerous cases in the MDL and set for trial. *Id.* at 2340-41. The outcome of the bellwether trials then encourages settlement in two ways. First, by requiring preparation for trial, the process forces litigants to take a more realistic assessment of what evidence and arguments they can present. *Id.* at 2341-42. Second, the outcome of the trials provides "real-world evaluations of the litigation by multiple juries." *Id.* at 2325.

Borrowing from federal court procedures cannot be so "'overly harsh' or 'one-sided'" as to be unconscionable. *See Sanchez*, 353 P.3d at 748. To the contrary, courts have recognized the benefits of bellwether proceedings in promoting fairness and orderly resolution of claims.

Take, for example, the lawsuit by Tubi over whether a law firm had improperly filed a large number of allegedly unvetted arbitrations and thereby tortiously interfered with Tubi's contracts with the claimants. *See* Compl., *Tubi, Inc. v. Keller Postman LLC*, No. 24-cv-01616 (D.D.C. May 31, 2024). Even though Tubi's agreement did not require the use of bellwether proceedings, to "actually get things moving" toward a resolution, the district court urged the parties to arbitrate—not all the cases, but "5 to 10" "bellwether arbitrations." Tr. 38, 40, *Tubi, Inc. v. Keller Postman LLC*, 1:24-cv-01616 (D.D.C. Dec. 19, 2024). Given the court's urging, the parties conferred over next steps, and about an hour later, agreed to just that (*id.* at 43-47)—because bellwether proceedings are a reasonable way to resolve large numbers of individual cases.

Along these lines, courts have upheld bellwether arbitration clauses. In *Ruiz v. CarMax Auto Superstores, Inc.*, the agreement required "similar claims to proceed in batches of ten." 2024 WL

1136332, *6 (C.D. Cal. Jan. 18, 2024). Because the agreement's protocol "provide[d] for the tolling of any applicable statute of limitations," the court held that it "constitutes a 'system to adjudicate a group of cases with the purpose of facilitating global or widespread resolution,'" and so "is not substantively unconscionable." *Id.* And at least one other court has agreed that a "staging procedure" for mass claims is not "substantively unconscionable" under California law when the agreement "tolls the applicable statute of limitations" for consumers waiting to arbitrate. *Brooks*, 2024 WL 3330305, at *17-18.

Like the provisions in *Ruiz* and *Brooks*, the procedures in the OSA's arbitration agreement expressly toll the statutes of limitations for all prospective claimants, stating that "[i]f this section 11.6 applies to a Notice, the statute of limitations applicable to the claims and relief set forth in that Notice shall be tolled from the beginning date of the Informal Resolution Period until that Notice is selected for a bellwether proceeding, withdrawn, or otherwise resolved." Schuessler Decl. Ex. 4 § 11.6. Accordingly, "no consumer is at risk of losing any claims as a result of this provision." *Caimano*, 2024 WL 3295589, at *12 (quotation marks and alterations omitted). The plain language of the clause thus reveals that plaintiffs are flat wrong in alleging that "consumers' claims are not tolled" under the clause. Compl. ¶ 23.

Plaintiffs also indicate that they intend to challenge the procedures in the OSA's arbitration provision under (1) the Ninth Circuit's decision in *Heckman v. Live Nation Entertainment, Inc.*, 120 F.4th 670 (9th Cir. 2024); and (2) this Court's decision in *Pandolfi v. AviaGames, Inc.*, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024), *appeal pending*, No. 24-5817 (9th Cir.). Compl. ¶¶ 16-17. Neither challenge succeeds.

*a. H&R Block's arbitration agreement does not offend Heckman.*

The Ninth Circuit's decision in *Heckman* has no bearing on the arbitration agreement here.

