**ZIMMERMAN REED LLP**
Ryan J. Ellersick (SBN 357560)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel (877) 500-8780
Fax (877) 500-8781
ryan.ellersick@zimmreed.com

**ZIMMERMAN REED LLP**
Zain A. Shirazi (SBN 302841)
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel (612) 341-0400
Fax (612) 341-0844
zain.shirazi@zimmreed.com

*Attorneys for Plaintiffs and the Classes*

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEDRO RIOS, JR., and CHRISTIAN MARQUEZ, individually, and on behalf of those similarly situated, | Case No. 3:25-cv-03530-EMC |
| Plaintiffs, | *Assigned to the Honorable Edward M. Chen* |
| vs. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY LITIGATION** |
| HRB DIGITAL, LLC, a Delaware Corporation, HRB TAX GROUP, INC., a Missouri Corporation, | Date:    August 28, 2025 |
| Defendants. | Time:    1:30 PM |
| | Courtroom: 5, 17th Floor |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .......................................................................................1

    I.    H&R Block Disclosed Private Taxpayer Information to Third Parties Through Online Tracking Tools in Violation of Federal and State Law. ....................................................1

    II.    H&R Block Sought to Insulate Itself from Liability Through Unconscionable Terms Foisted Upon Unsuspecting Customers in a Contract of Adhesion. ................................2

    III.    H&R Block Delayed and Obstructed Plaintiffs' Ability to Advance their Claims in Arbitration. ........................................................................................................4

    IV.    H&R Block's Mass Arbitration Protocol Allows Only 20 Claims to Proceed in AAA. ..6

    V.    Claims in AAA Take Far Longer than the 120 Days Referenced in the OSA. ................7

ARGUMENT .............................................................................................................8

    I.    The FAA Does Not Apply to H&R Block's Mass Arbitration Protocol, and the Class Action Waiver is Therefore Unenforceable Under California's *Discover Bank* Rule. .....8

        A.  H&R Block's Mass Arbitration Protocol Requires Aggregation and Creates Delay ..8

        B.  H&R Block's Mass Arbitration Protocol is not "Arbitration" Under the FAA. .......11

        C.  The Class Action Waiver is Unenforceable Under California's Discover Bank Rule ....................................................................................................13

    II.    H&R Block's Mass Arbitration Protocol and Pre-Filing Conference Requirement are Unconscionable and Unenforceable. ...............................................................15

        A.  The Arbitration Agreement Is Procedurally Unconscionable. ..................................15

            1.  The Arbitration Agreement is Oppressive. .......................................................15

            2.  The Arbitration Agreement is the Product of Surprise. ....................................17

        B.  The Mass Arbitration Protocol and Pre-Filing Conference Requirement are Substantively Unconscionable .......................................................................18

            1.  The Mass Arbitration Protocol is Substantively Unconscionable .....................19

            2.  The Pre-Filing Conference Requirement is Substantively Unconscionable. ......21

        C.  The Offending Provisions Should not be Severed to Save the Arbitration Agreement. ....................................................................................................23

        D.  H&R Block's Request for a Stay Should Be Rejected. ............................................24

CONCLUSION .........................................................................................................25

i

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

**Cases**

*A&M Produce Co. v. FMC Corp.,*
  135 Cal.App.3d 473 (1982) ....................................................................15

*Acad. of Cal. Optometrists, Inc. v. Superior Court,*
  51 Cal.App.3d 999 (1975) .....................................................................21

*Am. Pipe & Const. Co. v. Utah,*
  414 U.S. 538 (1974) ...............................................................................7

*Armendariz v. Found Health Psychcare Servs., Inc.,*
  24 Cal.4th 83 (2000) ..............................................................................20

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) ................................................................ 1, 11, 12, 14

*Bielski v. Coinbase, Inc.,*
  87 F.4th 1003 (9th Cir. 2023) ...........................................................22, 23

*Blair v. Rent-A-Center, Inc.,*
  928 F.3d 819 (9th Cir., 2019) ...............................................................25

*Booker v. Charter Commc'ns, LLC,*
  No. B322813, 2025 WL 1910954 (Cal. Ct. App. July 11, 2025) ...........14

*Caimano v. H&R Block,*
  No. CV 23-3272, 2024 WL 3295589 (E.D. Pa. July 3, 2024) ................2

*Discover Bank v. Superior Ct.,*
  36 Cal. 4th 148 (2005) ..........................................................................14

*Epic Systems Corp. v. Lewis,*
  548 U.S. 497 (2019) ..............................................................................11

*Gentry v. Sup. Ct.,*
  42 Cal. 4th 443 (2007) .....................................................................16, 17

*Gilmer v. Interstate/Johnson Lane Corp.,*
  500 U.S. 20 (1991) ................................................................................11

*Haydon v. Elegance at Dublin,*
  97 Cal. App. 5th 1280 (2023) ................................................................16

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024) ............................................................. 1, 8, 9, 11, 12, 13, 24

*Hodges v. Comcast Cable Comm, LLC*,
21 F.4th 535 (9th Cir. 2021) ................................................................................. 25

*Hunt v. Meta Platforms, Inc.*,
729 F. Supp. 3d 964 (N.D. Cal. 2024) ............................................................. 2, 18

*In re Meta Pixel Tax Filing Cases*,
No. 22-CV-07557-PCP, 2024 WL 1251350 (N.D. Cal. Mar. 25, 2024) ................... 2

*Ingle v. Circuit City Stores, Inc.*,
328 F.3d 1165 (9th Cir. 2003) ............................................................................. 15

*Jones v. Starz Entertainment, LLC*,
129 F.4th 1176 (9th Cir. 2025) .................................................................... 12, 13

*Kinney v. United Healthcare Servs., Inc.*,
70 Cal. App. 4th 1322 (1999) ............................................................................. 15

*Kramer v. Coinbase, Inc.*,
105 Cal. App. 5th 741 (2024) ............................................................................. 25

*MacClelland v. Cellco Partnership*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) ........................................... 9, 10, 19, 20, 24

*Maldonado v. Fast Auto Loans, Inc.*,
60 Cal. App. 5th 713 (2021) ............................................................................... 25

*McGill v. Citibank, N.A.*,
2 Cal. 5th 945 (2017) ......................................................................................... 25

*Meadows v. Cebridge Acquisition, LLC*,
132 F.4th 716 (4th Cir. 2025) ....................................................................... 22, 23

*Mejia v. DACM Inc.*,
54 Cal. App. 5th 691 (2020) ............................................................................... 25

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016) ............................................................................ 16

*OTO, L.L.C. v. Kho*,
8 Cal. 5th 111 (2019) ......................................................................................... 17

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

*Pappas v. AMN Healthcare Servs.*,
  762 F. Supp. 3d 862 (N.D. Cal. 2025) ...........................................................................15

*Pandolfi v. AviaGames, Inc.*,
  No. 23-CV-05971-EMC, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024) ...............................19, 20, 24

*Ramirez v. Charter Commc'ns, Inc.*,
  16 Cal. 5th 478 (2024) ...........................................................................24

*Ramsey v. Comcast Cable Comm., LLC*,
  99 Cal. App. 5th 197 (2023) ...........................................................................25

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co., Inc.*,
  6 Cal. 5th 59 (2018) ...........................................................................21

*Smith v. Google, LLC*,
  No. 23-CV-03527-PCP, 2024 WL 2808270 (N.D. Cal. June 3, 2024) ...................................2

*Stout v. Grubhub Inc.*,
  2021 WL 5758889 (N.D. Cal., Dec. 3, 2021) ...........................................................................25

*Swain v. LaserAway Med. Grp., Inc.*,
  57 Cal. App. 5th 59 (2020) ...........................................................................16

*Trivedi v. Curexo Tech. Corp.*,
  189 Cal. App. 4th 387 (2010) ...........................................................................18

*Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*,
  131 F.4th 661 (9th Cir. 2025) ...........................................................................9

*Vasquez v. Cebridge Telecom CA*,
  569 F. Supp. 3d 1016 (N.D. Cal. 2021) ...........................................................................25

*Zuckerman v. Charter Commc'ns, LLC*,
  No. 24-CV-128-WQH-BJC, 2024 WL 4871739 (S.D. Cal. Nov. 22, 2024) ...................................16

**Statutes**

28 U.S.C. §1407 ...........................................................................9

9 U.S.C. § 2 ...........................................................................8

Cal. Code of Civ. Proc. § 116.540 ...........................................................................20

Federal Rules of Civil Procedure 23 ...........................................................................9