In *Heckman*, the Ninth Circuit declared unconscionable a *sui generis* Ticketmaster arbitration clause that selected a newly created arbitration administrator (New Era) and adopted that administrator's rules. Most notably, the Ninth Circuit understood the New Era rules to call for the outcomes of selected bellwether arbitrations to be treated as "precedent" that was "*binding* on the plaintiffs in all of the batched non-bellwether cases," even though the non-bellwether plaintiffs

had no "notice" of the bellwether arbitrations, could not "be heard in" them, and had no "right to opt out" of their precedential effect. 120 F.4th at 684 (emphasis added). By contrast, under the OSA's arbitration clause, the rulings in earlier arbitrations do *not* have preclusive effect on later arbitrations: "No arbitration award or decision will have any preclusive effect as to any issues or claims in any dispute, arbitration, or court proceeding where any party was not a named party in the arbitration, unless and except as required by applicable law." Schuessler Decl. Ex. 4 § 11.7.

The New Era rules also imposed limits on discovery, evidence, and briefing; allowed for one-sided appeals of arbitration awards by the company but not by the consumer; and purported to override California law on arbitrator selection. *See Heckman*, 104 F.4th at 685-87. Neither the OSA nor the incorporated AAA rules suffer from any of these defects. Indeed, the Ninth Circuit emphasized in *Heckman* that "New Era's Rules . . . differ significantly from the rules of traditional arbitration fora such as . . . the American Arbitration Association" used by H&R Block. 120 F.4th at 678. And the Ninth Circuit has since confirmed that *Heckman* is confined to its unusual facts: in rejecting an unconscionability challenge to an arbitration agreement incorporating the rules of JAMS, another mainstream arbitration provider, the Court noted that *Heckman* "concerned novel arbitration procedures" (*i.e.*, the New Era rules) and that the JAMS rules did not "share[] even some of those defects." *Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1182-83 (9th Cir. 2025).

As in *Jones*, none of the features that led the Ninth Circuit to declare the provision in *Heckman* unconscionable are present here.[6]

*b. The substantive unconscionability holding in Pandolfi is erroneous and distinguishable in any event.*

In *Pandolfi*, this Court—contrary to the decisions in *Ruiz* and *Brooks*—held that a clause providing for bellwether sequencing of mass arbitration claims was substantively unconscionable

---

[6] *Heckman*'s alternative holding that the FAA did not apply to Ticketmaster's arbitration clause because it would result in arbitration that is not "bilateral" and "individualized" is similarly inapplicable here. 104 F.4th at 689-90. Unlike the New Era rules according bellwether decisions preclusive effect, the arbitration clause in the OSA requires traditional individual arbitration for all claims that are not settled, and the agreement makes clear that bellwether rulings have no preclusive effect—the exact *opposite* of the approach to arbitral "precedent" deemed improper in *Heckman*. *See also Jones*, 129 F.4th at 1182 (noting that consolidation under the JAMS rules "is not the same as class or representative arbitration" and does not present "the red flags associated with classwide arbitration" that were presented in *Heckman*).

even when limitations periods are tolled. 2024 WL 4051754, at *5-9. *Pandolfi* is distinguishable; respectfully, it also is mistaken, including for the reasons raised in AviaGames's pending appeal to the Ninth Circuit.

*First*, the Court's concerns that a bellwether process would excessively "delay . . . resolution[s]" and accordingly "chill[]" claims (2024 WL 4051754, at *5-6) are overstated, because bellwether proceedings are not necessarily slower than real-world alternatives for trying large numbers of individual cases—whether in court or in arbitration.

As an initial matter, the process in H&R Block's OSA is distinguishable from the one at issue in *Pandolfi*. Here, after the first two stages of 20 cases each, the claims that cannot be settled may proceed 50 (or more) at a time. Schuessler Decl. Ex. 4 § 11.6. Compared to the provision in *Pandolfi*, which was limited to 20 cases at a time for *every* stage, that increased volume of arbitration proceedings further reduces the prospect of delay compared to available alternatives.