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

**Other**

*Richard Frankel, Fighting Mass Arbitration: An Empirical Study of the Corporate Response to Mass Arbitration and Its Implications for the Federal Arbitration Act,*

   78 Vand. L. Rev. 133 (2025) .........................................................................12, 23

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

**INTRODUCTION**

The promise of consumer arbitrations is "greater efficiency and speed" in adjudicating small claims. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011). In the wake of revelations that H&R Block disclosed private taxpayer information to big tech companies without consent, consumers bound by H&R Block's arbitration agreement sought relief through this "efficien[t]" and "speed[y]" alternative forum. What they found was a dead end. Under H&R Block's mass arbitration protocol, virtually all consumers are shoved to the sidelines and prevented from even filing their claims in arbitration. Instead, they must wait years or decades to secure a hearing with an arbitrator. The process is neither efficient nor speedy and does not remotely resemble traditional bilateral arbitration contemplated by the Federal Arbitration Act ("FAA"). Therefore, the FAA does not preempt application of the *Discover Bank* rule, which holds that class action waivers in consumer contracts are unconscionable as a matter of law. *See Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 691 (9th Cir. 2024). H&R Block's arbitration agreement is also plagued by unconscionability that renders the agreement unenforceable. Because the promise of consumer arbitration rings hollow in this case, the Court should deny the motion to compel arbitration and allow Plaintiffs to stay in court.

**FACTUAL BACKGROUND**

**I.    H&R Block Disclosed Private Taxpayer Information to Third Parties Through Online Tracking Tools in Violation of Federal and State Law.**

In November 2022, *The Markup* published a report revealing that H&R Block and other tax preparation companies were unlawfully disclosing taxpayer information to Facebook through online tracking tools. Decl. of Ryan Ellersick Ex. 1. In response to *The Markup* report, the U.S. Senate opened an investigation. *Id.* Ex. 2. In July 2023, the Senate issued a report finding that, "[t]hrough the Meta Pixel and Google's business tools, the tax prep companies investigated in this report," including H&R Block, "recklessly disclosed and misused the personal tax return information of potentially millions of taxpayers." *Id.* Ex. 2 at 39. The findings of misconduct were so serious that the report recommended that H&R Block and the other tax companies "should be immediately investigated by the DOJ, IRS, TIGTA, and FTC, and liable actors should be duly prosecuted." *Id.* Taxpayers impacted by the unlawful disclosures filed class action lawsuits against Meta and Google, which courts allowed to proceed over

1

the tech companies' initial motions to dismiss. *See In re Meta Pixel Tax Filing Cases*, No. 22-CV-07557-PCP, 2024 WL 1251350 (N.D. Cal. Mar. 25, 2024); *Smith v. Google, LLC*, No. 23-CV-03527-PCP, 2024 WL 2808270 (N.D. Cal. June 3, 2024).

## II.    H&R Block Sought to Insulate Itself from Liability Through Unconscionable Terms Foisted Upon Unsuspecting Customers in a Contract of Adhesion.

Some taxpayers impacted by the unlawful disclosures also filed claims in court against H&R Block. But because H&R Block's Online Services Agreement ("OSA") contained an arbitration agreement, claimants were required to seek relief through private arbitration before the American Arbitration Association ("AAA"). *See Hunt v. Meta Platforms, Inc.*, 729 F. Supp. 3d 964, 971 (N.D. Cal. 2024) (compelling plaintiff to arbitration); *Caimano v. H&R Block*, No. CV 23-3272, 2024 WL 3295589, at *17 (E.D. Pa. July 3, 2024) (same). With the courtroom doors closed to impacted taxpayers, the only available avenue for relief was through arbitration. As shown below, however, H&R Block's arbitration process has proven entirely unworkable, exposing the arbitration clause as nothing more than a sham agreement designed to delay and obstruct claimants' ability to advance their claims.

H&R Block's OSA is a classic contract of adhesion, imposed on consumers seeking to utilize H&R Block's online tax preparation services on a take it or leave it basis, without any ability to negotiate terms. Consumers cannot use H&R Block's online tax preparation services without first agreeing to the form contract drafted by H&R Block. *See* Decl. of Valerie Schuessler ¶¶ 3, 7-10.

The arbitration agreement within the OSA contains several provisions relevant to this case:

- Opt-Out Provision (OSA ¶ 11.1): The arbitration agreement covers "all disputes and claims" between consumers and H&R Block. Even if a consumer opts out of the arbitration agreement, the OSA provides that, "any prior arbitration agreement shall remain in force and effect."

- Notice of Dispute (OSA ¶ 11.2(A)): Before initiating an arbitration, a consumer must mail to H&R Block's headquarters a written Notice of Dispute containing (1) the claimant's name, address, telephone number, and e-mail address; (2) the nature or basis of the dispute or claim; (3) the specific relief sought; and (4) the claimant's signature.[1]

---

[1] At different times, H&R Block has also required the Notice to include a claimant's partial Social Security Number. Ellersick Decl. Ex. 17 ¶ 11.2(A).

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

- Informal Settlement Conference (OSA ¶ 11.2(B)): Within 60 days of the Notice being "received," H&R Block can request an Informal Settlement Conference on an individual basis. A consumer is required to "personally participate" in the conference. If the consumer has an attorney, the attorney can attend the conference only if the consumer provides a "signed statement . . . authoriz[ing] the H&R Block Parties to disclose [the consumer's] confidential tax and account records to [] counsel."

- Tolling Provisions (OSA ¶ 11.2(B)): The OSA contains two provisions related to tolling of the statute of limitations, both of which are triggered by H&R Block's unilateral determination of what constitutes a "fully complete Notice":

  o ¶11.2(B): "Any applicable statute of limitations will be tolled for the claims and relief set forth in the Notice during the period between the date that either you or we send the other a fully complete Notice, until the later of (1) 60 days after receipt of the Notice; or (2) if a Settlement Conference is timely requested, 30 days after completion of the Settlement Conference (the 'Informal Resolution Period')."

  o ¶ 11.6: "If this section 11.6 applies to a Notice, the statute of limitations applicable to the claims and relief set forth in that Notice shall be tolled from the beginning date of the Informal Resolution Period until that Notice is selected for a bellwether proceeding, withdrawn, or otherwise resolved."

- Class Action Waiver (OSA ¶ 11.4): Consumers waive the right to a trial by jury and "to assert or participate in a class action lawsuit or class action arbitration."

- Mass Arbitration Protocol (OSA ¶ 11.6): A provision called "Arbitration of similar claims," states that "[i]f 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (regardless of whether the cases are submitted simultaneously), all of the cases must be resolved in arbitration in stages using staged bellwether proceedings." The protocol requires claims to initially proceed in batches of 20 (with each side selecting 10 cases) for the first two rounds, then batches of 50 for all subsequent rounds. "[N]o other cases may be filed in arbitration" while each batch proceeds through the arbitration process. Arbitrators are "encouraged" but not required "to resolve the cases within 120 days of appointment."

### III.    H&R Block Delayed and Obstructed Plaintiffs' Ability to Advance their Claims in Arbitration.

Consistent with the terms of the OSA, on September 20, 2024, counsel for Plaintiffs Rios and Marquez sent H&R Block a Pre-Filing Notice of Dispute Letter ("Pre-Filing Letter") via first class certified mail to H&R Block's Legal Department at the address designated in the OSA. Ellersick Decl. Ex. 3. The Pre-Filing Letter fully complied with the requirements of ¶ 11 of the OSA, as it provided a detailed explanation of the factual and legal bases for the privacy law claims asserted by Rios, Marquez, and approximately 2,480 other Claimants represented by Plaintiffs' counsel. The Pre-Filing letter did not seek a collective resolution but instead made clear that each Claimant presented individual claims. The Pre-Filing Letter also contained three ShareFile links:[2] (1) Exhibit A, containing a list of all Claimants, including their name, email address, phone number, mailing address, and the first five digits of their social security number; (2) Exhibit A-1, containing 2,481 individually signed Notices of Dispute, one for each Claimant, that provided a further description of the individual claimant's legal claims, relief sought, and all other information required by ¶11.2(A); and (3) Exhibit A-2, which contained 2,481 individually signed Consents to Disclose Tax Information to Attorneys ("Tax Consent forms") authorizing H&R Block to share the Claimant's tax information with counsel as part of any Informal Settlement Conference. Ellersick Decl. ¶ 9, Ex. 3. On September 27, 2024, a representative of H&R Block executed an acknowledgement confirming receipt of the Pre-Filing Letter. *Id.*, Ex. 6.