In addition, however, not even the largest arbitration providers can simultaneously arbitrate hundreds or thousands of cases. Under the AAA rules that would otherwise apply, the AAA assigns all cases to a modest roster of arbitrators, who then hear each claim individually.[7] The cases would not be tried all at once; instead, they too would be staged, just as under H&R Block's more orderly bellwether process—and just as mass tort cases would be staged in court. And if any claimant does not want to participate in orderly staged proceedings in arbitration, they have an alternative: The OSA arbitration clause allows a claimant to pursue an individual small claims court action instead. Schuessler Decl. Ex. 4 § 11.1.

Moreover, and relatedly, because bellwether proceedings promote settlement, they encourage resolution of the vast majority of claims in a reasonable time frame. That's no different from MDL proceedings in court. Although MDL bellwethers cannot force settlement, they are "designed to produce a verdict that would highlight the strengths and weaknesses of the parties' respective cases" and thereby "promote [global] settlement." *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 995 (9th Cir. 2008); *see also, e.g.*, *Briggs v. Merck Sharp & Dohme*, 796 F.3d

[7] Under Rule MA-7(C) of the AAA's Mass Arbitration Supplementary Rules, "if the number of individual cases exceeds the number of qualified arbitrators in the locale . . ., the AAA[] may assign multiple cases to a single Merits Arbitrator, who will decide each case on its own merits."

1038, 1051 (9th Cir. 2015) ("[a] bellwether trial is a test case that is typically used to facilitate settlement in similar cases").

In practice, MDLs—including bellwether trials—have proven to be remarkably effective at achieving settlements. Since 1968, when Congress passed the MDL statute, transferee courts have remanded back to the originating courts fewer than 3% of all cases consolidated into an MDL, which means that 97% of cases were terminated in the MDL without a remand for trial.[8]

One study by an NYU School of Law center determined that between 2000 and 2015, 72% of the MDL case terminations resulted from settlement. NYU Center on Civil Justice, *What the Data Show: Mapping Trends in Multidistrict Litigation* (Sept. 2015), https://bit.ly/3zoDwAp; *see also Manual for Complex Litigation, Fourth* § 20.132 (2004) ("Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court."). As one expert has observed, "nothing encourages global MDL settlement like setting bellwether trials." Hon. Stephen R. Bough & Anne E. Case-Halferty, *A Judicial Perspective on Approaches to MDL Settlement*, 89 UMKC L. Rev. 971, 976 (2021) (quoting Special Master David Cohen). California's unconscionability doctrine does not forbid adapting this MDL approach for mass arbitration.

*Second*, in *Pandolfi*, this Court criticized AviaGames's bellwether provision for being non-mutual. *Pandolfi*, 2024 WL 4051754, at *7. With respect, that criticism is misplaced. Mass arbitrations—like class actions—are almost invariably brought by consumers against a company and not the other way around. Yet the law is clear that arbitration agreements precluding class proceedings are enforceable. *Concepcion*, 563 U.S. 333. Simply put, the fact that mass arbitration is a one-sided phenomenon does not and cannot mean that California law forbids companies from utilizing reasonable procedures to address that phenomenon. California law does not require point-by-point mutuality of all contract terms. *See, e.g.*, *Sanchez*, 353 P.3d at 749 (contract can provide "extra protection" to drafter). Accordingly, the bellwether provision is not unconscionable on these grounds.

---

[8] *See* U.S. J.P.M.L., *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2021* at 3 (2021), https://bit.ly/3feso28 ("Since the creation of the Panel in 1968, . . . a total of 17,357 actions have been remanded for trial and 647,396 actions have been terminated in the transferee court.").