H&R Block's first move was to delay and obstruct the process. On October 17, 2024, H&R Block responded to the Pre-Filing Letter by asserting that the "'Pre-filing Notice of Dispute' [did] not conform with the terms of the Online Services Agreement ('OSA') between H&R Block and each of its clients." *Id.* Ex. 8. Despite the OSA containing no individual envelope or mailing requirement, H&R Block asserted that the OSA required Plaintiffs' counsel to individually and separately mail each Notice of Dispute on behalf of the approximately 2,481 Claimants. Because the individually signed Notices of Dispute were provided in a ShareFile link contained within the Pre-Filing Letter (which itself was mailed

---

[2] ShareFile is a cloud-based platform that facilitates secure and encrypted file sharing. AAA uses ShareFile for the filing and administration of mass arbitrations. *See* "Submission instructions," https://www.adr.org/industries/consumer-mass-arbitration/ ("Mass arbitrations may be submitted only through the AAA's ShareFile platform.").

to and signed for by H&R Block as being received), H&R Block took the position that the Notices of Dispute were "improper and ineffective." *Id.*

On October 23, 2024, Plaintiffs' counsel responded to H&R Block, disagreeing that the Notices of Dispute were defective in any way, and again attaching the ShareFile links to the Claimant list, the signed Notices of Dispute, and the signed Tax Consent forms. *Id.* Ex. 9.

On November 7, 2024, H&R Block reiterated its position that the Pre-Filing Letter did "not comply with the clear terms of the OSAs and [did] not give proper or effective notice of any claimant's dispute with H&R Block." *Id.* Ex. 10. Despite having access to all the available Claimant data and the signed Notices of Dispute and Tax Consent forms, H&R Block doubled down on its position that Plaintiffs' counsel was required to separately mail the documents to H&R Block's headquarters:

> You state that your September 20 letter is sufficient because it provides 'ShareFile links' to electronic files 'H&R Block could access,' which you state consist of 2,481 'Individual Pre-Arbitration Notices of Dispute' and 'Individual Consents to Disclose Tax Information to Attorneys.' The OSAs do not provide for notice of a claim to be given through 'access' to electronic ShareFile links. Rather, as detailed in my letter of October 17, 2024, the OSAs require that '[a] party who intends to seek arbitration must first mail a written Notice of Dispute ('Notice') to the other party,' and that such notice 'must be on an individual basis.' *Id.* § 11.2(A). A purported ShareFile link to 2,481 Notices of Dispute is not a mailed written Notice of Dispute made on an individual basis. Nor is it consistent with the parties' agreement in the OSAs that '[y]ou and the H&R Block Parties also agree that each may bring claims against the other in arbitration only in your or their respective individual capacities and in so doing you and the H&R Block Parties hereby waive the right . . . to assert or participate in . . . any . . . joint or consolidated arbitration of any kind.' *Id.* at § 11.4.
>
> To the extent any of the 2,481 putative claimants referenced in your letter wishes to proceed with a claim, please mail an individualized Notice of Dispute to H&R Block-Legal Department, Attention: Notice of Dispute, One H&R Block Way, Kansas City, MO 64105. We will review any Notices received and will work to set up Informal Settlement Conferences at mutually agreed upon times.

Further, despite not providing a copy or link to any particular form in the OSA published on its website, H&R Block took the position that Claimants had to separately execute a specific tax authorization form H&R Block provided, not the Tax Consent form already signed by Claimants. *Id.* H&R Block's conduct in this regard was contrary to ¶ 11.2(B) of the OSA, which simply required a "signed statement" authorizing disclosure to counsel, not use of H&R Block's own form.

On November 21, 2025, Plaintiffs' counsel again disputed H&R Block's hyper-technical reading of the OSA, pointing out that, "[t]here is no material difference as to whether the Notices of Disputes

were provided via 2,481 individually mailed letters or more efficiently via a single letter, sent to H&R Block by certified mail, providing a ShareFile link that provided access to the exact same documents for [H&R Block's] review." *Id.* Ex. 11. Plaintiffs' counsel also highlighted that the individual Tax Consent forms signed by Claimants—and provided to H&R Block with the Pre-Filing Letter—was materially identical to the form H&R Block demanded Claimants sign in order to advance their claims, suggesting H&R Block was simply "creat[ing] new and different barriers" to force delay by unnecessarily requiring Claimants to execute a duplicative form. *Id.*

On December 5, 2024, H&R Block finally "agree[d] to accept service of [the] Notices of Dispute sent on behalf of 2,481 claimants," but did so "without waiving any rights and expressly reserving all rights." *Id.* ¶ 19-21, Ex. 12. H&R Block stated that it would "review the submissions and send responses, including requests for informal settlement conferences." *Id.* Ex. 12. But H&R Block continued to maintain that Claimants had to execute the specific tax authorization form provided by H&R Block to participate in the Informal Settlement Conferences, disregarding the Tax Consent forms provided. *Id.*

## IV. H&R Block's Mass Arbitration Protocol Allows Only 20 Claims to Proceed in AAA.

On April 21, 2025, Zimmerman Reed filed 25 arbitration demands in AAA on behalf of clients other than Plaintiffs.[3] *Id.* ¶ 27. The parties eventually agreed to hold 5 claims in abeyance, allowing just 20 to proceed forward with AAA. *Id.* Under the batched filing provision in ¶ 11.6 of the OSA, no additional demands may be filed in arbitration until the first batch of 20 claims are completely resolved. *Id.* ¶ 28. As a result, Plaintiffs cannot file and advance their claims in AAA for an indefinite period. *Id.* For Rios or Marquez (or any other Zimmerman Reed client) to file their claims in AAA and proceed with an individual arbitration: (1) the first batch of 20 arbitrations would have to conclude, and claimants would need their names selected over other claimants as part of the second batch of 20; or (2) claimants would have to find legal counsel who did not have clients with similar claims against H&R Block. *Id.*

With the arbitration process effectively stalled, on April 22, 2025, Plaintiffs Rios and Marquez

---

[3] Because H&R Block did not begin sending individual demands that Claimants participate in the Informal Settlement Conferences until December 18, 2024—more than 60 days after they were received on September 27, 2024—the Claimants who filed the 25 arbitration demands did not participate in pre-filing conferences. Ellersick Decl. ¶¶ 24-26.

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

sought relief for their claims in this Court.[4] *Id.* ¶ 29; Compl. (Dkt 1.). Plaintiffs filed in court because their claims, like those of other absent class members, were subject to indefinite delay under H&R Block's mass arbitration protocol. Rios Decl. ¶¶ 4-5; Marquez Decl. ¶¶ 4-5. Plaintiffs' only other option was to retain a law firm that does not represent 20 clients with similar claims and thus lacks experience in handling online privacy disputes. Rios Decl. ¶¶ 8-9; Marquez Decl. ¶¶ 8-9. Frustrated by the inability to advance their claims in arbitration, Plaintiffs agreed to serve as class representatives in this action. Rios Decl. ¶ 4; Marquez Decl. ¶ 4. Further, because H&R Block "reserved all rights" to challenge the Notices of Dispute, the tolling of any statute of limitations for unfiled claims was uncertain. Ellersick Decl. ¶¶ 22-23. This action thus ensures tolling of the thousands of claims forced to the sidelines by H&R Block's mass arbitration protocol. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974).

## V.    Claims in AAA Take Far Longer than the 120 Days Referenced in the OSA.

Paragraph 11.6 of the OSA states that: "The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible, consistent with principles of fundamental fairness." Schuessler Decl. Ex. 4 ¶ 11.6. H&R Block knows arbitrations under this provision are not resolved within 120 days, but H&R Block continues to make this representation. Ellersick Decl. ¶¶ 35-37.

Zimmerman Reed clients are not the only H&R Block customers who ran into the brick wall of H&R Block's arbitration process. For example, the law firm Korein Tillery, LLC represents more than 25,000 clients with claims against H&R Block. Decl. of Stephen Tillery ¶ 2. In October 2024, Korein Tillery filed 10 arbitration demands in AAA on behalf of its clients, yet not a single case has proceeded to an arbitration hearing to date. *Id.* ¶¶ 3-4. The law firm Milberg Coleman Bryson Phillips Grossman, LLC ("Milberg") also represents thousands of clients with claims against H&R Block. Decl. of Scott Falgoust ¶ 2. In February 2024, Milberg filed 20 arbitration demands in AAA on behalf of its clients. *Id.* ¶ 3. To date—a year and a half after filing—Milberg is still litigating the first batch of 20 arbitrations. *Id.* ¶ 4. The two plaintiffs compelled to arbitration in the *Caimano* case have likewise not seen a resolution of their individual claims in arbitration (at least as of June 10, 2025), despite filing demands with AAA in August 2024. Ellersick Decl. ¶¶ 39-41, Ex. 18-19. The OSA's reference to "120 days" is

---

[4] Plaintiffs Rios and Marquez have discharged any other counsel that they previously retained and are proceeding solely with their disputes against H&R Block represented by Zimmerman Reed.  Decl. of Pedro Rios Jr. ¶ 3; Decl. of Christian Marquez ¶ 3.