*Third*, and relatedly, the *Pandolfi* order did not adequately account for a very real-world problem addressed by the bellwethering procedures—the rise of abusive mass arbitrations containing large numbers of frivolous and unvetted claims. *See generally* U.S. Chamber of Commerce Institute for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* 37 (Feb. 2023), https://bit.ly/3qTzu1q.[9] The manner in which mass arbitrations are assembled—typically by using social media advertisements to amass claimants—greatly increases the risk that the underlying claims are illegitimate. *Id.* at 21, 34. And examples abound of mass arbitrations containing large percentages of unsupportable claims. *Id.* at 36-38.[10]

The mass arbitration pursued by Zimmerman Reed here is a prime example of this phenomenon, with a review of H&R Block's records indicating that 4 out of 10 claimants cannot truthfully assert the factual allegation set forth in their Notices of Dispute. *See* page 6, *supra*. As this pattern shows, plaintiffs' lawyers cannot blindly trust the unverified information typed into online forms by social media or other Internet users recruited to be arbitration claimants. And a bellwether approach helps to address the problem by enabling parties to resolve mass claims based on actual arbitration resolutions of some of the claims—rather than coerced settlements reflecting merely the aggregate number of threatened claims and associated arbitration fees, regardless of the merits of the claims or whether the claims are frivolous or unvetted. California unconscionability law requires courts to consider the practical realities that might justify the inclusion of the challenged contract term, *see, e.g.*, *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 630 (2021) (citing Cal. Civ. Code § 1670.5(b)), and here the practical realities strongly support the conclusion that a bellwether approach to resolving mass arbitrations is commercially reasonable.

*c. The FAA preempts plaintiffs' unconscionability challenge.*

Even if the bellwethering procedures in the OSA were unconscionable under California law (they are not), the FAA would preempt that state-law holding for two reasons.

---

[9] This white paper was authored by some of the defense counsel here.

[10] *See also, e.g.*, Decl. of Alicia Baiardo ¶¶ 31-37, Dkt. 21, & Exs. 45-54, Dkt. 21-2, *Penuela v. Wells Fargo & Co.*, 24-cv-766 (N.D. Cal. May 28, 2024) (attaching process arbitrator's order dismissing 89% of claimants because plaintiffs' counsel could not attest that those claimants were actual Wells Fargo customers with the account feature at issue who incurred the relevant fee within the statute of limitations).

First, "the FAA . . . preempts any state law rule discriminating on its face against arbitration," *Kindred Nursing Centers Limited P'Ship v. Clark*, 581 U.S. 246, 251 (2017), and the unconscionability rule against bellwether clauses has been invented solely for invalidating arbitration agreements. *See Oblix, Inc. v. Winiecki*, 374 F.3d 488, 492 (7th Cir. 2004) (FAA forbids states from applying "any novel rule" to invalidate "arbitration agreements"). California does not deem unconscionable MDL processes in court; indeed, California imposes its own similar process, called Judicial Council Coordination Proceedings, in state courts. *See* Cal. R. Ct. 3.501-50. California therefore cannot adopt an "arbitration-specific" rule against agreements to use similar MDL processes in arbitration. *Kindred*, 581 U.S. at 254.

Second, a state-law rule against bellwether procedures would obstruct "the full purposes and objectives of Congress" in enacting the FAA—which was to "ensure the enforcement of arbitration agreements according to their terms" and "to promote arbitration." *Concepcion*, 563 U.S. at 344-45, 352. Such a rule improperly strips parties of their "discretion in designing arbitration processes" that are "tailored to the type of dispute." *Id.* at 344-45. And by forcing companies to face large numbers of unsupportable and unvetted claims (and attendant coerced settlements), such a state-law rule would impermissibly deter companies from entering into arbitration agreements. *See id.* at 352.

**3. The challenged terms are severable.**

Finally, even if the pre-arbitration and bellwethering procedures were unenforceable (they are not), the remedy would be to sever the provisions, not to deny arbitration altogether. California has a "'strong preference'" for severance. *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1272 (9th Cir. 2017) (quotation omitted). That "strong preference" is codified in California Civil Code § 1599, which provides that "[w]here a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." As the California Supreme Court has explained, Section 1599 "preserves and enforces any lawful portion of a parties' contract that feasibly may be severed." *Marathon Ent., Inc. v. Blasi*, 174 P.3d 741, 750-51 (Cal. 2008).