7

therefore misleading, giving claimants false hope that H&R Block's arbitration process provides an efficient mechanism for timely dispute resolution, when it does not.

## ARGUMENT

H&R Block's arbitration process is fundamentally broken. Through its mass arbitration protocol, H&R Block pushes virtually all claimants to the sidelines through a complex aggregation process plagued by delays. Because H&R Block's mass arbitration protocol is not traditional bilateral arbitration contemplated by the FAA, California's *Discover Bank* rule mandates that this case remain in court. In addition, the arbitration agreement is unconscionable and unenforceable under California law, and the unconscionable provisions cannot be severed. The motion to compel should be denied.

**I.     The FAA Does Not Apply to H&R Block's Mass Arbitration Protocol, and the Class Action Waiver is Therefore Unenforceable Under California's *Discover Bank* Rule.**

Section 2 of the FAA provides, in relevant part, that "[a] written provision in . . . a contract . . . to settle by *arbitration* . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2 (emphasis added). The word "arbitration" as reflected in the FAA is not all-encompassing. As the Ninth Circuit recently recognized in *Heckman.*, "[s]imply labeling something as 'arbitration' does not automatically bring it within the ambit of the FAA's protection." 120 F.4th at 691  (VanDyke, J. concurring); *see also id.* at 689 (agreeing with the concurrence). Here, the OSA contains a mass arbitration protocol that requires aggregation of similar cases brought by the same or coordinated counsel, and which utilizes a staged system of batching and bellwether proceedings. This system of aggregation and delays departs dramatically from the type of informal, speedy, and efficient bilateral arbitration that Congress had in mind when it passed the FAA in 1925. Because H&R Block's mass arbitration protocol is not "arbitration" as covered by the FAA, the FAA does not apply. And because the FAA does not apply, California's *Discover Bank* rule prohibiting class action waivers in consumer contracts "springs back to life," *Heckman*, 120 F.4th at 692 (VanDyke, J. concurring).

**A.  H&R Block's Mass Arbitration Protocol Requires Aggregation and Creates Delay.**

H&R Block's mass arbitration protocol applies broadly whenever there are "25 or more claimants . . . raising *similar* claims" and where claimants "are represented by the same or *coordinated* counsel." Schuessler Decl. Ex. 4 ¶ 11.6 (emphasis added). All claims deemed "similar" and

8

"coordinated" are aggregated together. *See id.* This aggregation occurs without the hallmarks of due process afforded in court. For example, there is no explicit or guaranteed process to opt-out of aggregation, an opportunity generally afforded in class action litigation. *See, e.g.*, Federal Rules of Civil Procedure 23(c)(2)(B)(v) (providing that a court will exclude from a Rule 23(b)(3) class "any member who requests exclusion"). Nor is aggregation determined by a panel of seven federal circuit and district judges with decades of experience in consolidated proceedings based on detailed criteria and with an opportunity to oppose consolidation, as in multidistrict litigation. *See* 28 U.S.C. §1407; *Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*, 131 F.4th 661, 668 (9th Cir. 2025); *see also* David F. Herr, *Multidistrict Litigation Manual* § 4:19 "Responding to transfer proceedings" (May 2025).

Under the H&R Block regime, once claims are deemed "similar" and "coordinated" and after having to endure an "Informal Resolution Period," *see* Schuessler Decl. Ex. 4 ¶ 11.2(B)-(C), claims "must be resolved in arbitration in stages using staged bellwether proceedings," *id.* ¶ 11.6. Bellwethers proceed 20 at a time for the first two rounds, and 50 at a time thereafter. *Id.* ¶ 11.6. While the bellwethers proceed, "no other cases may be filed in arbitration." *Id.* In other words, the mass arbitration protocol "sets a cap on the number of arbitrations against [H&R Block] that may proceed at one time." *MacClelland v. Cellco Partnership*, 609 F. Supp. 3d 1024, 1040 (N.D. Cal. 2022). Other "similar" claimants—like Plaintiffs Rios and Marquez—must sit idly by on the sidelines and wait even to file their arbitration demand.[5]

This is fundamentally an "aggregative" procedure eschewed by the court in *Heckman*. Plaintiffs' ability to file and resolve their claims are completely dependent on the filing, speed, and resolution of claims of other persons they have no relation to—other than having hired a common lawyer. And despite being shut out of the process while the small number of initial cases proceed in AAA, those forced to the sidelines, like Plaintiffs, must engage in common settlement procedures based on the bellwether results. *See* Schuessler Decl. Ex. 4 ¶ 11.6. ("[i]f the remaining cases are unable to be resolved after the

---

[5] H&R Block makes much of the fact that Rios and Marquez submitted notices of dispute through other law firms—an understandable situation where, as here, corporate misconduct impacts hundreds of thousands or millions of people who must find an attorney to advance their individual, low-dollar claims, and the claims can potentially languish for years without resolution. Even submitting multiple notices, however, (some as far back as 2023) did not help Plaintiffs advance their claims through H&R Block's mass arbitration protocol. *See* Decl. of Bobbie Crew ¶¶ 7, 10; Rios Decl. ¶ 4; Marquez Decl. ¶ 4.

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

conclusion of the first stage bellwether proceeding" then the parties proceed to the second stage, and "[i]f any claims remain after the second stage, the process will be repeated until all claims are resolved through settlement or arbitration"). H&R Block itself describes the bellwether process as akin to "representative cases" in federal MDL proceedings. Defs.' Mem. of Points and Authorities in Supp. of Mot. to Compel ("Defs.' Mem.") at 15. As noted above, however, in MDL proceedings claimants actually file their claims, gain procedural rights, and have an opportunity to be heard. H&R Block's protocol, by contrast, prohibits claimants from even filing their claims and starting the process. Locking claimants out of arbitration is not "bilateral" arbitration under the FAA—it's no arbitration at all.

What's more, the potential delay caused by this system of aggregation is extreme. Under the mass arbitration protocol, arbitrators are "encouraged" but not required to resolve a batch of bellwether proceedings "within 120 days." Schuessler Decl. Ex. 4 ¶ 11.6. Even assuming each batch of bellwether proceedings is resolved in 120 days,[6] and even ignoring the "Informal Resolution Period," it would take a batch of 10,000 demands over 65 years to resolve. A batch of 2,000 demands (as in this case) would take over 13 years to resolve. In this way, H&R Block can use the mass arbitration protocol to drag out litigation involving all "similar" arbitration demands at a snail's pace, maintaining practical immunity from any monetary damages involving an illegal company-wide policy. And because the mass-arbitration protocol has no off-ramp, claimants are locked into the process for as long as H&R Block desires. *Cf. MacClelland*, 609 F. Supp. 3d at 1043 (approving another company's arbitration protocol where claimants could "opt out of the arbitration process and proceed in court with the remaining claims" if mediation failed following first round of arbitrations).

H&R Block knows these delays are not just likely—they are inevitable. H&R Block requires consumers to "agree to this process even though it may delay the arbitration of [their] claim." Schuessler Decl. Ex. 4 ¶ 11.6. But by agreeing to a potential "delay," no consumer expects to wait a decade or longer to adjudicate a serious but low-dollar privacy claim. Nor does the OSA's assurance of tolling of limitations periods while consumers wait on the sidelines provide any comfort. The tolling provisions

---

[6] A tall feat since, according to AAA, the median time to resolve a consumer arbitration is over twice that. *See* AAA, "Infographic: Consumer Dispute Resolution," 2024, *available at* https://go.adr.org/rs/294-SFS-516/images/2024_Consumer_Dispute_Resolution_Infographic.pdf (last visited July 17, 2025).

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

are triggered only by H&R Block's subjective determination of having received what it considers a "fully complete Notice," which, as demonstrated by this case, can leave consumers in perpetual limbo when H&R Block accepts the Notices of Dispute "without waiving any rights and expressly reserving all rights"—meaning H&R Block can later challenge the adequacy of the Notices and any tolling.

In short, by aggregating all "similar" and "coordinated" claims into a delay-laden regime of batching and bellwethers, H&R Block holds virtually all consumers hostage to a process that offers no real hope of advancing their individual claims.