Both the pre-arbitration and bellwethering procedures can be severed as "collateral to the main purpose of the contract," which is to resolve disputes by arbitration. *Poublon*, 846 F.3d at 1272; *accord Ramirez v. Charter Commc'ns, Inc.*, 551 P.3d 520, 545-46 (Cal. 2024). Here, the OSA expressly provides that "[i]f any portion of this Arbitration Agreement is deemed invalid or unenforceable, it will not invalidate the remaining portions of the Arbitration Agreement." Schuessler Decl. Ex. 4 § 11.7. When "the contract contains a severance clause," as the OSA does, the California Supreme Court has instructed that courts "should take it into account" in the severability analysis. *Ramirez*, 551 P.3d at 547.

Moreover, the OSA's arbitration agreement differs dramatically from the ones at issue in *Heckman* and *Pandolfi*, where the courts rejected severance because "multiple unconscionable provisions" "permeate[d] all aspects of the arbitration agreement," the "central purpose" of which was a "systematic effort" to make arbitration "an inferior forum." *Heckman*, 120 F.4th at 688-89 (quotations omitted); *see also Pandolfi*, 2024 WL 4051754, at *13. For example, this Court in *Pandolfi* deemed three provisions substantively unconscionable: the delegation provision, the bellwether procedures, and a contractual limitations period. 2024 WL 4051754, at *13. The OSA's arbitration agreement, by contrast, does not contain a delegation provision or reduce the limitations period for consumers to bring claims. And it contains no effort to make individual arbitration systematically unfair to consumers. Accordingly, if any terms in the OSA's arbitration agreement are substantively unconscionable, they should be severed. *See Poublon*, 846 F.3d at 1273-74.

## III. Plaintiffs Cannot Evade Arbitration By Invoking *McGill*.

The complaint also indicates that plaintiffs will try to avoid arbitration by invoking the *McGill* rule. *See, e.g.*, Compl. ¶¶ 10, 149, 162 (purporting to seek public injunctive relief). But they cannot do so, for two reasons. First, under Ninth Circuit precedent, the relief they request is private, not public. Second, the arbitration agreements require severing any request by plaintiffs that qualifies as a public injunction, compelling all of their remaining claims to individualized arbitration, and staying their public-injunction request pending the outcome of arbitration.[11]

[11] Separately, defendants maintain that the FAA preempts *McGill*. Defendants recognize, however, that the Ninth Circuit has held to the contrary and therefore raise this additional preemption argument solely to preserve it for future review.

**A. Plaintiffs Request Private, Not Public, Injunctive Relief.**

Plaintiffs seek to enjoin the alleged practice of "intercepting and disclosing sensitive taxpayer data—including protected tax return information—to Meta, Google and/or other third-parties." Compl. ¶ 10; *see also id.* ¶¶ 143, 149, 162. That relief is by definition limited to H&R Block clients like plaintiffs who use H&R Block's online tax filing services, and controlling Ninth Circuit precedent makes clear that injunctive relief primarily focused on a defendant's customers *is not* public injunctive relief. *See Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 548-49 (9th Cir. 2021).

In *Hodges*, for example, the Ninth Circuit held that the requested injunctions regarding how Comcast treats the personal data of its cable subscribers were private, not public, in nature. 21 F.4th at 548-49. As the *Hodges* court explained, there "is simply no sense in which this relief could be said to *primarily* benefit the general public *as a more diffuse whole*," even if *future* Comcast subscribers would benefit from "forward-looking prohibitions against future violations of law." *Id.* (second emphasis added). The *primary* beneficiaries of such an injunction are still "Comcast 'cable subscribers,'" who are "a 'group of individuals similarly situated to the plaintiff.'" *Id.* (quoting *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017)).