### B.    H&R Block's Mass Arbitration Protocol is not "Arbitration" Under the FAA.

Whatever H&R Block may label this process, it is not "arbitration" as envisioned by Congress when it passed the FAA in 1925. The Supreme Court has repeatedly emphasized that Congress's twin goals in passing the FAA were (1) enforcement of private agreements to arbitrate, and (2) "encouragement of efficient and speedy dispute resolution." *Concepcion*, 563 U.S. at 345 (citation modified). That second goal is critical, and the Supreme Court has called arguments to the contrary "greatly misleading." *Id*. In *Concepcion*, the Supreme Court derided class arbitration because it "sacrifices the principal advantage of arbitration – its informality – and makes the process *slower*, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 348 (emphasis added). Traditional arbitration as envisioned by the FAA, the *Concepcion* Court pointed out, "foregoes the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, *greater efficiency and speed*, and the ability to choose expert adjudicators to resolve specialized disputes." *Id.* (citation modified) (emphasis added); *see also Epic Systems Corp. v. Lewis*, 548 U.S. 497, 508-09 (2019) ("In the Court's judgment, the virtues Congress originally saw in arbitration" are "its speed and simplicity and inexpensiveness"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (discussing how, by agreeing to arbitrate, parties trade the procedures of courtrooms "for the simplicity, informality, and expedition of arbitration"). Given the inherent procedural formality and delays associated with aggregated litigation, "[t]he Supreme Court has consistently disparaged the use of aggregation in arbitration." *Heckman*, 120 F.4th at 690.

The hallmarks of traditional bilateral arbitration—informality, speed, and efficiency—are notably absent from H&R Block's process. Indeed, the front-end aggregation mandated by H&R Block's

11

mass arbitration protocol—first into batches of 20 and later into batches of 50—creates a procedural dead-end for all other claimants who are left to languish on the sidelines with the timeliness of their claims hanging in the balance. Further, the promise of an individual, bilateral arbitration at the back-end of the batching process is a mirage, as virtually all consumers are forced to wait potentially years on end before seeing the benefits of what is supposed to be "efficient and speedy dispute resolution" process. *Concepcion*, 563 U.S. at 345. This is by design. As one scholar has observed, "[t]he bellwether and batching models that corporations have devised merely reinforce that individualized, speedy arbitration is not their goal. The entire aim of the bellwether process is to avoid individual arbitration." Richard Frankel, *Fighting Mass Arbitration: An Empirical Study of the Corporate Response to Mass Arbitration and Its Implications for the Federal Arbitration Act*, 78 Vand. L. Rev. 133, 210 (2025).

Aggregating consumers into batches and bellwether proceedings is therefore not a minor procedural question designed to create greater efficiency and speed consistent with the FAA. It is procedural quicksand, designed to delay arbitration and make the process slower and less efficient for consumers. While "some parties may and sometimes do agree to aggregation of arbitration claims," with its inherent delays and formality, "the Supreme Court has emphasized that such parties would not be agreeing to arbitration as envisioned by the FAA." *Heckman*, 120 F.4th at 690 (citation modified).

H&R Block's effort to bring its protocol under the umbrella of the FAA does not succeed. First, it is no defense to argue that H&R Block's process is "arbitration" as envisioned by the FAA because it was modeled after MDL proceedings. Defs.' Mem. at 15. Just as "class arbitration was not even envisioned by Congress when it passed the FAA in 1925," *Concepcion*, 563 U.S. at 349, neither was the MDL Panel's centralization process which "was created by an Act of Congress in 1968," *see* Judicial Panel on Multidistrict Litigation, "About the Panel," *available at* https://www.jpml.uscourts.gov/about-panel (last visited July 22, 2025). Again, parties may agree to adopt MDL-style proceedings for their arbitrations, but it would not be "arbitration" governed by the FAA.

Nor does *Jones v. Starz Entertainment, LLC*, 129 F.4th 1176 (9th Cir. 2025) help H&R Block's position. First, in *Jones*, unlike here, all claimants were allowed to immediately file their claims in arbitration. *Id.* at 1179. Second, unlike this case, any limitations period was presumably suspended based on an objective factor—the filing of claims—and did not depend on the defendant's subjective, unilateral

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

determination of the triggering event for tolling. Third, after filing their claims in arbitration, the claimants in *Starz* could request exclusion from any consolidated proceedings and seek to proceed individually. *Id.* at 1183. No such mechanism exists for Plaintiffs. Finally, *Jones* did not overrule *Heckman* or indicate that a *precedential* bellwether process was dispositive of the FAA analysis. Rather, *Jones* recognized that *Heckman* was based on the precedential bellwether process "among other reasons," and noted that had the case "shared even some of [the] defects" discussed by the *Heckman* court, the outcome may have been different. *Id.* at 1182-83.

Indeed, unlike the JAMS consolidation rules addressed by *Jones*, H&R Block's mass arbitration protocol contains many of the same "red flags associated with classwide arbitration." *Id.* at 1182. Arbitration demands are aggregated into batches of 20 (and later 50), with the remaining claimants having no opportunity to appear, object or otherwise participate in the batching process. While the claims within each batch proceed through the arbitration process, no other claimants can participate or even file their claims in arbitration. And even if H&R Block decides to arbitrate each batch for years on end, claimants have no off-ramp allowing them to seek relief in another forum. While the decisions in each arbitration are not precedential, that is little comfort when a claimant's individual arbitration is put on hold for a decade or longer. The JAMS rules approved of in *Jones* were geared toward "efficient and timely adjudication." *Id.* at 1180. H&R Block's process accomplishes the opposite.

The solution to the logistical realities of adjudicating tens of thousands of individual disputes is not to grind the claims to a halt. Rather, the solution is to use the mechanism for aggregating serious but low-dollar claims that has stood the test of time for almost 60 years: the class action device under Rule 23. Because the FAA does not apply to H&R Block's mass arbitration protocol, *Discover Bank* prescribes that exact remedy.

### C.   The Class Action Waiver is Unenforceable Under California's Discover Bank Rule

Because the FAA does not apply to H&R Block's mass arbitration protocol, California's *Discover Bank* rule, "springs back to life," *Heckman*, 120 F.4th at 692, and "governs" the outcome of this case, *id.* at 689.

In *Discover Bank*, the California Supreme Court held that class action waivers in contracts are unenforceable (1) "when the waiver is found in a consumer contract of adhesion in a setting in which

13

1  disputes between the contracting parties predictably involve small amounts of damages," and (2) "when

2  it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately

3  cheat large numbers of consumers out of individually small sums of money." *Discover Bank v. Superior*

4  *Ct.*, 36 Cal.4th 148, 162-63 (2005). The United States Supreme Court has made clear that the *Discover*

5  *Bank* rule is not a high bar. *See Concepcion*, 563 U.S. at 347.

6      H&R Block's class action waiver is contained in a consumer contract of adhesion, and Plaintiffs

7  have alleged a deliberate scheme to violate the law and cheat large numbers of consumers. *See* Compl.

8  ¶¶ 1-10. *Discover Bank* therefore directs that this case remain in court.

9      The "opt out" provision in the arbitration agreement does nothing to change that result. First,

10  *Discover Bank's* use of the phrase "consumer contract of adhesion" demonstrates that it is the

11  adhesiveness of the *wider* contract—and not a specific contract provision—that the *Discover Bank* rule

12  seeks to address. Because Plaintiffs were unable to opt out of the OSA itself, which was unquestionably

13  offered on a "take it or leave it basis," the OSA constitutes a classic "contract of adhesion"

14  notwithstanding the "opt out" provision in the narrower arbitration agreement. *Cf. Concepcion*, 563 U.S.

15  333, 346–47 (observing that "the times in which consumer contracts were anything other than adhesive

16  are long past"). Second, California courts recognize that an opt-out provision does not necessarily

17  sanitize an otherwise adhesive contract. *See, e.g, Booker v. Charter Commc'ns, LLC*, No. B322813, 2025

18  WL 1910954, at *6 (Cal. Ct. App. July 11, 2025) (disagreeing "that the opt-out mechanism rendered the

19  agreement nonadhesive"). *Discover Bank* itself involved an agreement that provided an opportunity to

20  opt-out. *See Discover Bank*, 36 Cal.4th at 154 ("Existing cardholders were notified that if they did not

21  wish to accept the new arbitration clause, they must notify Discover Bank of their objections and cease

22  using their accounts."). The "opt out" provision is not the silver bullet H&R Block thinks it is, especially

23  given the trappings of procedural unconscionability that permeate the OSA, as described in detail below.