Similarly, in *Cottrell v. AT&T Inc.*, the Ninth Circuit held that the requested injunctions, including one to "refrain from committing future violations of the California law by signing customers up for products or services without authorization," sought private relief. 2021 WL 4963246, at *1-2 (9th Cir. Oct. 26, 2021). The court rejected the argument that any member of the public could walk into an AT&T store and be subject to the challenged conduct, because the challenged conduct could occur only after an individual "first transact[ed] in some way with AT&T by providing payment and billing information"—that is, "the individual must become a customer." *Id.* at *1; *see also, e.g.*, *Stout v. Grubhub, Inc.*, 2021 WL 5758889, at *7-8 (N.D. Cal. Dec. 3, 2021) (Chen, J.) (injunction requiring Grubhub to stop charging a certain fee to Grubhub+ subscribers was private because it was "primarily designed to benefit Grubhub+ subscribers only, even if the public may incidentally benefit").

The injunction here is private, not public, under *Hodges* and the other cases just discussed. Indeed, plaintiffs' request for an injunction directed at H&R Block's practices with respect to its clients' information is indistinguishable from the relief sought in *Hodges*, which sought to change "Comcast's privacy and data-collection practices" with respect to its subscribers. *Hodges*, 21 F.4th at 538, 548-49. And plaintiffs' argument that the injunction is public because it could benefit members of the public who become H&R Block clients in the future (Compl. ¶¶ 10, 149) is the exact argument that the Ninth Circuit *rejected* in *Hodges* and *Cottrell*.

**B. Any Requests By Plaintiffs For Public Injunctive Relief Must Be Severed And Stayed Pending The Outcome Of Arbitration.**

Even if any of plaintiffs' requests for injunctive relief qualified as public injunctive relief under *McGill*—they do not—those requests would not permit them to avoid arbitration of the rest of their claims and requests for relief. Rather, their arbitration agreements provide that if any of the agreement's limitations on non-individualized relief is unenforceable "as to a particular claim or any particular request for a remedy for a claim (*such as a request for public injunctive relief*), then the parties agree that the particular claim or the particular request for a remedy (and only that particular claim or particular request for a remedy) must remain in court and be severed from any arbitration." Schuessler Decl. Ex. 4 § 11.4 (emphasis added).

This severability language is fully enforceable. The Ninth Circuit has made clear that "[p]arties are welcome to agree to split decisionmaking between a court and an arbitrator" by "requiring the arbitrator to adjudicate liability first" and "carv[ing] out only the potential public injunctive remedy" for judicial determination after the conclusion of arbitration. *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 831 (9th Cir. 2019); *accord Stout*, 2021 WL 5758889, at *9-11; *Lag Shot LLC v. Facebook, Inc.*, 545 F. Supp. 3d 770, 785-86 (N.D. Cal. 2021). The language in the OSA easily "satisfies the particularity requirement from *Blair*." *Lag Shot*, 545 F. Supp. 3d at 786.

Accordingly, if the Court concludes that any of the relief plaintiffs request is public injunctive relief under *McGill* (which it should not), the Court should compel arbitration of all of plaintiffs' individual claims and requests for individual relief, and stay the litigation of plaintiffs' public-injunction request. *See Lag Shot*, 545 F. Supp. 3d at 786.

**IV. This Action Should Be Stayed Pending Arbitration.**

When, as here, the FAA governs an arbitration provision that covers a plaintiff's claims, Section 3 of the FAA directs the district court to compel arbitration and stay the lawsuit. *See* 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 478-79 (2024).

**CONCLUSION**

The Court should compel plaintiffs to arbitrate their claims in accordance with their arbitration agreements and stay further litigation (including any requests by plaintiffs for public injunctive relief) pending the outcome of arbitration.

Dated: July 14, 2025

Respectfully submitted,

By: */s/ Archis A. Parasharami*

Archis A. Parasharami
*aparasharami@mayerbrown.com*
MAYER BROWN LLP
575 Market Street, Suite 2500
San Francisco, CA 94105
Telephone: (415) 874-4230

Attorneys for Defendants HRB Digital, LLC and HRB Tax Group, Inc.