24      Finally, the opt-out provision in H&R Block's arbitration agreement is illusory. It provides, "[i]f

25  you opt out of this Arbitration Agreement, any prior arbitration agreement shall remain in force and

26  effect." Schuessler Decl. Ex. 4 ¶ 11.1. This means that, even if Plaintiffs Rios and Marquez had opted

27  out of the arbitration agreement in 2021 or 2022 when filing their taxes online, they would have still

28  found themselves bound by the arbitration agreement from 2020 and any prior years. Under these

14

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

circumstances, the OSA was plainly a contract of adhesion subject to the *Discover Bank* rule, which requires this case to remain in court.

## II.   H&R Block's Mass Arbitration Protocol and Pre-Filing Conference Requirement are Unconscionable and Unenforceable.

Even if H&R Block's arbitration agreement is governed by the FAA (it is not), the agreement is still unconscionable and unenforceable. "California courts may refuse to enforce an unconscionable arbitration agreement." *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1170 (9th Cir. 2003). Unconscionability refers to "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *A&M Produce Co. v. FMC Corp.,* 135 Cal.App.3d 473, 486 (1982) (citation modified). "Unconscionability has both a procedural and a substantive element," the former focusing on "oppression" or "surprise" due to unequal bargaining power, the latter on "overly harsh" or "one-sided" results. *Id.* at 486–487 (citation modified). "California courts apply a 'sliding scale' to determine whether to invalidate an agreement that is both procedurally and substantively unconscionable: 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'" *Pappas v. AMN Healthcare Servs.*, 762 F. Supp. 3d 862, 870 (N.D. Cal. 2025) (quoting *Armendariz v. Found Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114 (2000)).

### A.   The Arbitration Agreement Is Procedurally Unconscionable.

To determine procedural unconscionability, the Court examines "the manner in which the contract was negotiated and the circumstances of the parties at that time." *Kinney v. United Healthcare Servs., Inc.*, 70 Cal.App.4th 1322, 1329 (1999). "It focuses on factors of oppression and surprise." *Id.*

#### 1.   The Arbitration Agreement is Oppressive.

"A contract is oppressive if an inequality of bargaining power between the parties precludes the weaker party from enjoying a meaningful opportunity to negotiate and choose the terms of the contract." *Ingle*, 328 F.3d at 1171. "The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of

15

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

1  the party; and (5) whether the party's review of the proposed contract was aided by an attorney." *Swain*

2  *v. LaserAway Med. Grp., Inc.*, 57 Cal.App.5th 59, 69 (2020) (citation modified).

3        H&R Block's arbitration agreement is rife with oppression, for at least the following reasons:

4  (1) H&R Block, a large corporation, is in a position of unequal bargaining power over lay individual

5  consumers, like Plaintiffs; (2) H&R Block undisputedly drafted the arbitration agreement; (3) customers

6  are not permitted to modify the agreement's terms—they must take it or leave it without any ability to

7  negotiate or change terms; (4) the only notification to Plaintiffs of the OSA when signing up to obtain

8  H&R Block's tax preparation services is behind a hyperlink on H&R Block's website, which, if a

9  consumer happens to click, brings up a dense 21-page, single spaced, small font legal document; (5)

10 because customers generally use H&R Block's tax preparation services when under stress to timely

11 complete their tax returns on threat of financial penalties from the government, there is an added element

12 of pressure and urgency to simply click the box and agree to arbitration; and (6) H&R Block provides

13 no explanation of the detrimental aspects of proceeding with an agreement that mandates dispute

14 resolution through the mass arbitration protocol, as opposed to court.

15       While H&R Block argues based on *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201(9th Cir. 2016),

16 that "[t]he opt-out provision" in the arbitration agreement "completely undermines" allegations of

17 procedural unconscionability, Defs.' Mem. at 10, multiple courts have found procedural

18 unconscionability even when an arbitration clause has an opt-out provision, s*ee Gentry v. Sup. Ct.,* 42

19 Cal.4th 443, 467-70 (2007) (observing that arbitration agreement had a degree of procedural

20 unconscionability despite 30-day opt-out provision); *Swain,* 57 Cal.App.5th at 69 ("[A]n opt out

21 provision does not insulate an arbitration agreement from a finding of procedural unconscionability");

22 *Haydon v. Elegance at Dublin*, 97 Cal.App.5th 1280, 1288 (2023) ("Even where an arbitration provision

23 allows a party to opt out, there may be procedural unconscionability if there is not an authentic informed

24 choice to make that decision."); *Zuckerman v. Charter Commc'ns, LLC*, No. 24-CV-128-WQH-BJC,

25 2024 WL 4871739, at *9 (S.D. Cal. Nov. 22, 2024) (citing *Gentry* and rejecting argument that arbitration

26 agreement was "not an adhesion contract because Plaintiff was afforded 30 days to opt-out").

27       What matters under California law is whether a consumer had "an authentic informed choice"

28 to opt out of the arbitration agreement. For the reasons outlined above—including that H&R Block did

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

not adequately explain the disadvantageous terms of the agreement and the opt-out was presented in the context of pressure to comply with tax deadlines—the agreement was not "free from procedural unconscionability" notwithstanding the opt-out provision. *See Gentry*, 42 Cal.4th at 472 (finding procedural unconscionability given "[t]he lack of material information about the disadvantageous terms of the arbitration agreement, combined with the likelihood that employees felt at least some pressure not to opt out of the arbitration agreement").

Further, Plaintiffs lacked an "authentic informed choice" because the opt-out provision is fundamentally illusory. As discussed above, even if Plaintiffs had opted out of the arbitration agreement during the relevant years in 2021 and 2022, "any prior arbitration agreement [would have] remain[ed] in force and effect." Schuessler Decl. Ex. 4 ¶ 11.1. Thus, unless an H&R Block customer opts out of the arbitration agreement the *first* and every *subsequent* year they use the service, the customer has no real opportunity to pursue claims in court. When "opting out" of one arbitration agreement just means "opting in" to an earlier identical arbitration agreement, there can be no "authentic informed choice." Given the lack of informed choice and the other factors bearing on oppression, the arbitration agreement is procedurally unconscionable.

### 2. The Arbitration Agreement is the Product of Surprise.

The second way to establish procedural unconscionability is through a showing of surprise. "Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Ingle*, at 1171.

H&R Block's arbitration agreement suffers from multiple elements of surprise. *First*, the arbitration agreement is buried in a dense, 21-page, single-spaced, small font document filled with legalese and complex mechanisms related to pre-arbitration procedures, tolling of the statute of limitations, and arbitration of similar claims. "A layperson trying to navigate this block text, printed in [small] font, would not have an easy journey." *OTO, L.L.C. v. Kho*, 8 Cal.5th 111, 128 (2019). *Second*, H&R Block does not provide a copy of the tax form required for claimants to engage in the pre-filing dispute resolution process, instead only mentioning the need for a "signed statement" that "authorize[s] the H&R Block Parties to disclose your confidential tax and account records to your counsel." A claimant who provided such a "signed statement" would be surprised to find that H&R Block had its

17

own form—even if identical to the claimant's "signed statement"—that the claimant also had to execute. *Cf. Trivedi v. Curexo Tech. Corp.*, 189 Cal.App.4th 387, 393 (2010) (observing that "[n]umerous cases have held that the failure to provide a copy of the arbitration rules to which the employee would be bound, supported a finding of procedural unconscionability"). *Third*, a consumer who agreed to arbitration where "the arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible," would be surprised to find their arbitration still pending a full year or more after filing. H&R Block knows that disputes are not resolved in anything close to 120 days, yet H&R Block continues to make that claim, perpetuating the false hope of speedy and efficient dispute resolution.

*Fourth*, at the time of contract formation, claimants have no way of knowing if their claim will proceed without delay or, alternatively, if they will be pushed to the sidelines for years on end before H&R Block will even permit them to file a demand. Lay claimants cannot be expected to infer, based on H&R Block's complex mass arbitration protocol, that their ability to present a timely claim will depend on the identity of their still unknown legal counsel *and* the number of individuals with similar claims who have retained the same counsel. The reality of that situation can only come into focus when the dispute is ripe, long after the claimant has "agreed" to the arbitration provision.

H&R Block asks this Court to follow *Hunt v. Meta Platforms, Inc.*, 729 F. Supp. 3d 964, 970 (N.D. Cal. 2024), but in that case the plaintiff's "only argument on procedural unconscionability [was] that the agreement was a contract of adhesion." Because the plaintiff "offered no other reason why the arbitration agreement [was] procedurally unconscionable, the Court [found] no procedural unconscionability." *Id.* Unlike *Hunt*, Plaintiffs here allege significant oppression *and* surprise, either of which is sufficient to support a finding of procedural unconscionability, especially given the record demonstrating that H&R Block's arbitration process is a facade. Because the arbitration agreement has multiple elements of procedural unconscionability, the Court's analysis can turn to the substantive unconscionability that pervades H&R Block's arbitration agreement.

## B. The Mass Arbitration Protocol and Pre-Filing Conference Requirement are Substantively Unconscionable.

"Under California law, substantive unconscionability focuses on the terms of the agreement and whether those are overly harsh or one-sided." *MacClelland*, 609 F. Supp. 3d at 1034 (citation modified).

### *1.  The Mass Arbitration Protocol is Substantively Unconscionable*

H&R Block's mass arbitration protocol is permeated with significant substantive unconscionability. *First*, the procedural morass inherent in H&R Block's batching and bellwether process imposes unreasonable delays on virtually all claimants, causing them to wait years (and potentially decades) to even file their claims with AAA and initiate their individual arbitration process. These delays are not theoretical, as evidenced by the facts of this case and the experiences of other law firms pursuing arbitration claims against H&R Block. As this Court has previously observed, "[r]equiring the consumers who retain counsel willing to represent them in cases such as this to wait months, more likely years before they can even submit a demand for arbitration is unreasonably favorable to [corporate defendants]." *MacClelland*, 609 F. Supp. 3d at 1042.

*Second*, the mass arbitration protocol punishes claimants who select counsel most likely to have the experience and resources to effectively pursue their specific type of claims in arbitration. The mass arbitration protocol is triggered by any claims submitted "by the same or coordinated counsel." Thus, in order to avoid the batching and bellwether process, a claimant "would have to find different counsel, which affects the right to counsel of their choice or indeed, the ability to find any counsel at all: where the individual claims are small (as consumer claims often are), it may be difficult to find an attorney who represents only a single or small number of similarly situated clients." *Pandolfi*, 2024 WL 4051754, at *11. A consumer should not be forced to hire the divorce lawyer down the street just to have their privacy claim heard without delay. And the adverse party should play no role in the selection of counsel.

*Third*, the "provision is pregnant with the risk that claims will be effectively barred when coupled with the statute of limitations." *MacClelland*, 609 F. Supp. 3d at 1042. The statute of limitations is tolled based solely on H&R Block's unilateral determination of what constitutes a "fully complete Notice." And given the myriad requirements for the Notice, H&R Block can lob endless hyper-technical arguments that the Notices suffer from some defect and fail to trigger the tolling provision. This is especially true where, as here, H&R Block only agrees to accept the Notices "without waiving any rights and expressly reserving all rights." *See* Ellersick Decl. ¶¶ 19-20, Ex. 12.

*Fourth*, the mass arbitration protocol "lacks mutuality, which is a 'paramount' consideration in assessing substantive unconscionability." *MacClelland*, 609 F. Supp. 3d at 1042 (quoting *Pokorny v.*

*Quixtar*, 601 F.3d 987, 997 (9th Cir. 2010)); *see also Pandolfi*, 2024 WL 4051754, at *7 (observing that the "bellwether provision effectively has a built-in asymmetry, and with no apparent justification"). "Although the provision imposes restrictions on a law firm representing twenty-five or more of [H&R Block's] customers with 'similar claims,' [H&R Block] is apparently free to select the same law firm to represent it in all of its arbitrations." *MacClelland*, 609 F. Supp. 3d at 1042. In this way, H&R Block is "able to enjoy all of the advantages that come from being a 'repeat player,' while law firms that represent twenty-five or more of [H&R Block's] customers may be forced to sideline any clients which would exceed the numeric cap." *Id.* at 1043.

H&R Block tries to paper over these issues, arguing that concerns over delays are "overstated," because eventually the batching process allows up to 50 claims to move forward at a time. Defs.' Mem. at 18. But the evidence shows that just getting through the initial batch of 20 claims is plagued by delay, suggesting that arbitrations for even the *first* batch of 50 are likely still years in the future. H&R Block also argues the delays are a necessary evil given the limited roster of AAA arbitrators and the inability to administer thousands of arbitrations simultaneously. *Id.* But H&R Block cannot throw up its hands and shift blame to AAA after designing a process that it knows offers no meaningful opportunity for dispute resolution. H&R Block's acknowledgment that its chosen arbitration provider is unable to administer disputes without excessive delay stands as a stark admission that arbitration in this context is "not simply [] an alternative to litigation, but [] an inferior forum."[7] *Armendariz*, 24 Cal. 4th at 124. Nor can claimants simply take their case to small claims court, as H&R Block suggests. Defs.' Mem. at 18. California rules prohibit attorneys from appearing in small claims court, *see* Cal. Code of Civ. Proc. § 116.540(a), (m), leaving claimants with the Hobson's choice of either sticking with counsel in a stalled arbitration, or going it alone in court.

Finally, H&R Block argues that its mass arbitration protocol "promote[s] settlement . . . [and] encourage[s] resolution of the vast majority of claims in a reasonable time frame." Defs.' Mem. at 18. H&R Block points to data from federal MDL proceedings where bellwether trials facilitated settlement. But notably absent from H&R Block's motion is any data, even anecdotal, that its mass arbitration

---

[7] An arbitrator with AAA recently concluded that the mass arbitration protocol at issue in *MacClelland* violated AAA Consumer Due Process Protocol No. 8, which requires that "ADR proceedings should occur within a reasonable time, without undue delay." Ellersick Decl. ¶¶ 42-43, Ex. 20-21.

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

protocol has facilitated any settlements whatsoever. In fact, other law firms are bogged down in the first batch of arbitrations despite initiating the process, in some cases, as long as a year and a half ago. H&R Block's comparison of its mass arbitration protocol to MDL proceedings is a false equivalency. Given its various unfair provisions, the mass arbitration protocol is substantively unconscionable.

### 2. The Pre-Filing Conference Requirement is Substantively Unconscionable.

H&R Block's pre-filing conference requirement is also substantively unconscionable because it runs afoul of basic rules of professional responsibility that govern the conduct of attorneys in California. "Contracts which violate the canons of professional ethics of an attorney may for that reason be void." *Acad. of Cal. Optometrists, Inc. v. Superior Court*, 51 Cal.App.3d 999, 1006 (1975) (citing 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 475). A "violation of a Rule of Professional Conduct in the formation of a contract can render the contract unenforceable as against public policy." *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co., Inc.*, 6 Cal.5th 59, 87 (2018); *see also id.* at 73 (observing that a contract "that undermine[s] an ethical rule designed for the protection of the client as well as for the preservation of public confidence in the legal profession" is unenforceable).

The pre-filing conference requirement violates Rules 4.2 and 3.2 of the California Rules of Professional Conduct. Rule 4.2, titled "Communication with a Represented Person" provides, "[i]n representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." "This rule applies even though the represented person initiates or consents to the communication." California Rule of Professional Conduct, 4.2, Comment [1]. Further, "[t]he prohibition against communicating 'indirectly' with a person represented by counsel . . . is intended to address situations where a lawyer seeks to communicate with a represented person through an intermediary such as an agent, investigator or the lawyer's client." *Id.*, Comment [3].

The pre-filing conference requirement violates Rule 4.2 by requiring a claimant to personally meet with H&R Block's lawyers and representatives to discuss settlement of the claims, Ellersick Decl. Ex. 14, even if the claimant does not want to meet with H&R Block's representatives and even if the claimant's counsel advises against the meeting. *See* Schuessler Decl. Ex. 4 ¶ 11.2(B) ("You and our business representative must both personally participate in a good-faith effort to settle the dispute

21

1   without the need to proceed with arbitration. The requirement of personal participation in an Informal

2   Settlement Conference may be waived only if both you and we agree in writing.").

3        H&R Block argues that the pre-filing conference requirement is no different from a court

4   ordering parties to attend settlement conferences as a way of "increas[ing] the chance of reaching

5   agreement." Defs.' Mem. at 12. But it is one thing for a *court* to order parties to *attend* a settlement

6   conference, and another thing for a corporate *defendant* to unilaterally require a consumer to *personally*

7   *participate* in a settlement discussion against the advice of the consumer's attorney. And while courts

8   have acknowledged that pre-arbitration dispute resolution mechanisms can, in the right circumstances,

9   be "both reasonable and laudable," *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1014 (9th Cir. 2023), H&R

10  Block cites no case where requiring a consumer to "personally participate" in settlement discussions

11  with a corporate defendant's lawyers against the wishes of the consumer and the consumer's lawyer was

12  found appropriate. The Fourth Circuit decision H&R Block cites as upholding a "process similar to the

13  one here," Defs.' Mem. at 13, did not involve a requirement that a consumer "personally participate" in

14  settlement discussions, and instead merely required a party to "engage in a good-faith negotiation,"

15  which presumably could occur through counsel. *See Meadows v. Cebridge Acquisition*, LLC, 132 F.4th

16  716, 723 (4th Cir. 2025). H&R Block casts the pre-filing conference requirement as a "benefit" to

17  consumers, Defs.' Mem. at 13, but no consumer wants to be forced to personally meet with lawyers of

18  a corporate defendant against their wishes and advice of counsel.

19       In a last-ditch effort to justify the pre-filing conference requirement, H&R Block says

20  consumers' personal participation is necessary to weed out what H&R Block calls "unvetted claims."

21  Defs.' Mem. at 14. As a starting point, H&R Block overstates the number of supposed "illegitimate or

22  unvetted claims." H&R Block's own data demonstrates that 96% of the claimants represented by

23  Zimmerman Reed are bona fide H&R Block customers, and the other 4% are individuals for whom

24  H&R Block "cannot locate any record . . . based on the information provided," Decl. of Daniel Murdock

25  ¶¶ 4-6, suggesting that additional information could change that conclusion.[8]

26

27  ───────────────

[8] H&R Block presents the Murdock Declaration to argue that certain claims are deficient, but the
declaration does not identify any particular claimant or group of claims with deficient claims, nor does
28  it support the contentions with any evidence. In any event, the class definition in ¶ 91 of the Complaint
is defined objectively and addresses any such issues.

OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION

Further, if H&R Block's real goal for the pre-filing conferences was to address defective claims, H&R Block could have picked any number of more efficient methods for doing so. For example, H&R Block could have easily sent an email to Plaintiffs' counsel identifying any purported defective claims and requesting clarification. To be sure, when H&R Block first raised the issue of potentially defective claims, Zimmerman Reed promptly requested that H&R Block identify the specific claimants so counsel could investigate further. Ellersick Decl. ¶ 31, Ex. 15. H&R Block refused to do so. *Id.* ¶ 31. Before filing this case, Zimmerman Reed re-iterated its request, but H&R Block again refused to identify the supposedly defective claims and has not done so to this day. *Id.* ¶¶ 33-34, Ex. 16. No legitimate purpose is served by holding a settlement conference with H&R Block lawyers, the claimant (who must "personally participate"), and claimant's counsel just so H&R Block can say the claim is defective. H&R Block's real goal is not to weed out defective claims—it's to delay the process.

H&R Block's purported justification for the pre-filing conference requirement collapses under the weight of basic scrutiny. Because the only discernible purpose for requiring a claimant to "personally participate" in a pre-filing conference is delay, the pre-filing conference requirement also violates California Rule of Professional Conduct 3.2, which provides that, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to delay or prolong the proceeding or to cause needless expense." A pre-filing provision that allows counsel for the respective parties to discuss the merits of claims and potential settlement offers can be "both reasonable and laudable." *Bielski*, 87 F.4th at 1014. But requiring claimants to "personally participate" in a meeting with H&R Block lawyers against their wishes and advice of counsel serves "no substantial purpose other than to delay or prolong with proceeding[s]," which, in turn, delays the filing of arbitration demands. *Cf. Frankel*, 78 Vand. L. Rev. at 182 (observing that "several features of companies' pre-arbitration provisions suggest that the purpose is to thwart claims entirely rather than to reach a mutually agreeable mediated resolution"). H&R Block's pre-filing conference requirement is substantively unconscionable.

### C.     The Offending Provisions Should not be Severed to Save the Arbitration Agreement.

As in *Heckman*, the Court should decline to sever the unconscionable terms to save the arbitration agreement. 120 F.4th at 688. The California Supreme Court recently explained that, in order

23

to "sever any unconscionable portion of a contract and enforce the rest," a court must find that (1) "the illegality is collateral to the contract's main purpose," (2) "it is possible to cure the illegality by means of severance," *and* (3) "enforcing the balance of the contract would be in the interests of justice." *Ramirez*, 16 Cal.5th at 517 (citing *Armendariz*, 24 Cal.4th at 124-25). While courts should take a severance clause into account, "the parties to an agreement cannot divest a trial court of its discretion" to void a contract "by including such a severance clause." *Id.* Indeed, "[t]he existence of [a] severability clause[] does not change the fact that where an agreement is permeated by unconscionability, a court will not sever the unlawful provisions." *MacClelland*, 609 F. Supp. 3d at 1045.

The unconscionable provisions in the H&R Block arbitration agreement "are not merely collateral to the main purpose of the arbitration agreement. Rather, these provisions are designed to structurally and systematically make arbitration an inferior forum." *Pandolfi*, 2024 WL 4051754 at *13. H&R Block should not be "entitled to rely on severance as a fix when they profited from inclusion of the [unconscionable provisions] in the first instance, *i.e.*, because it may have had a chilling effect that deterred [consumers] from ever pursuing their rights in the arbitral forum available to them. Severance does not cure the problematic chilling effect of the unconscionable [provisions]." *Pandolfi*, 2024 WL 4051754 at *9. Permitting severance and allowing the arbitration clause to stand would incentivize H&R Block and other companies "to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event that they are challenged successfully in court." *Id.* at 1046*; see also Heckman,* 120 F.4th at 688.

Because unconscionability permeates the arbitration agreement, and allowing severance of the offending provisions would create perverse incentives for H&R Block and other corporate actors, the Court should decline the request for severance and instead find the arbitration agreement unenforceable.

### D.    H&R Block's Request for a Stay Should Be Rejected.

H&R Block incorrectly argues that Plaintiffs' claims seeking public injunctive relief under *McGill v. Citibank, N.A.,* 2 Cal.5th 945, 951 (2017), should be stayed pending arbitration of their other claims. H&R Block's arguments fail for several reasons. First, the Complaint asserts claims for public injunctive relief for the benefit of future customers within the general public who have yet to transact with H&R Block but are likely to in the future. Compl. ¶¶ 10, 149. California courts have repeatedly

confirmed that such claims properly seek public injunctive relief, rejecting the narrower interpretation of public injunctive relief in *Hodges v. Comcast Cable Comm, LLC,* 21 F.4th 535 (9th Cir. 2021).[9] Second, seeking both public and private injunctive relief are not mutually exclusive remedies; in the same case private injunctive relief can be sought for a class of past customers, while public injunctive relief can be sought for the benefit of future customers. *Stout v. Grubhub Inc.*, 2021 WL 5758889, *9 (N.D. Cal., Dec. 3, 2021); *Vasquez v. Cebridge Telecom CA*, 569 F.Supp.3d 1016, 1027-29 (N.D. Cal. 2021). Third, any provision of the OSA (including ¶ 11.4) that seeks to waive Plaintiffs' right to seek public injunctive relief is void and unenforceable. *McGill* 2 Cal.5th at 961. Since ¶ 11.4 prohibits claims that "affect any other client" from proceeding in AAA, the provision is void and the claims may properly proceed in court. And because the OSA contains no requirement for staggered proceedings where claims for public injunctive relief must be stayed pending the resolution of other claims, no stay is warranted in any event.

### CONCLUSION

This case belongs in court. *Discover Bank* mandates that result because the FAA does not apply to H&R Block's mass arbitration protocol. And even if the FAA does apply, the arbitration agreement is unconscionable and unenforceable. The motion to compel arbitration should be denied.

Dated: August 5, 2025

Respectfully submitted,

**ZIMMERMAN REED LLP**

*/s/ Ryan Ellersick*
Ryan J. Ellersick (SBN 357560)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel (877) 500-8780
Fax (877) 500-8781
ryan.ellersick@zimmreed.com

*Attorneys for Plaintiffs and the Classes*

---

[9] *Ramsey v. Comcast Cable Comm., LLC*, 99 Cal.App.5th 197, 210-12 (2023); *Kramer v. Coinbase, Inc.*, 105 Cal.App.5th 741, 747-49, 752, n.3 (2024); *Maldonado v. Fast Auto Loans, Inc.*, 60 Cal.App.5th 713, 721 (2021); *Mejia v. DACM Inc.*, 54 Cal.App.5th 691 (2020). Further, the FAA does not preempt such claims. *Ramsey*, 99 Cal.App.5th at 204; *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir., 2019). Claims for public injunctive relief are individual, not representative claims. *McGill*, 2 Cal.5th at 955-56.