# EXHIBIT 2



# Attacks on Tax Privacy:

## How the Tax Prep Industry Enabled Meta to Harvest Millions of Taxpayers' Sensitive Data

Prepared by the Offices of Senators Elizabeth Warren, Ron Wyden, Richard Blumenthal, Tammy Duckworth, Bernie Sanders, and Sheldon Whitehouse, and Representative Katie Porter

July 2023



# TABLE OF CONTENTS

| | |
|---|---|
| Executive Summary | 1 |
| Introduction | 4 |
| Senate Investigation of Tax Prep Companies Sharing of Sensitive Taxpayer Information With Big Tech | 9 |
| Findings | 10 |
| Conclusions | 39 |
| References | 40 |

# EXECUTIVE SUMMARY

In November 2022, a public report revealed that major tax preparation companies TaxSlayer, H&R Block, and TaxAct were sharing sensitive taxpayer data with Big Tech firms Meta and Google. In response, Senators Elizabeth Warren, Ron Wyden, Richard Blumenthal, Tammy Duckworth, Bernie Sanders, and Sheldon Whitehouse, as well as Representative Katie Porter, opened an investigation into the extent of this disclosure and its impact on taxpayer privacy. This report contains the results of that investigation. It reveals that Big Tax Prep has recklessly shared tens of millions of taxpayers' sensitive personal and financial data with Meta for years, without appropriately disclosing this data usage or protecting the data, and without appropriate taxpayer consent. The sharing of taxpayer data with Meta has put taxpayer privacy at risk and appears to represent a violation of taxpayer privacy laws.

Specific findings include:

- **Tax preparation companies shared millions of taxpayers' data with Meta, Google, and other Big Tech firms.** The tax prep companies used computer code – known as pixels – to send data to Meta and Google. While most websites use pixels, it is particularly reckless for online tax preparation websites to use them on webpages where tax return information is entered unless further steps are taken to ensure that the pixels do not access sensitive information. Yet, the tax prep companies described this as a "ubiquitous" and "common industry practice." TaxAct, TaxSlayer, and H&R Block confirmed that they had used the Meta Pixel, and had been using it "for at least a couple of years" and all three companies had been using Google Analytics (GA) for even longer. One tax prep company revealed it had employed an additional 11 pixels on its website and that, because of the way these pixels operated and were set up, they potentially shared data for every single user of the company's websites – millions of taxpayers.

- **Tax prep companies shared extraordinarily sensitive personal and financial information with Meta, which used the data for diverse advertising purposes.** TaxAct, H&R Block, and TaxSlayer each revealed, in response to this Congressional inquiry, that they shared taxpayer data via their use of the Meta Pixel and Google's tools. The Meta Pixel and other Meta tools used by TaxAct collected far more information than was previously reported: in addition to taxpayers' filing status, approximate AGI, approximate refund amount, and names of dependents, the Pixel collected approximate federal tax owed and buttons that were clicked and names of text-entry forms that the taxpayer navigated to (both of which could indicate, for example, whether taxpayers were eligible for certain deductions or exemptions). The Pixel also shared full names, email, country, state, city, and zip codes, phone numbers, and gender as hashed values. TaxAct also revealed that all this information was shared for taxpayers who used TaxAct's Free File service – a public-private partnership between private tax prep companies like TaxAct and the Internal Revenue Service (IRS).

  H&R Block and TaxSlayer also revealed an extensive list of data shared via the Meta Pixel, including transmitting information on whether taxpayers had visited pages for many revealing tax situations, such as having dependents, certain types of income (such as rental income or capital gains), and certain tax credits or deductions. Although the tax prep companies and Big Tech firms claimed that all shared data was anonymous, the FTC and experts have indicated that the data could easily be used to identify individuals, or to create a dossier on them that could be used for targeted advertising or other purposes.

  Meta also confirmed that it used the data to target ads to taxpayers, including for companies other than the tax prep companies themselves, and to train Meta's own AI algorithms.

- **Tax prep companies and Big Tech firms were reckless about their data sharing practices and their treatment of sensitive taxpayer data.** The tax prep firms were shockingly careless with their treatment of taxpayer data. They indicated that they installed the Meta and Google tools on their websites without fully understanding the extent to which they would send taxpayer data to these tech firms, without consulting with independent compliance or privacy experts, and without full knowledge of Meta's use of and disposition of the data.

In fact, the tax prep companies indicated that they were still not fully aware of the current status of millions of taxpayers' data that had been shared with the Big Tech firms.

The Big Tech firms also appeared to act with stunning disregard for taxpayer privacy – failing to provide full and complete information about how they would collect taxpayer data, and what they did – or are doing – with it once it was collected. And although both Meta and Google claimed to have filtering systems to prevent the inadvertent collection of sensitive taxpayer information, these filtering systems appeared to be ineffective.

- **Tax prep companies may have violated taxpayer privacy laws by sharing taxpayer data with Big Tech firms.** Taxpayer privacy laws give broad protection to prevent abuses, and contain penalties that include large fines and potential jail time. Under the law, "a tax return preparer may not disclose or use a taxpayer's tax return information prior to obtaining a written consent from the taxpayer," – and they failed to do so when it came to the information that was turned over to Meta and Google. Violating the law can result in criminal penalties of up to $1,000 per instance and up to a year in prison. Tax prep companies can also turn over data to "auxiliary service providers in connection with the preparation of a tax return." But Meta and Google likely do not meet the definition of "auxiliary service providers" and the data sharing with Meta was for advertising purposes – not "in connection with the preparation of a tax return."

 The findings of this report reveal a shocking breach of taxpayer privacy by tax prep companies and by Big Tech firms that appeared to violate taxpayers' rights and may have violated taxpayer privacy law. Relevant enforcement entities – including the IRS, the Treasury Inspector General for Tax Administration (TIGTA), the Federal Trade Commission (FTC), and the Department of Justice (DOJ) should fully investigate this matter and prosecute any company or individuals who violated the law. We also welcome the recent IRS announcement of a free, direct file pilot next year, which will give taxpayers the option to file taxes without sharing their data with untrustworthy and incompetent tax preparation firms.

# I. INTRODUCTION

## A. Americans Rely on Big Tax Prep Companies to File Their Taxes

Online tax filing has become the predominant way Americans do their taxes, with over 200 million electronic returns filed in 2022 – over 80% of all filings that year.[1] But doing so is complex, expensive, and essentially requires taxpayers to use one of a handful of private, online tax filing companies, such as TurboTax, TaxSlayer, TaxAct, or H&R Block. Thus, Americans spend an average of $250 and 13 hours filing their taxes each year.[2]

In contrast, many other countries offer return-free tax filing.[3] In a return-free system, the government uses information it already has to help prepare returns for taxpayers instead of requiring them to make their own tax calculations, making it free and fast to file taxes.[4] Analysts from the Treasury Department, Federal Reserve, and Dartmouth College recently studied the potential impact of a U.S. government-run, simplified tax filing tool utilizing data that the Internal Revenue System (IRS) already has, finding that it could help tens of millions of Americans, including 11 million non-filers who missed out on $8.3 billion in refunds in 2019.[5]

Return-free systems are cheaper and easier for taxpayers, reduce errors, minimize government waste, and even cut tax fraud.[6] But, the tax preparation industry has long fought against efforts to make U.S. tax filing simpler and cheaper. Intuit, the parent-company of TurboTax and the largest single tax preparation company by market share,[7] has spent decades – and nearly $45 million since 1998[8] – lobbying against the adoption of a return-free or free filing system.[9] Similarly, H&R Block, the next biggest industry player by market share,[10] has spent more than $40 million on federal lobbying since 1998.[11] Intuit and H&R Block are also among the tax prep companies that helped create the Free File program, a public-private partnership that was supposed to provide free e-filing to over 70 percent of taxpayers, but currently serves an average of just 3 percent of all individual taxpayers.[12] It has been riddled with reports of industry sabotage, including that Intuit

deliberately added code to its TurboTax Free File landing page to hide it from Google and other search engines search results.[13]

Despite these efforts, there has been new momentum towards free tax filing. Last year, Senator Warren and Representative Porter (along with Representative Brad Sherman) introduced the Tax Filing Simplification Act, which would direct the IRS to develop its own free tax filing system, thereby simplifying the tax filing process and lowering costs.[14] The Government Accountability Office also recommended that the IRS develop additional options for free online filing,[15] and Treasury Secretary Janet Yellen agreed that investing in truly free and simple tax filing tools like those proposed in Senator Warren's legislation is "definitely a priority."[16] And the Inflation Reduction Act of 2022 provided the IRS with significant new funding, including billions for IT operations and business systems modernization, as well as $15 million specifically to study how it could implement a free, direct tax filing system.[17] The IRS released its report on May 16, finding that a direct file tool is both popular and feasible, and at the same time announced that it will pilot such a tool during the 2024 filing season.[18]

## B.   Reports of Tax Prep Companies Sharing Sensitive Personal and Financial Information with Big Tech Firms

Unfortunately, until a direct e-filing option is available, millions of Americans must continue relying on the tax prep industry to file their taxes – forced to share their sensitive personal and financial information with these companies, and to pay for the privilege. Given the risk of tax prep companies abusing or mishandling sensitive taxpayer information, Congress and the IRS have put in place protections for taxpayer privacy and prohibited tax return preparers from sharing taxpayer information with third parties.[19]

But these protections ultimately did not deter tax prep companies from sharing private tax return information (TRI) and other sensitive personal and financial information with Meta [20] – likely impacting tens of millions of Americans. A November 2022 investigation by The Markup revealed that "[m]ajor tax filing services such as H&R Block, TaxAct, and TaxSlayer have been quietly transmitting sensitive financial information to Facebook" through the Meta Pixel, a line of code inserted into the online tax prep software.[21]

Specifically, The Markup report found that the Pixel on TaxAct's website collected and sent to Meta "users' filing status, their adjusted gross income [(AGI)], and the amount of their refund." The Pixel also reportedly sent the names of dependents back to Meta, in a modified "hashed" form to provide some additional privacy.[22] TaxAct also was found to have used similar code, Google Analytics, on its website, through which Google received "similar financial data, but not names."[23]

H&R Block reportedly used the Meta Pixel on its website, which "gathered information on filers' health savings account usage and dependents' college tuition grants and expenses."[24]

The Markup found that TaxSlayer too sent personal information through the Meta Pixel's Advanced Matching functionality.[25] On TaxSlayer's site, this included "phone numbers, the name of the user filling out the form, and the names of any dependents added to the return," sent in a hashed format.[26]

Intuit also reportedly implemented the Meta Pixel on their website, but unlike the other companies in the report, The Markup found that the Pixel "did not send financial information to Meta but rather usernames and the last time a device signed in."[27]

## C. Meta and Google's Use of Tracking Pixels

These tax prep companies sent TRI to Meta and Google via a piece of web code (called a pixel) installed on their websites.[28] These pixels sent massive amounts of user data to Big Tech firms - used to improve their ad business or other business tools.[29]
The Meta and Google pixels are snippets of code that are placed within the overall code of a website or webpage.[30] Once placed on the website, the pixel downloads more code from Meta and Google, which then gathers valuable information about website visitors and their activity.[31] This information allows advertisers to understand their users' behaviors and shopping patterns, measure the performance of ad campaigns, and build an audience-base for future ad targeting.[32] But "Facebook [Meta] also retains that data and can use it for its own advertising purposes."[33] The data collected by Google appears to be used in a more limited way, by website publishers to better understand how people enter, use, and leave their websites.

Meta offers its Pixel to customers as a way "make sure [their] ads are shown to the right people," and "drive more sales."[34] Meta makes its Pixel available to third-party advertisers – like the tax prep companies – free of charge and instructs them on how to use it.[35] In its setup instructions, Meta recommends that developers add the Pixel "between the opening and closing <head> tags on every page where [they] will be tracking website visitor actions."[36] Doing so "reduces the chances of browsers or third-party code blocking the Pixel's execution. It also executes the code sooner, increasing the chance that your visitors are tracked before they leave your page."[37]

When that user visits a third-party website that has the Meta Pixel enabled, the Pixel collects information about that user's activity on the website and can match it to the user's unique "c_user cookie."[38] When a user logs into Facebook (Meta) for the first time or from a new device, the c_user cookie is delivered to that user's computer or device,[39] and will be returned by the users' web browser each time they interact with Meta in the future. The cookie has a lifespan of 365 days, which is extended each time the cookie is refreshed by interacting with Meta. [40] Meta is then able to use this cookie – in conjunction with the many other cookies it utilizes[41] – to record and organize user's activities and communications. In this way, Meta is able to collect information and attribute it to individual users, effectively creating a "dossier" that is recorded and utilized for future purposes.[42]

Through this data collection process, Meta is able to provide its marketing partners with deep insights into their user's activities, allowing them the ability to track visitors' actions, define custom audiences to better target ads to potential customers,[43] and create lookalike audiences to "reach new people who are likely to be interested in [their] business because they share similar characteristics to [the business'] existing customers."[44] All of these functions can be managed and analyzed by businesses in the Facebook Ads Manager and the Facebook Events Manager.[45]

Google also offers its own pixel (but does not refer to it as such) as part of its larger Google Analytics (GA) product.[46] With GA, Google gives its partners the opportunity to "[u]nderstand how [their] customers interact across [their] sites and apps," "anticipate future customer actions" with machine learning, and "optimize marketing performance."[47]

Unlike the Meta Pixel, however, GA can be implemented on certain websites without writing or copying any additional code at all.[48] This functionality allows less technologically sophisticated businesses to utilize GA to collect certain information by default such as browser language, browser type, user clicks, user downloads, form interactions, and page titles.[49] Additionally, by default, GA matches that information geolocation (to the closest city), gender, and general interests.[50] This information is then provided to the customer in an aggregated form, accessible through the customer's GA account dashboard.[51]

For more sophisticated businesses, Google gives the option to install a pixel, called the Google Tag, directly to individual web pages, allowing website publishers to customize the type of data they want collected.[52] Just like the Meta Pixel, Google directs the customer to add the snippet of code "immediately after the <head> on each page of your website."[53]

Unlike the Meta Pixel, Google claims that the data collected by GA is not used by Google for other purposes unless the customers explicitly opt-in to do so,[54] According to Google, it then provides the data only to website publishers "to improve or create new products and services," not to serve ads or track or profile users across the internet.[55] Google also gives its customers the option to link their GA account to their Google Ads account.[56] This allows customers to use their GA data to improve their Google Ads performance and "show users ads based on their specific online behavior."[57] "When [marketing partners' GA] audiences are available in Google's advertising products, [they] can use them to specify who [they] want to show [their] ads to."[58]

# II. SENATE INVESTIGATION OF TAX PREP COMPANIES SHARING OF SENSITIVE TAXPAYER INFORMATION WITH BIG TECH

On December 14, 2022, Senators Warren, Wyden, Blumenthal, Duckworth, Sanders, and Whitehouse, as well as Representative Porter, opened an investigation into the reports of tax prep companies sharing taxpayers' personal and financial information with Big Tech firms. The lawmakers, along with Representative Brad Sherman, sent letters to H&R Block, TaxAct, TaxSlayer, Intuit, Meta and Google asking for a full accounting and explanation of the disclosure and use of taxpayer data, asking important questions regarding the extent of the disclosure and use and the policies in place that enabled them it in the first place.[59] Congressional staff supplemented this investigation with additional information obtained from the tax prep companies and Big Tech firms, including from interviews with key officials.

This report contains the results of this investigation. It reveals a troubling pattern and practice of data sharing by tax prep companies, a complete lack of corporate responsibility and accountability on the part of tax prep companies and Big Tech firms, and a potentially illegal use of sensitive taxpayer information.

# III. FINDINGS

## A. Extensive Sharing of Taxpayers' Data with Big Tech Firms

### *1. Extensive Use of Pixels to Share Data*

In each of their written responses, the tax prep companies revealed a troubling pattern and practice of sharing data with Meta and Google through their use of pixels.

The tax prep companies contacted by Senators Warren and Wyden and their colleagues indicated that their use of pixels on their websites was "common industry practice,"[60] explaining that pixels are widely used by a "number of organizations"[61] and "online companies" [62] and that the Meta Pixel is a "common advertising technolog[y]"[63] that is "ubiquitous."[64] All three of the tax prep companies – TaxAct, TaxSlayer, and H&R Block – confirmed that they had used the Meta Pixel, though these companies also claimed to have removed or disabled the Meta Pixel from their websites after The Markup report.[65]

Moreover, several companies revealed that they had been employing pixels on their websites for years – in one case, for over a decade. TaxSlayer implemented the Meta Pixel in February 2018[66] and indicated that it has been using GA since March 2011.[67] TaxSlayer also revealed that it has continued to employ an additional 11 pixels on their website[68] even after learning that the Meta Pixel had attempted to collect numerous sensitive taxpayer details, including "name, email, phone number, city, state, and zip code on certain pages."[69] These pixels were from Cloudflare, Commission Junction LLC, Episerver, Heap, InfoTrust LLC, Innovid, Medallia, Microsoft, Verizon, and YouTube.[70] This investigation did not examine any potential disclosures of taxpayer data via these other pixels, but their extensive use raises additional privacy concerns.

H&R Block stated that it had been using the Meta Pixel for "at least a couple of years."[71] H&R Block representatives communicated that they were "not aware" of any other pixels used on their website, "past or present,"[72] despite Google confirming that H&R Block did have GA installed on their website[73] – which was also previously unreported and raises the concern that tax prep companies themselves are unaware of what pixels they are using and how this may be affecting taxpayer privacy.

TaxAct first implemented the Meta Pixel in 2018 but has been using GA since "approximately 2014."[74] TaxAct refused to provide information on which other pixels were or have been in use on the company's website.

These responses revealed a troubling pattern and practice of sharing taxpayer data with Meta, Google, and countless other Big Tech companies via pixels embedded in their websites.

### *2. The Tax Prep Industry Shared Sensitive Data – Including Income Data – for Tens of Millions of Taxpayers*

Each of the tax prep firms that responded to the Senate inquiry revealed that they shared extensive taxpayer data via their use of the Meta Pixel and Google's tools.

TaxAct revealed that the Meta Pixel on their website collected far more information than was previously reported, including full names, email, country, state, city, zip codes, phone numbers, gender, date of birth, first names of dependents, buttons that were clicked, names of text-entry forms that the taxpayer navigated to (both of which could indicate, for example, whether taxpayers were eligible for certain deductions or exemptions), web browser used, year of the return, and website referral, if any.[75] TaxAct also indicated that the company collected "substantially similar" types of data using Google Analytics 360.[76]

In addition, TaxAct informed the lawmakers that, through another Meta "business tool that leverages Facebook's computing services" and is "not used for direct ad targeting,"[77] Meta collected indicators for whether a given taxpayer was head of household, married filing jointly, had certain assets, investment income, charitable contributions, mortgage interests, standard deductions, Schedule Cs, and student loan interest.[78] Finally, TaxAct shared with Meta taxpayers' number of dependents, number of W2s, AGI (rounded to the

nearest thousand), and federal tax owed, and refund amount (each one rounded to the nearest hundred).[79]

TaxAct also indicated that it shared all the same information for its IRS Free File users because "For purposes of website analytics, TaxAct does not differentiate between our paid and Free File services."[80]

H&R Block indicated that "Meta's default settings of their pixel allowed them to collect additional information, including page title information from our online tax filing service… [S]ome of those page titles included a subset of information related to the customer and his or her tax situation, including the first name of the taxpayer and aggregate amounts relating to HSA contributions, scholarships, and education expenses."[81] The company also indicated that the Pixel transmitted information on page headers[82] – meaning that the Pixel would transmit information on whether taxpayers had visited pages for many broad categories, such as dependents, certain types of income (such as rental income or capital gains), and certain tax credits or deductions.

TaxSlayer indicated that "the Meta Pixel may have attempted to collect name, email, phone number, city, state, and zip code on certain pages. To the best of the company's knowledge, the Meta Pixel did not, however, collect gender, country, date of birth, social security numbers, income, adjusted gross income, deductions, refunds owed, taxes owed, health savings information, Form 1040 or other tax forms, or other sensitive information from tax returns."[83] But, like H&R Block, the company indicated that the Pixel would transmit information on which pages taxpayers had used, [84] providing information on a broad set of sensitive information, from taxpayer reporting rental income to alimony.[85]

TaxSlayer also indicated that the Google Analytics Pixel has been embedded on the company's website since March 2011, but that, "To the best of the company's knowledge, the Google Analytics Pixel does not collect name, address, filing status, information about dependents, income, assets, refunds owed, taxes owed, social security number, health savings information, Form 1040 or other tax forms, or any other sensitive information from tax returns"[86]

Intuit informed the lawmakers that the only information the company had shared with Meta was users' usernames.[87]

Information was shared for years by the tax prep companies, and consequently they likely shared information for tens – or even hundreds of millions of taxpayers. In fact, although the companies initially dissembled when it came to revealing how many taxpayers had their data shared with Big Tech firms, they ultimately indicated that – because of the way the pixels were set up and implemented – every single taxpayer who used their websites to file their taxes could have had at least some of their data shared. [88]

### *3. Shared Data Was Not Truly Anonymous*

The tax prep companies and Meta and Google claimed that data was shared in an anonymized fashion: that it was sent without identifying information, or was "hashed" to hide identifying information and "could not be de-hashed" and was "not traceable back to the original data."[89] However, these claims of anonymity do not hold up.

Experts, including former FTC Chief Technologist Edward Felten, have found that "hashing is vastly overrated as an 'anonymization' technique."[90] Essentially, a hash is a mathematical function that transforms data into another, less-identifiable, form – but the key is that each "input yields the same output."[91] So, for example, if a user hashed their SSN, the result would be a long string of letters and numbers, "but that in itself does not make the value anonymous."[92] To determine the SSN, all an analyst would have to do is go through every possible combination of SSN and hash each one – something computers can do "in less time than it takes you to get a cup of coffee" – and when the correct SSN is hashed, the result will be equal to the string, telling the analyst he found the right one.[93] Felten continues: "A clever analyst would do it even faster. He would hash all of the possible SSNs in advance, and build an index that allowed him to recover the SSN from its corresponding hash value in the blink of an eye. Hashing the SSN would offer no protection at all against an analyst who had built such an index."[94] The FTC has recently raised similar concerns, noting that "significant research has shown that "anonymized" data can often be re-identified, especially in the context of location data."[95]

Indeed, in the case of Meta, experts have indicated that if customer data is transmitted directly to Facebook, "the hash method is not suitable for generating anonymous character strings."[96] According to Kristin Benedikt, a German data security expert, "[w]e are certain that Facebook obtains additional information about users from matching email addresses, regardless of whether a person is already registered with Facebook."[97] At the very least, personally identifiable data that is transmitted via the Meta Pixel as hash values[98] "shows Facebook that a user is also a customer of a particular company or online store… Facebook adds this information to existing profiles and continues to use it."[99]

In addition, although Meta requires developers to hash various fields for privacy reasons, for some of them, the hashing provides, at best, a minimal degree of privacy because the hashing options are limited. For example, for the gender field, Meta only has two permitted options, M and F, so there are a total of two hashes that would need to be precomputed and checked against to reveal the true value.[100]

In fact, during an interview with congressional staff, Meta admitted that they do indeed match email addresses collected through the Pixel with email addresses that Facebook has on file.[101] According to them, this allows them to better target a business's ads to that individual on Facebook. But, via its c_user cookie, Meta can also use data gathered by the Pixel to expand its user dossiers. During this staff interview, Meta described one example of how this works: "Let's say a business has a list of emails of great customers. They want to reach other people who are like those people. Lookalike Audiences will expand the list to other people who have things in common with those people."[102] Meta could only offer such a feature if their system had some sort of informational record of all of their users – like a dossier organized around a c_user cookie.

Google claimed that at its base level, GA is not set up to collect personally identifiable information – such as names, email addresses, and phone numbers – but admitted that such information could be collected and sent to Google for processing if it's more sophisticated customers specifically configured GA to do so.[103] Similarly, Google was unable to definitively determine whether financial info, such as AGI, was collected and sent to Google, but admitted that it was theoretically possible.[104] Google claimed though that even if this were the case, any such info would be pseudonymous – or not identifiable to an individual user – because Google's systems were designed specifically

to prevent financial info from being tied to personally identifiable information.[105] However, Google admitted that such info would be identifiable to the user's unique cookie embedded on their device, but that the cookie itself is not associated with the user's name or other identifiable information.[106]

Once again though, this reassurance means little because, as one Stanford and Princeton University study found, Google's tracking software could "successfully carry out de-anonymization," through a simple process that leverages a user's web browsing history collected by Google's tracking tools.[107] Moreover, Google's claim of anonymity ignores how data can be compiled and used by customers to target ad content, limiting the extent to which anonymity can be protected. This raises questions as to the true anonymity of the personal, tax information potentially shared by the tax prep companies with GA – information that is supposed to be confidential.

## B. Tax Prep Companies and Big Tech Firms Employed Irresponsible Data Sharing Practices

### *1. TaxSlayer Implemented the Meta Pixel without Fully Understanding its Functionality – and TaxAct and H&R Block Apparently Knew but Chose to Implement it Anyway*

TaxSlayer first installed the Meta Pixel in February 2018. Yet despite years of usage, the company indicated that it was unaware of the extent to which the Pixel was sharing taxpayers' data with Meta – and continues to be uncertain about the full extent of data that was shared.

In a written response, TaxSlayer claimed that the company was, until late 2022, unaware that the Meta Pixel, by default, has a feature called Automatic Configuration (AutoConfig), "which gives Meta the ability to read certain page metadata."[108] They claim that "[t]here was no mention that AutoConfig is on by default within the base code provided by Meta," and "[w]ithout encountering a clear or prominent disclosure about AutoConfig, TaxSlayer was unaware it was on by default."[109] This is despite the fact that Meta clearly describes the AutoConfig feature within their Meta Pixel online guides and includes instructions for how to turn it off.[110]

Furthermore, TaxSlayer indicated that company officials were unaware that "when AutoConfig is on, it also enables a feature… called Automatic Advanced Matching,"[111] which, as described above, collects information based on certain parameters. According to TaxSlayer, their testing "indicated that all parameters are on by default when the feature is activated."[112] Once again, information about Automatic Advanced Matching, including how to turn it on and off, can be found on Meta's website.[113]

Nevertheless, TaxSlayer claimed that their account representative at Meta "specifically recommended in a presentation to the marketing team to use the Automatic Advanced Matching feature."[114] According to TaxSlayer, "[t]he slide presentation did not advise of the full functionality of the Meta Pixel."[115] Based on the advice of their Meta account representative and their marketing team, the Automatic Advanced Matching feature was activated, which allowed the Pixel to transmit sensitive taxpayer information to Meta, including "name, email, phone number, city, state, and zip code."[116] They later admitted to congressional staff that web page titles were also collected, providing important information about types of tax forms that taxpayers were filling out.[117] According to TaxSlayer, the Advanced Matching feature was turned on in December 2021 and only turned off after the release of The Markup report in November of 2022.[118]

H&R Block also only took action to prevent data collection after being contacted by The Markup in November 2022,[119] indicating that they either did not know of the Pixel's full functionality or they knew and did not care.

TaxAct on the other hand seemed to know exactly the full functionality of the Meta Pixel, yet chose to implement it anyways. TaxAct was adamant of their "commitment to maintaining taxpayer trust," pointing to the fact that, after The Markup report, they took actions "beyond what is required by current laws and regulations" by limiting GA data collection and removing the Meta Pixel entirely.[120] Even so, TaxAct was unapologetic, positing that the data collection they employed through the Meta Pixel "was and is permitted under the law" and that they did not feel it was necessary to inform taxpayers about its implementation on their website.[121] These examples raise questions about the tax prep industry's ability to responsibly handle taxpayer data and how seriously they take the privacy of its customers.

### *2. Meta Refused to Respond to TaxSlayer's and H&R Block on the Final Disposition of the Shared Data*

After the release of The Markup report, H&R Block and TaxSlayer reached out to Meta inquiring about the final disposition and use of any data collected by the Pixel, but Meta was mostly unresponsive.

Specifically, TaxSlayer contacted Meta to "request a full disclosure on the information that may have been collected by Meta through the Meta Pixel and to delete any personal information that it may have collected."[122] TaxSlayer revealed that a Meta "Business Manager Support Agent informed the company that 'the customer's personal information from [their] Pixel should be deleted,'" but that "Meta did not provide any detail on the information that was actually collected."[123] On a call with congressional staff, company officials did not seem reassured by this response from Meta, noting that "since we didn't see [Meta] delete the data, we can't affirmatively say whether they did or not."[124] The company also claimed that they sent a letter to Meta asking for specifics regarding the deleted data, but Meta never responded.[125]

Regardless, by the time TaxSlayer reached out to Meta, the Pixel likely transmitted the personal information of tens of millions of taxpayers to Meta, going all the way back to 2018, when the Pixel was first installed[126] – and TaxSlayer to this day is not fully aware of the ultimate disposition of this taxpayer data.

H&R Block also claimed to have contacted Meta after The Markup report, inquiring about the use and final disposition of the data, but noted that they never received a "satisfactory answer."[127] The company admitted that they really have "no idea what Meta does with the data."[128] According to H&R Block, Meta was "not open to conversations" and was "reluctant to engage."[129]

This reluctance by Meta to reveal the final disposition and use of the taxpayer data it received is dubious at best and nefarious at worst. At the very least, it raises serious concerns as to what Meta really did with the data and what became of it – especially because they were unwilling to share this information with even its marketing partners.

### *3. Meta Refused to Respond to TaxSlayer's and H&R Block on the Final Disposition of the Shared Data*

Evidence obtained as part of this investigation appears to indicate that Meta and Google failed to implement adequate safeguards to prevent the transfer of taxpayers' sensitive personal and financial information, despite their contentions that they did so. Indeed, these policies appear designed and enforced solely to provide the companies with a modicum of deniability when third parties share sensitive data, rather than actually preventing them from doing so.

Meta claimed that they "do not want or permit developers to transmit sensitive information of any kind—including personal financial information."[130] The company highlighted that its Facebook Business Tools Terms, which all developers must agree to prior to implementing the Meta Pixel, requires developers to, among other things: "(1) warrant that they have 'all of the necessary rights and permissions and a lawful basis…' to disclose the information they are sending to Meta; [and] (2) refrain from sending Meta any 'sensitive information,' specifically including financial information."[131] Additionally, according to Meta, developers must also accept the Meta Commercial Terms which "expressly provide that developers may not send to Meta 'information that… includes health, financial, biometrics, or other categories of similarly sensitive information.'"[132]

These policies state the company seeks to prevent developers from sending sensitive information to Meta, but in practice, they are not enforced by the company. Recently, a consolidated class action lawsuit against Meta regarding this sharing of taxpayer information made the point that "Meta does not verify that advertisers have obtained adequate consent from users before transmitting their sensitive data. Instead, the Pixel is made available to any willing publisher regardless of their privacy policies, consent processes, or the nature of their business."[133] Our own investigation corroborates this argument: the policies in place did nothing to prevent tax prep companies from sending personal financial information to Meta.[134]

Meta also claimed that they "educate developers about these contractual obligations,"[135] that during the Pixel setup process they instruct developers "not to send Meta sensitive data" and that they maintain "publicly available guidance about types of data they should not send to us… in accordance with our Business Tool

 Terms."[136] While Meta does indeed maintain such publicly available guidance,[137] developers are able to access the Pixel code without reading or understanding any guidance or signing any kind of separate acknowledgement. As one expert noted, "[developers] just grab the code from Facebook, copy and paste, and they're done… They don't necessarily think about the implications."[138] In fact, Congressional staff ran a test and were able to access the Meta Pixel code in less than 6 clicks from start to finish, without being prompted to read or sign any acknowledgements or other guidance.[139]

Meta argues however, that even if these policies fail, its signal filtering mechanism detects and filters the data "before it can be stored and used in our advertising systems."[140] Then, Meta claims that when their systems "detect and drop potentially sensitive data, including potentially sensitive financial data, we send notifications to the developer about the affected data and instruct them to take any necessary action to fix their integrations."[141]

However, this investigation revealed serious gaps in this Pixel filtering mechanism. Meta publicly discloses only that it attempts to filter "sensitive financial information," "sensitive health information," and "personally identifiable information (contact information)," such as Social Security numbers.[142] Regarding "sensitive financial information," Meta discusses financial account information, such as bank account and credit card numbers, income, loan amounts, and debt status.[143] Meta does not disclose any tax-specific filtration efforts, although it states that the list of filtered information is not exhaustive.[144] This raises serious questions about the ability of Meta' signal filtering mechanism to accurately detect and prevent the collection of taxpayer information – information that has specific protections under the law.

Indeed, the signal filtering mechanism did not seem to work when it came to filtering out sensitive information from the tax prep companies: Meta told congressional staff that "several" notifications were sent to tax prep companies in the weeks leading up to The Markup report – after Meta had learned of the initial findings – but the tax prep companies stated that they never received any such notifications.[145] And Meta confirmed that if the signal filtering mechanism was triggered, the tax prep companies would have received a notification via email and through the Facebook Business Manager, and conversely, if companies did not receive a notification, no data was filtered.[146]

Congressional staffed asked Meta to provide copies of the notifications which they claimed had been sent to the tax prep companies, but Meta did not do so. It thus appears likely that the sensitive taxpayer information was indeed harvested by the Meta Pixel on the tax prep company websites and not filtered by Meta's signal filtering system from the time they began using the Meta Pixel until late 2022 when The Markup investigation was published and the companies disabled their Meta Pixels.

Meta's own internal documents seem to corroborate the insufficiency of their data filtering mechanism. In April 2022, an internal memorandum was leaked that revealed the true lack of control that Meta has over the data it receives.[149] In the document, Facebook privacy engineers state that "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[150]

Google has similar policies in place that "prohibit" its GA customers from "passing any information that could be used by Google to identify individuals."[151] Unlike Meta however, Google explicitly states that "[c]ustomers who violate our policies are subject to account suspension or termination."[152] Google also provides its customers with "data deletion tools to help promptly remove data from our servers."[153]

Google customers that connect their GA account to Google's advertising products must also adhere to the GA Advertising Features policy, which states that they "will not identify users or facilitate the merging of personally identifiable information with additional information collected through any Google advertising product or feature unless [they] have," the user's affirmative consent.[154] Google notes also that it is against their policies to "target advertisements based on sensitive information including information related to… financial hardship."[153]

It is unclear how, if at all, Google enforces these policies. For one, pursuant to this investigation, Google admitted that they never contacted any of the tax prep companies about their sharing potentially sensitive data with the company, and they did not suspend or terminate any of their accounts.[154]

Second, Google indicated that the company does not necessarily know what information is being collected by GA because, as previously discussed, customers are

able to program "custom events" to collect whatever information they like.[155] In fact, despite Google's policies to the contrary, company officials admitted that if a customer wanted to, they would be able to configure their custom events in such a way to track sensitive taxpayer information such as AGI, and Google's systems would not filter this information or alert anyone.[156]

When asked how they could possibly enforce their policy if they do not always know what attributes custom audiences are based on, company officials called it a "fair question" but offered no definitive answer.[157] This raises questions as to Google's ability to enforce their own policies and protect sensitive information, including TRI.

## C. Sharing Taxpayer Data with Meta and Google Was Potentially Illegal

The disclosure and use of taxpayer data was an egregious violation of taxpayer privacy, and it may also have been illegal: information obtained as part of this Senate investigation indicates that the tax prep companies that shared this horde of personal taxpayer information may have violated taxpayer privacy laws and regulations. The Internal Revenue Code states that a tax return preparer may not disclose "any information furnished to him for, or in connection with, the preparation of any such return" or use "any such information for any purpose other than to prepare, or assist in preparing, any such return."[158]

Thus, taxpayers can furnish their returns and return information to tax prep companies like TaxAct, TaxSlayer, and H&R Block, presumably with confidence that their privacy will be maintained. Such information, including names, mailing addresses, AGI, filing status, refund amount, and names of dependents all qualify as "information furnished to [a preparer] for, or in connection with, the preparation of any such return" under the statute and, accordingly, tax prep companies are not allowed to disclose or use such information for non-tax preparation purposes unless the taxpayer gives them permission to do so.[159] Any tax return preparer who "knowingly or recklessly discloses" this tax return information is subject to a fine of up to $1,000 per violation, and a prison term of up to 1 year.[160]

One exception where the disclosure of returns and return information is permitted without the taxpayer's consent is to "auxiliary service providers."[161] Despite the tax

prep companies' assertions that they scrupulously followed the law, it is not clear that they did so: they likely disclosed tax return information to Meta and Google without valid taxpayer consent, and it is not clear that they were authorized to do so without taxpayer consent because Meta and Google do not appear to be auxiliary service providers under the law.

Treasury Regulation 301.7216-1 broadly defines "tax return preparer" as including "[a]ny person who is engaged in the business of preparing or assisting in preparing tax returns" or "develops software that is used to prepare or file a tax return."[162] All of the tax prep companies discussed in this report likely meet the definition of "tax return preparer" under this regulation.

An auxiliary service provider (ASP), or someone who "is in the business of providing auxiliary services in connection with the preparation of a tax return," is a person who in the course of their business, "holds himself out to tax return preparers or to taxpayers as a person who performs auxiliary services."[163] Under this definition, merely providing some kind of service to a tax return preparer is not necessarily enough to qualify as an ASP – the service has to be connected to the preparation of a tax return, meaning that Meta and Google likely do not qualify as ASPs, though TaxAct attempted to indicate otherwise.[164]

The regulatory definition of "tax return information" or TRI is also important. Specifically, "tax return information means any information, including, but not limited to, a taxpayer's name, address, or identifying number, which is furnished in any form or manner for, or in connection with, the preparation of a tax return of the taxpayer."[165] The regulation also clarifies that TRI includes information that "the taxpayer would not have furnished… to the tax return preparer but for the intention to engage… the tax return preparer to prepare the tax return."[166] In other words, if a taxpayer provided information to a tax prep company with the intention of helping the company prepare their tax return, then that information is TRI under the regulation.

This definition of TRI is intentionally broad to "provide taxpayers with the most protection."[167] Because of this broad scope, nearly all of the information provided to tax prep companies would likely qualify as TRI under the regulations.

Lastly, it is important to understand the regulatory definition of "disclosure" and "use" of TRI. "Disclosure" is defined as "the act of making tax return information known to any person in any manner whatever," and use as "any circumstance in which a tax return preparer refers to, or relies upon, tax return information as the basis to take or permit an action."[168] Again, this definition is broad and consequently, when the tax prep companies shared TRI with Meta and Google via the Pixel and GA respectively, it was likely a "disclosure" under the regulations, and when that TRI was used, including to target Meta ads, it was likely a "use" under the regulations.

To summarize, for the purposes of these regulations: TaxAct, TaxSlayer, and H&R Block are tax return preparers. These preparers were provided with TRI by taxpayers which the preparers then disclosed to Meta and Google and used for purposes other than to prepare a return. The following sections address the question of whether these disclosures were permitted because the preparer's either obtained the taxpayer's valid consent, or because they were authorized to disclose the TRI without the taxpayer's consent to qualifying ASPs.

### *1. Tax Prep Companies Did Not Obtain Valid Taxpayer Consent*

Treasury Regulation 301.7216-3 describes specific instances when a tax return preparer may disclose or use TRI with the consent of the taxpayer – but the tax prep companies failed to meet the detailed requirements for consent.

First, the regulation states that "a tax return preparer may not disclose or use a taxpayer's [TRI] prior to obtaining a written consent from the taxpayer," and such consent must be "knowing and voluntary."[169] Furthermore, if a preparer conditions the use of their services on the taxpayer giving their consent, then such consent is considered involuntary.[170]

For a consent to be valid, there are key regulatory requirements that must be met:

- The consent must include the name of the tax return preparer and the name of the taxpayer;[171]
- The consent must identify the purpose of the disclosure and the intended recipients; [172]
- The consent must describe the particular use authorized;[173]

- The consent must specify the TRI to be disclosed;[174]
- The consent must be signed and dated by the taxpayer;[175]
- The consent may specify a duration of time where it is valid, but if no duration is specified, the consent is limited to one year from the date of signing.[176]

According to former National Taxpayer Advocate Nina Olson, who helped the Treasury Department write these rules, "The regulation also requires one consent document for uses, and a separate consent document for disclosure. Where such documents seek consent for multiple uses or multiple disclosures, they must list each such use or [disclosure] specifically."[1] According to the Revenue Procedure prescribed by this regulation, if a consent "authorizes the disclosure of a copy of the taxpayer's entire tax return or all information contained within a return," the consent must give the taxpayer the ability to request a more limited disclosure of TRI."[2] Furthermore, for the Form 1040 series of tax returns which are some of the most common returns filed,[3] there are extra regulatory requirements that must be met for a consent to valid.[4]

Thus, for the tax prep companies to have been legally allowed to disclose TRI to third parties – such as Meta or Google – or use the TRI for non-preparation purposes, it appears that they had to get consent from each of their users and that consent had to meet all of the above requirements to be legally valid. It does not appear that the tax prep companies met this standard.

As part of this investigation, congressional staff requested that each tax prep company provide current and historical versions of disclosure agreements and privacy policies, but the companies refused to provide such information. Accordingly, congressional staff retrieved current privacy policies from each company's website and obtained historical versions from internet archives. Current versions of disclosure agreements were also examined, but historical versions were not available.

### *a. TaxAct Did Not Appear to Obtain Valid Consent*

To sign up for tax prep services with TaxAct, users must create an account on their website. In order to do so, they must click a box certifying that they "agree to the TaxAct Terms of Service & Terms of Use," and "have read and acknowledge the Privacy Statement."

Once the user checks the box acknowledging that they have read and agreed to the Privacy Statement, they are taken to several pages where they can input TRI – their personal information, filing status, dependent status, and contact information.

This simple sign-up procedure does not appear to meet IRS regulations. First, at no point did the website prompt the user to sign or date a consent form for the disclosure of TRI. Second, while TaxAct's 2022 version of its Privacy Statement broadly describes the purpose of the data sharing and named Google as a recipient,[1] it did not mention Meta at all and did not describe each particular use authorized nor specify the precise TRI that was to be disclosed to those recipients. The Markup report reached a similar finding, noting that no disclosures "that specifically mentioned Meta or Facebook" were found.[2] Even though the current iteration of TaxAct's Privacy Statement now mentions both Meta and Google, at the time TRI was found to have been disclosed in November 2022, no such mention was made. Even so, the current version fails to meet all other IRS regulatory requirements described above.

Case 3:25-cv-03530-EMC Document 26-2 Filed 08/05/25 Page 29 of 55

information allows us to better understand the functionality of our mobile software. We do not utilize the information we store within the analytics software in connection with personally identifiable information you submit within the mobile application.

- **GeoLocation Data:** If you have enabled background location services on your mobile device, we may collect the data about you in the background even when you do not have the TaxAct application open. You may turn off location services at any time by changing your mobile device settings. Independent of your device, the IP address we collect through your use of our Services, as described above, may itself indicate information about your location.

**Third-Party Tools and Collecting Information**

We use third-party tools, including those listed below to obtain information on how visitors interact with our Services. These tools collect information about the performance of our site and how visitors navigate around and interact with our web pages, which allows us to evaluate and further improve and optimize our web pages. For more information on the below third-party tools, please click on the links:

- Google Analytics Privacy Policy - We use the information from Google Analytics to improve our site and services.
  - To opt out of Google Analytics install the Google Analytics opt-out browser add-on or refer to the following link: https://tools.google.com/dlpage/gaoptout/
  - To control settings for Google's personalized ads visit https://adssettings.google.com/
- Facebook Privacy Policy - To better assess and optimize our marketing activities, we may use a tool called the "Meta Pixel" operated by Meta (formerly Facebook). To opt-out of providing your information to the Meta Pixel or other third-party tracking technologies, please visit: https://www.aboutads.info/choices
- AppsFlyer Privacy Policy - We use information from AppsFlyer to improve our mobile app and the services it offers. You can opt out of AppsFlyer's use of information about you here: https://www.appsflyer.com/legal/opt-out/
- Neustar Privacy Policy - Neustar may be used to analyze and optimize marketing effectiveness and allow better personalization of our website. You can opt out of Neustar's use of information about you here: https://www.home.neustar/privacy/opt-out
- ContentSquare Privacy Policy, Cookie Policy, and how it treats security. - We use ContentSquare to better understand the effectiveness and utilization of various portions of our website.
- Optimizely Privacy Policy and Data Subject Rights - We use Optimizely to test variations, analyze, and direct traffic on our website and in our products.

**Third Party Links**

Our Services may contain links to third party websites, which are clearly identified and will direct you from TaxAct's site to a third-party site. Our link to a product or service offered by a third-party company does not by itself indicate our endorsement. Some of these third-party sites may collect information about you or request personal information from you. TaxAct does not direct or oversee the policies, procedures or other practices for companies other than TaxAct. If accessing a third-party site via a link, you will be directed to that third-party's website and governed by their privacy notice and policies. We encourage you to review their privacy statements or notices to learn more about what information is collected, how it is used, and how it is stored.

We and our service providers use cookies, web beacons, or similar technologies to automatically or passively collect information about the use of our Services, analyze trends, administer the website, track users' movements around the website, and to gather demographic information about our user base as a whole. Cookies are small data files stored on your hard drive or in device memory that help us improve our Services and your experience, enhance security, see which areas and features of our Services are popular and count visits. Web beacons are electronic images that may be used in our Services or emails and help deliver cookies, count visits and understand usage of our Services. You may elect to have your browser not accept cookies, however, this may disable or render unusable some of the features of the Services.

We use third party tools, such as Google Analytics, Contentsquare, and Crazy Egg, to obtain information on how visitors are interacting with our Services. These tools collect information about the performance of our site and how visitors navigate around and interact with our web pages, which allows us to evaluate and further improve or optimize our web pages. For more information on these third-party tools, please click here:

- Google Analytics Privacy Policy - To opt out of: (i) Google Analytics install the Google Analytics opt-out browser add-on and (ii) Google's ad serving
- Crazy Egg Privacy Policy - You can opt-out of the use of Crazy Egg, here: Opt Out.
- Content Square Privacy Policy, Cookie Policy, and how it treats security.
- Neustar Privacy Policy – You can opt out of Neustar's use of information about you here: Opt Out.

In connection with marketing related activities, TaxAct may monitor and collect information posted on our accounts or linked to us on third party operated social networks or other web offerings (such as Twitter, LinkedIn, Facebook, Instagram, TikTok or Google).

*Figure 1. TaxAct Privacy Statements as of April 2023 (Left) and August 2022 (Right)*

And, because the electronic disclosure consent consisted of checking a box on the sign-up page, there was no separate page or window for the consent of each separate disclosure or separate use of TRI as required by law. And the mandatory disclosure language prescribed by the IRS was nowhere to be found.

This simple sign-up procedure fails to meet IRS regulatory requirements. Accordingly, it appears that TaxAct did not obtain valid consent from taxpayers prior to disclosing their TRI to Meta and Google and using the TRI for non-preparation purposes.

*b. TaxSlayer Did Not Appear to Obtain Valid Taxpayer Consent*

Review of TaxSlayer's privacy policy and disclosure agreements also strongly suggests that TaxSlayer did not obtain valid consent for its disclosures of taxpayer data to Meta and Google. TaxSlayer also requires its users to first sign up for an account on their website in order to access their tax prep services. In order to do so, they must check a box that states "By clicking 'Create Account', you agree to TaxSlayer's License Agreement, Privacy Policy, [and] Terms of Service."[183]

Once a user checks the box agreeing to the Privacy Policy and clicks "create account" they are taken to another page that asks for "your approval on a couple things." The first is a consent statement that provides mandatory federal disclosures required by IRS Revenue Procedure 2013-14.[184] The second is a disclosure statement which states that "[b]y signing below, you can allow us to share your 2022 tax return information to our marketing partners so that we can personalize how you see online advertising for TaxSlayer products and services." It then provides more mandatory federal disclosures, followed by a list of their marketing partners, including Commission Junction LLC, Exponential Interactive (d/b/a VDX), Google LLC (including YouTube), LiveRamp Holdings, Inc., Microsoft Corporation (Bing), TV Squared Limited, and Yahoo Inc. If the users check the "I agree" boxes under each statement, the page then populates a date and signature box, including one for a spouse if filing jointly.



2022 | SIMPLY FREE

Help & Support

We need your approval on a couple things

Consent to use information

Federal law requires this consent form be provided to you. Unless authorized by law, we cannot use your Tax Return Information for purposes other than the preparation and filing of your tax return without your consent.

You are not required to complete this form to engage our tax return preparation services. If you do not want to consent, simply click "Remind Me Later" at the bottom of the screen. If we obtain your signature on this form by conditioning our services on your consent, your consent will not be valid. Your consent is valid for the amount of time that you specify. If you do not specify the duration of your consent, your consent is valid for one year from the date of signature.

I agree to the Consent to Use terms.

PRINT

Ensure the details below are accurate:

Full Name *

Date
03/29/2023

I am filing a joint return with my spouse.

Spouse's Name (if filing together) *

Date
03/29/2023

I am filing a joint return with my spouse.

Spouse's Name (if filing together) *

Date
03/29/2023

DISCLOSURE OF INFORMATION

Before you get started, please review the following disclosure. By signing below, you can allow us to share your 2022 tax return information to our marketing partners so that we can personalize how you see online advertising for TaxSlayer products and services. If you choose not to consent, you may still see advertisements or offers for our products and services, but we cannot simplify the offers you receive to fit your specific needs.

Federal law requires we provide this consent form to you. Unless authorized by law, we cannot use your Tax Return Information for purposes other than the preparation and filing of your tax return without your consent. If you consent to the disclosure of your Tax Return Information, federal law may not protect your Tax Return Information

I agree to the Consent to Disclosure terms.

PRINT

Ensure the details below are accurate:

Full Name *

Date
03/29/2023

I am filing a joint return with my spouse.

Spouse's Name (if filing together) *

Date
03/29/2023

*Figure 2. TaxSlayer Disclosure Agreements as of April 2023*

Once this page is completed, the user is then prompted to begin inputting TRI. At this point, assuming a user agreed to the consent and disclosure statements, any pixels on the website would begin collecting and transmitting data to any marketing partners – including Google and Meta.

It is unclear whether the consent procedures in place prior to November 2022 included these separate disclosure statements and signature boxes. However, TaxSlayer informed congressional staff that after The Markup report was released, the company made substantial updates to its Privacy Policy and consent procedures.[1]
 For example, in its 2022 Privacy Policy, TaxSlayer mentions in general terms that it may disclose taxpayer information to service providers to "to market one of our products or services."[2] Furthermore, the policy states that "cookies, tags, or similar technologies are utilized by TaxSlayer and our partners, affiliates, or analytics or service providers," and that TaxSlayer "use[s] the information collected to develop, improve, enhance, and secure our websites, products, and services."[3] The policy briefly mentions that "[t]he primary technologies used by TaxSlayer are: Decibel®, Heap®, and Google®," but there is no mention of Meta anywhere.

The 2022 Privacy Policy also only vaguely explains how these technologies are used, stating that "[s]pecifically, the technologies listed above, and possibly others, are used in administering the websites and application, analyzing trends, evaluate functionality of our websites and application on your device, tracking users' movements around the site and to gather demographic information about our user base as a whole. We may receive reports based on the use of these technologies by these service providers on an individual as well as aggregated basis."[4]

HOW AND WHY WE COLLECT INFORMATION

In addition to the information you input directly, certain technologies such as: cookies, tags, or similar technologies are utilized by TaxSlayer and our partners, affiliates, or analytics or service providers. As part of the information collected, we may record page views, mouse clicks, movements and scrolling activity. A device user may control the ability of access of some of these technologies at the individual browser level, however, this limitation may disable or limit some of the features offered. The primary technologies used by TaxSlayer are: Decibel®, Heap®, and Google®. For an updated and complete list of our providers please contact us at support@taxslayer.com.

We use the information collected to develop, improve, enhance, and secure our websites, products, and services. Specifically, the technologies listed above, and possibly others, are used in administering the websites and application, analyzing trends, evaluate functionality of our websites and application on your device, tracking users' movements around the site and to gather demographic information about our user base as a whole. We may receive reports based on the use of these technologies by these service providers on an individual as well as aggregated basis. Additionally, we use cookies for settings preferences, e.g., language preference. From time to time, we may send push notifications to update you about any alerts, offers, or promotions.

*Figure 3. TaxSlayer Privacy Policy as of May 2022*

 In addition to this vague language, the current iteration of its Privacy Policy now discloses that TaxSlayer "collect[s] information from you directly, the devices that you use to interact with us, and third-party analytics providers."[189] The policy now explains in relative detail the information users give it and explains the information that it collects automatically.[190]

The policy also now lists TaxSlayer's "partners that collect the information described above," on a separate page connected through a hyperlink in the policy. Once clicked, users are taken to a page where TaxSlayer lists its marketing partners and explain the cookies that are used on its site.[191] In this iteration of the policy, the Meta Pixel is not listed, likely because, as TaxSlayer informed us, after The Markup report, the company removed the Meta Pixel from their products.

The company also now discloses, in general terms, how it uses taxpayer information, including for "marketing, advertising, and promotions."[192]

Although TaxSlayer's Privacy Policy is now more extensive than its 2022 version, both still do not appear to meet IRS regulatory requirements. For one, although the policy now lists the recipients of TRI, neither version adequately describe the particular uses authorized – relying instead on vague language that such information is used for "marketing" and "promotions." Furthermore, it does not specify the TRI to be disclosed or for what purposes.[193]

Additionally, although there is now a separate page with disclosure consent agreements, dated signature boxes, and statements that identify the general purpose of the disclosure ("so that we can personalize how you see online advertising for TaxSlayer products and services"), neither of the agreements specifically state what TRI is to be disclosed. And the initial consent agreement does not include the name of the tax return preparer – all of which are required by IRS Revenue Procedure 2013-14.[194] Furthermore, it seems that neither consent agreement adequately describes the particular use authorized: other than the general purpose statement mentioned above, no other particular uses were described in either of the consent forms.

Accordingly, it appears that even with the updated Privacy Policy and disclosure consent procedure, TaxSlayer fails to meet the IRS regulatory requirements and thus likely did not obtain taxpayer's valid consent prior to disclosing TRI to Meta and

Google and using TRI for non-preparation purposes.

*c. H&R Block Did Not Appear to Obtain Valid Taxpayer Consent*

Review of H&R Block's privacy policy and disclosure agreements also strongly suggests that H&R Block did not obtain valid consent for its disclosures of taxpayer data to Meta and Google.

Unlike TaxAct and TaxSlayer, H&R Block does not require users to create an account prior to accessing their tax prep software, although users are given the option to do so. If a user clicks the "create account later" button at the bottom, they are then taken to a page where they must click a box to agree to H&R Block's Electronic Communications Consent, Online Services Agreement, and the H&R Block Privacy Notice.

In the 2022 Privacy Notice, a version almost identical to its current Privacy Notice, H&R Block lists the type of information they collect, as pictured below:

If you have questions or complaints regarding our privacy practices or principles, please contact us by clicking here or calling 1-800-HRBLOCK.

**What information do we collect?**

| In brief: As part of providing products and services to you, we may collect information, including personal information, about you, your spouse, your dependents, or your business when you use our services. | As part of providing products and services to you, we may collect information, including personal information, about you, your spouse, your dependents, or your business when you use our services. Personal information is data that can be used to identify a person individually. The information we may collect includes, but is not limited to:<br>• **Contact Information** (e.g., name, phone number, address, and email address);<br>• **Social Security Number** and other government identification numbers (e.g., EIN, Driver's License Number, and ITIN);<br>• **Date of Birth**;<br>• **Financial Information** (e.g., income, revenue, assets, credits, deductions, expenses, and bank account information);<br>• **Payment Data** (e.g., checking, debit and credit card account numbers, balances and payment history);<br>• **Health Information** (e.g., health insurance status and financial information related to payment for healthcare services);<br>• **Geo-Location Information**;<br>• **Website, Mobile Application, and Email Usage Data** (e.g., interactions with a website, application or advertisement);<br>• **Device Information** (e.g., internet protocol (IP) address, device type, unique identifier, app version, operating system, network data, and phone state);<br>• **Login Information**;<br>• **Demographic Information;**<br>• **Professional or employment-related information**; and<br>• **Education information**. |
|---|---|

*Figure 3. TaxSlayer Privacy Policy as of May 2022*

The notice also mentions that the company collects certain "usage data," including "which websites you visit, what you click on, and when you performed those actions."[195] The notice then describes how it uses this information, including to "offer you relevant information, products, or services; and enhance our products and services."[196] It notes that "[t]hese activities may be performed by us or a service provider acting on our behalf."[197]

The notice then describes, in general terms, with whom H&R Block shares information, noting that it "may disclose information as permitted by law or with your consent to other H&R Block companies or to third parties."[198] The notice explains that H&R Block may also share personal information "with a third-party advertising partner… to deliver advertising tailored to your interests when you visit certain other websites."[199] However, the notice claims that "[d]ata shared for tailored advertising is made pseudonymous," and that H&R Block does "not share your information with third parties for their marketing purposes without your consent."[200]

The notice then describes the technologies used on the company's website, including cookies and "pixel tags" that help it "better manage content on our websites by allowing us to… improve the products and services offered to you on our websites."[201] It also notes that H&R Block allows "third-party companies, such as Google DoubleClick Campaign Manager, to serve ads and collect certain pseudonymous information when you visit our websites," and that these third parties "may use this information… during your visits to our websites in order to provide advertisements about goods and services likely to be of interest to you and to enhance your consumer experience across the different devices that you use."[202]

After checking the box agreeing to this privacy notice, the user is then taken to another page with a disclosure consent form. This page includes a dated signature box and a check box where the user indicates their consent to the disclosure of information to H&R Block Personalized Services, LLC (HRBPR). If the user indicates they are filing jointly, a dated signature box appears for the spouse as well. At the very bottom of the page is federal mandatory language prescribed by IRS Revenue Procedure 2013-14.[203]

The disclosure agreement states that "[b]y agreeing you authorize H&R Block to disclose to [HRBPR] all your… tax return info (excluding all Social Security

numbers)… so that, after you file, [HRBPR] can develop, offer, and provide products and services… including… products or services customized to you." The agreement also notes that HRBPR "may use service providers and business partners to accomplish these tasks," and provides a hyperlink to their website with more information. Lastly, the agreement includes more of the federal mandatory language as prescribed by IRS Revenue Procedure 2013-14.[204]

After clicking on the HRBPR hyperlink, a user can find their Privacy Notice, which is almost an exact copy of H&R Block's privacy notice, discussed above.[205] At the top, the HRBPR notice mentions that they are "owned and operated by H&R Block and are a member of the H&R Block family of companies."[206]

Users who do not wish to consent to this disclosure agreement can click the "no thanks" button at the bottom of the page. Otherwise, if a user types their name in the signature box, clicks the accept box, and clicks the "next" button, then the user agrees to share their entire return (excluding SSNs) with HRBPR. After selecting one of these options, users are taken to another page to begin inputting TRI.

At this point, if a user agreed to the disclosure agreement, any pixels embedded on this page would likely begin collecting TRI to share with HRBPR. Then, HRBPR could share that info with its "service providers" as permitted by the disclosure agreement, which could include Meta and Google.

It appears that the 2022 H&R Block Privacy Notice did not meet IRS regulatory requirements. While H&R Block did provide a disclosure agreement on a separate page which included a dated electronic signature box and the federal mandatory language – making it one better than TaxAct – the disclosure agreement did not list any of the recipients of TRI, such as Meta or Google. Neither did the Privacy Notice list them as recipients, aside from a brief mention of "Google DoubleClick Campaign Manager." Furthermore, while the disclosure agreement identified the general purpose of the disclosure and specified that all TRI is to be disclosed, it did not give the taxpayer the ability to request a more limited disclosure of their tax return, as required by the regulation.[207]

Ultimately, it appears that none of these tax prep companies obtained a valid consent from taxpayers prior to sharing TRI with Meta and Google and using TRI for non-preparation purposes. If this is true, then unless the tax prep companies were authorized to disclose and use TRI without taxpayer's consent, it is likely they violated the law and could be subject to civil and criminal penalties.

### *2. Tax Prep Companies Were Likely Not Authorized to Disclose TRI without Taxpayer's Consent*

Treasury Regulation 301.7216-2 describes specific instances when a tax return preparer may disclose TRI without the consent of the taxpayer. There are only a few potentially relevant provisions, and all three tax prep companies do not appear to have met the requirements.

First, subsection (d) allows a tax return preparer to disclose TRI to another tax return preparer "for the purpose of preparing or assisting in preparing a tax return, or obtaining or providing auxiliary services in connection with the preparation of any tax return."[208] In other words, under this provision, tax prep companies can only disclose TRI without taxpayer's consent to other tax prep companies – including auxiliary service providers (ASPs) – and only if they are doing so to prepare or help prepare an actual tax return.

Meta and Google do not appear to qualify as ASPs. Moreover, even if they did, they would be bound by statute not to use the TRI for "any purpose other than to prepare, or assist in preparing," returns.[209] However, the services they provided to the tax prep companies in this instance could hardly be considered "in connection with the preparation of any tax return" as required by subsection (d): none of the services they provided assisted in the actual preparation of a tax return. Consequently, these rules do not appear to authorize the tax prep companies to disclose TRI without taxpayer's consent.

Subsection (d) also allows a tax return preparer to disclose TRI without taxpayer consent to a "person under contract with the tax return preparer in connection with the programming, maintenance, repair, testing, or procurement of equipment or software used for purposes of tax return preparation."[210] Meta was under contract with the tax

prep companies, and the services they provided did involve some programming. However, the services provided by Meta did not involve any programming of the tax prep software itself because the pixel code in no way directly effects the functionality of the actual tax return software, and does not involve any maintenance, repair, or testing of the tax prep software. Consequently, none of subsection (d) likely applies to the tax prep companies in this instance.

Second, subsection (n) allows a tax return preparer to "compile and maintain a separate list containing solely items of tax return information," including names, mailing addresses, email addresses, phone numbers, and income tax return form number.[211] The provision defines "list" as "any record or system whereby the types of information expressly authorized" by this provision are retained.[212] However, such a list:

> [M]ay be used by the compiler solely to contact the taxpayers on the list for the purpose of providing tax information and general business or economic information or analysis for educational purposes, or soliciting additional tax return preparation services. The list may not be used to solicit any service or product other than tax return preparation services.

The compiler of the list can also disclose the list to other tax return preparers or ASPs (pursuant to subsection (d)) but only for the express purposes outlined in (n), above. [213] Thus, had the tax prep companies used these lists to send their own emails or other communications to provide info or solicit more tax prep services, they could have done so without getting taxpayers' consent. Alternatively, they could have disclosed these lists to ASPs for the same authorized purposes.

However, because Meta and Google likely are not ASPs, disclosing this information to them was not permitted without taxpayer consent. Moreover, the information shared with Meta was used for more than just providing information and soliciting additional tax prep services. For one, as discussed above, Meta likely utilized the TRI it received to expand its knowledge-base of individual users, allowing it to offer more accurate advertising services – in part through its Lookalike Audience feature – to other advertisers that are not tax return preparers. And, Meta also confirmed that it uses the Pixel data it collects for machine learning for Meta's own general purposes, allowing it to optimize its marketing algorithms and provide more effective advertising to other advertisers.[214] Consequently, under any circumstances, subsection (n) likely did not

authorize the tax prep companies in this instance.

Lastly, subsection (o) allows a tax return preparer to use TRI to "produce a statistical compilation of data," the purpose of which must "relate directly to the internal management or support of that tax return preparer's… business."[215] The provision clarifies that "[f]or purposes of this paragraph, marketing and advertising is in direct support of the tax return preparer's… business."[216]

However, tax return preparers "may not disclose the statistical compilation, or any part thereof, to any other person unless disclosure of the statistical compilation is anonymous as to taxpayer identity,"[217] and clarifies that "[a] statistical compilation is anonymous as to taxpayer identity if it is in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer."[218] Lastly, the subsection notes that it does not "authorize the disclosure or use in marketing or advertising of any statistical compilations, or part thereof, that identify dollar amounts of refunds, credits, or deductions associated with tax returns, or percentages relating thereto, whether or not the data are statistical, averaged, aggregated, or anonymous."[219]

It is unclear whether any tax prep company shared any statistical compilations of data with Meta or Google in this instance, as opposed to raw, individualized data. For example, GA ultimately provides tax prep companies with statistical compilations of data, but the information these compilations are based on was apparently not in a compiled form until Google received it and compiled it.

In any case, the data shared with Meta and Google was not truly anonymous as to taxpayer identity, because it could, at the very least, be indirectly associated with a particular taxpayer. Furthermore, TaxAct and TaxSlayer revealed to us that dollar amounts of AGI and refund amounts were disclosed to Meta and Google which, even in a statistical, rounded form, is not permitted. Consequently, regardless of whether or not any of the information shared with Meta and Google were statistical compilations, the exemptions found in subsection (o) did not apply, and did not authorize the tax prep companies to disclose TRI without taxpayer's consent.

### *3. Tax Prep Companies Were Likely Not Permitted to Disclose TRI to Meta and Google*

The analysis above reveals that it is unlikely that any of the regulatory exceptions that would have allowed TaxAct, TaxSlayer, and H&R Block to disclose TRI to Meta and Google with or without the taxpayer's consent applied with regard to the tax prep companies use of pixels. In other words, it appears that these companies violated the Internal Revenue Code when they shared TRI via the Meta Pixel and GA and could be subject to civil and criminal penalties.

Normally, taxpayers would also be able to bring a civil action for damages against these tax prep companies for violating the confidentiality of their tax returns under Section 7431(a)(2) of the Internal Revenue Code. Unfortunately, however, all of these companies force their users to agree to binding arbitration agreements as a condition for using their tax services. These agreements make it unlikely that taxpayers will be able to pursue their claims in court.

For this reason, we urge the Department of Justice (DOJ), the IRS the U.S. Treasury Inspector General for Tax Administration (TIGTA), and the Federal Trade Commission (FTC) to immediately open an investigation into this incident.

# IV. CONCLUSIONS

Through the Meta Pixel and Google's business tools, the tax prep companies investigated in this report – TaxAct, TaxSlayer, and H&R Block – recklessly disclosed and misused the personal tax return information of potentially millions of taxpayers. This potentially illegal misuse of taxpayer data should be immediately investigated by the DOJ, IRS, TIGTA, and FTC, and liable actors should be duly prosecuted. This investigation raises serious doubts about the ability of the tax prep industry to safeguard taxpayer information and highlights the urgent need for the IRS to develop its own online tax filing system – to protect taxpayer privacy and provide a better alternative for taxpayers to file their returns.

# REFERENCES

---

[1] Internal Revenue Service, "Returns Filed, Taxes Collected & Refunds Issued," April 14, 2023, https://www.irs.gov/statistics/returns-filed-taxes-collected-and-refunds-issued.
[2] Internal Revenue Service, "1040 (and 1040-SR) Instructions," Tax Year 2022, pg. 107, https://www.irs.gov/pub/irs-pdf/i1040gi.pdf#page=107.
[3] Urban Institute & Brookings Institute: Tax Policy Center, "Briefing Book," May, 2020, https://www.taxpolicycenter.org/briefing-book/what-other-countries-use-return-free-filing.
[4] The Office of U.S. Senator Elizabeth Warren, "Tax Maze: How the Tax Prep Industry Blocks Government from Making Tax Day Easier," April 13, 2016, pg. 3, https://www.warren.senate.gov/files/documents/Tax_Maze_Report.pdf.
[5] National Bureau of Economic Research, "Automatic Tax Filing: Simulating a Pre-Populated Form 1040," Lucas Goodman, Katherine Lim, Bruce Sacerdote, and Andrew Whitten, April 2022, revised May 2023, https://www.nber.org/system/files/working_papers/w30008/w30008.pdf.
[6] The Office of U.S. Senator Elizabeth Warren, "Tax Maze: How the Tax Prep Industry Blocks Government from Making Tax Day Easier," April 13, 2016, pg. 3, https://www.warren.senate.gov/files/documents/Tax_Maze_Report.pdf.
[7] IBISWorld, "Paying off: Industry operators will need to adjust to the trend toward electronic services," Kush Patel, August, 2019, pg. 25, https://www.gsa.gov/cdnstatic/54121D%20Tax%20Preparation%20Services%20in%20the%20US%20Industry%20Report.pdf.
[8] Open Secrets, "Intuit spends millions lobbying amid accusations of deceptive TurboTax advertising," Anna Massoglia, March 31, 2022, https://www.opensecrets.org/news/2022/03/intuit-spends-millions-lobbying-amid-accusations-of-deceptive-turbotax-advertising/.
[9] ProPublica, "Inside TurboTax's 20-Year Fight to Stop Americans From Filing Their Taxes for Free," Justin Elliott and Paul Kiel, October 17, 2019, https://www.propublica.org/article/inside-turbotax-20-year-fight-to-stop-americans-from-filing-their-taxes-for-free.
[10] IBISWorld, "Paying off: Industry operators will need to adjust to the trend toward electronic services," Kush Patel, August 2019, pg. 25, https://www.gsa.gov/cdnstatic/54121D%20Tax%20Preparation%20Services%20in%20the%20US%20Industry%20Report.pdf.
[11] Open Secrets, "Intuit spends millions lobbying amid accusations of deceptive TurboTax advertising," Anna Massoglia, March 31, 2022, https://www.opensecrets.org/news/2022/03/intuit-spends-millions-lobbying-amid-accusations-of-deceptive-turbotax-advertising/.
[12] U.S. Government Accountability Office, "IRS Free File Program: IRS Should Develop Additional Options for Taxpayers to File for Free," April 2022, pp. 1 and 42, https://www.gao.gov/assets/gao-22-105236.pdf.
[13] ProPublica, "Inside TurboTax's 20-Year Fight to Stop Americans From Filing Their Taxes for Free," Justin Elliott and Paul Kiel, October 17, 2019, https://www.propublica.org/article/inside-turbotax-20-year-fight-to-stop-americans-from-filing-their-taxes-for-free.
4] Office of U.S. Senator Elizabeth Warren, "Senator Warren Leads 22 Colleagues in Introducing the Tax Filing Simplification Act of 2022," Press Release, July 13, 2022, https://www.warren.senate.gov/newsroom/press-releases/senator-warren-leads-22-colleagues-in-introducing-the-tax-filing-simplification-act-of-2022

[15] Government Accountability Office, "IRS Free File Program: IRS Should Develop Additional Options for Taxpayers to File for Free," April 2022, p. 38, https://www.gao.gov/assets/gao-22-105236.pdf.

[16] The Office of U.S. Senator Elizabeth Warren, "At Hearing, Secretary Yellen Agrees with Senator Warren on Need to Create a Free Tax Filing System That Actually Works for Americans," press release, June 7, 2022, press release, https://www.warren.senate.gov/newsroom/press-releases/at-hearing-secretary-yellen-agrees-with-senator-warren-on-need-to-create-a-free-tax-filing-system-that-actually-works-for-americans.

[17] The Inflation Reduction Act of 2022, Public Law 117-169.

[18] Internal Revenue Service, "IRS Report to Congress: Inflation Reduction Act §10301(1)(B), IRS-run Direct e-File Tax Return System," May 16, 2023, https://www.irs.gov/pub/irs-pdf/p5788.pdf; Letter from Internal Revenue Commissioner Daniel Werfel to Treasury Secretary Janet Yellen, May 16, 2023, https://www.irs.gov/pub/newsroom/letter-to-secretary-yellen-direct-file.pdf.

[19] Procedurally Taxing, "The Facebook Pixel and Unauthorized Use and Disclosure of Tax Return and Tax Return Information," Nina Olson, November 29, 2022, https://procedurallytaxing.com/the-facebook-pixel-and-unauthorized-use-and-disclosure-of-tax-return-and-tax-return-information/.

[20] The Washington Post, "How to file your taxes without selling your soul," Shira Ovide, April 11, 2023, https://www.washingtonpost.com/technology/2023/04/11/tax-prep-turbotax-privacy/.

[21] The Markup, "Tax Filing Websites Have Been Sending Users' Financial Information to Facebook," Simon Fondrie-Teitler, Angie Waller, and Colin Lecher, November 22, 2022, https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Statista, "Annual revenue and net income generated by Meta Platforms from 2007 to 2022," S. Dixon, February 16, 2023, https://www.statista.com/statistics/277229/facebooks-annual-revenue-and-net-income/#:~:text=In%202022%2C%20Meta%20Platforms%20generated,to%20114%20billion%20U.S.%20dollars.

[30] DigitalMarketer, "What Is A Tracking pixel—Explained in 800 Words or Less," September 17, 2019, https://www.digitalmarketer.com/blog/what-is-tracking-pixel/; see also Meta for Developers, "Get Started," https://developers.facebook.com/docs/meta-pixel/get-started/.

[31] Viant, "What are advertising pixels – and will they end with third-party cookies?" June 23, 2021, https://www.viantinc.com/insights/blog/what-are-advertising-pixels-and-will-they-end-with-third-party-cookies/.

[32] DigitalMarketer, "What Is A Tracking pixel—Explained in 800 Words or Less," September 17, 2019, https://www.digitalmarketer.com/blog/what-is-tracking-pixel/.

[33] The Markup, "Applied for Student Aid Online? Facebook Saw You," Surya Mattu and Colin Lecher, April 28, 2022, https://themarkup.org/pixel-hunt/2022/04/28/applied-for-student-aid-online-facebook-saw-you.

[34] *Id.*

[35] Google Analytics Help, "Set up Analytics for a website (Universal Analytics)," https://support.google.com/analytics/answer/10269537?hl=en#zippy=%2Cadd-the-google-tag-to-a-website-builder-or-cms-hosted-website-for-example-wordpress-shopify-etc%2Cadd-the-google-tag-directly-to-your-web-pages.

[36] *Id*. See also MParticle, "Google Tag Manager vs. Google Analytics: What Are the Key Differences?" https://www.mparticle.com/blog/google-tag-manager-vs-google-analytics/#:~:text=Google%20Analytics%20is%20an%20analytics,for%20granular%20user%20event%20insights.

[37] Google Analytics Help, "Set up Analytics for a website (Universal Analytics)," https://support.google.com/analytics/answer/10269537?hl=en#zippy=%2Cadd-the-google-tag-to-a-website-builder-or-cms-hosted-website-for-example-wordpress-shopify-etc%2Cadd-the-google-tag-directly-to-your-web-pages.

[38] Google: The Keyword, "Some facts about Google Analytics data privacy," Russell Ketchum, January 13, 2022, https://blog.google/around-the-globe/google-europe/google-analytics-facts/.

[39] *Id.*

[40] Google Analytics Help, "Link/unlink Google Ads and Analytics," https://support.google.com/analytics/answer/1033961?hl=en#zippy=%2Cin-this-article.

[41]Id. See also Google Analytics Help, "[GA4] Introduction to audiences in Google Analytics," https://support.google.com/analytics/answer/12799087.

[42] Google Analytics Help, "[GA4] Introduction to audiences in Google Analytics," https://support.google.com/analytics/answer/12799087.

[43] Meta for Developers, "Get Started," https://developers.facebook.com/docs/meta-pixel/get-started/.

[44] Meta Business Help Center, "About lookalike audiences," https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[45] Meta for Developers, "Conversion Tracking," https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[46] Google Analytics Help, "Set up Analytics for a website (Universal Analytics)," https://support.google.com/analytics/answer/10269537?hl=en#zippy=%2Cadd-the-google-tag-to-a-website-builder-or-cms-hosted-website-for-example-wordpress-shopify-etc%2Cadd-the-google-tag-directly-to-your-web-pages.

[47] Google Marketing Platform, "Analytics: Overview," https://marketingplatform.google.com/about/analytics/.

[48] Google Analytics Help, "Set up Analytics for a website (Universal Analytics)," https://support.google.com/analytics/answer/10269537?hl=en#zippy=%2Cadd-the-google-tag-to-a-website-builder-or-cms-hosted-website-for-example-wordpress-shopify-etc%2Cadd-the-google-tag-directly-to-your-web-pages.

[49] Google Firebase Help, "[GA4] Automatically collected events," https://support.google.com/firebase/answer/9234069?visit_id=638151082191029261-3875904855&rd=1.

[50] *Id*.

[51] Google Analytics Help, "Set up Analytics for a website (Universal Analytics)," https://support.google.com/analytics/answer/10269537?hl=en#zippy=%2Cadd-the-google-tag-to-a-website-builder-or-cms-hosted-website-for-example-wordpress-shopify-etc%2Cadd-the-google-tag-directly-to-your-web-pages.

[52]Id. See also MParticle, "Google Tag Manager vs. Google Analytics: What Are the Key Differences?" https://www.mparticle.com/blog/google-tag-manager-vs-google-analytics/#:~:text=Google%20Analytics%20is%20an%20analytics,for%20granular%20user%20event%20insights.

[53] Google Analytics Help, "Set up Analytics for a website (Universal Analytics)," https://support.google.com/analytics/answer/10269537?hl=en#zippy=%2Cadd-the-google-tag-to-a-website-builder-or-cms-hosted-website-for-example-wordpress-shopify-etc%2Cadd-the-google-tag-directly-to-your-web-pages.

54] Google: The Keyword, "Some facts about Google Analytics data privacy," Russell Ketchum, January 13, 2022, https://blog.google/around-the-globe/google-europe/google-analytics-facts/.

55] *Id.*

56] Google Analytics Help, "Link/unlink Google Ads and Analytics," https://support.google.com/analytics/answer/1033961?hl=en#zippy=%2Cin-this-article.

57] Id. See also Google Analytics Help, "[GA4] Introduction to audiences in Google Analytics," https://support.google.com/analytics/answer/12799087.

[58] Google Analytics Help, "[GA4] Introduction to audiences in Google Analytics," https://support.google.com/analytics/answer/12799087.

[59] Letter from Senators Warren, Wyden, Duckworth, Whitehouse, Sanders, Blumenthal and Representatives Porter and Sherman to Google CEO Sundar Pichai, H&R Block CEO Jeff Jones, Intuit CEO Sasan Goodarzi, Meta CEO Mark Zuckerberg, TaxAct President Curtis Campbell, and TaxSlayer CEO Brian Rhodes, https://www.warren.senate.gov/imo/media/doc/TaxPrepMetaLetters.pdf.

[60] Letter from TaxAct President Curtis Campbell and Chairman Dermot Halpin to Senator Elizabeth Warren, January 3, 2023. [On file with Senator Warren's office].

[61] Letter from H&R Block Chief Government Relations Officer Tom Gannon to Senator Elizabeth Warren, January 3, 2023. [On file with Senator Warren's office].

[62] Letter from TaxSlayer Counsel Christopher J. Armstrong to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren's office].

[63] Letter from Intuit Executive Vice President and General Counsel Kerry McLean to Senator Elizabeth Warren, December 23, 2022. [On file with Senator Warren's office].

[64] *Id.*

[65] The Markup, "Tax Filing Websites Have Been Sending Users' Financial Information to Facebook," Simon Fondrie-Teitler, Angie Waller, and Colin Lecher, November 22, 2022, https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook.

[66] Virtual Meeting with Congressional staff and TaxSlayer officials, February 27, 2023.

[67] Electronic Correspondence from TaxSlayer Counsel Christopher J. Armstrong to Congressional staff, March 22, 2023. [On file with Senator Warren's office].

[68] *Id.*

[69] Letter from TaxSlayer Counsel Christopher J. Armstrong to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren's office].

[70] Electronic Correspondence from TaxSlayer Counsel Christopher J. Armstrong to Congressional staff, March 22, 2023. [On file with Senator Warren's office].

[71] Virtual meeting with Congressional staff and H&R Block officials, March 2, 2023. [Notes on file with Senator Warren's office].

[72] *Id.*

[73] Virtual meeting with Congressional staff and Google officials, March 22, 2023. [Notes on file with Senator Warren's office].

[74] Letter from TaxAct President Curtis Campbell and Chairman Dermot Halpin to Senator Elizabeth Warren, January 3, 2023. [On file with Senator Warren's office].

[75] Virtual Meeting with Congressional staff and TaxAct officials, February 3, 2023. [Notes on file with Senator Warren's office].

[76] Letter from TaxAct President Curtis Campbell and Chairman Dermot Halpin to Senator Elizabeth Warren, January 3, 2023. [On file with Senator Warren's office].

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] Letter from H&R Block Chief Government Relations Officer Tom Gannon to Senator Elizabeth Warren, January 3, 2023. [On file with Senator Warren's office].

[82] *Id.*

[83] Letter from TaxSlayer Counsel Christopher J. Armstrong to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren's office].

[84] *Id.*

[85] See TaxSlayer tutorial video for filing for the 2021 tax year, which includes links to pages to report "alimony received" and "profit or less from rentals and royalties," among any other specific categories of taxpayer information, at YouTube, "HOW TO FILE YOUR TAX REFUND 2022 (STEP BY STEP TUTORIAL), https://youtu.be/81SBSSZdzj4?t=226.

[86] Electronic Correspondence from TaxSlayer Counsel Christopher J. Armstrong to Congressional staff, March 22, 2023. [On file with Senator Warren's office].

[87] Letter from Intuit Executive Vice President and General Counsel Kerry McLean to Senator Elizabeth Warren, December 23, 2022. [On file with Senator Warren's office].

[88] Electronic Correspondence from TaxSlayer Counsel Christopher J. Armstrong to Congressional staff, March 22, 2023. [On file with Senator Warren's office].

[89] Virtual Meeting with Congressional staff and TaxAct officials, February 3, 2023. [Notes on file with Senator Warren's office].

[90] Federal Trade Commission, "Does Hashing Make Data 'Anonymous'?" Ed Felten, April 22, 2012, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] Federal Trade Commission, "Location, health, and other sensitive information: FTC committed to fully enforcing the law against illegal use and sharing of highly sensitive data," Kristin Cohen, July 11, 2022, https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal.

[96] Bavarian State Office for Data Protection Supervision, "Facebook Custom Audience at Bavarian Companies," press release [translated], October 4, 2017, https://www.lda.bayern.de/media/pm2017_07.pdf.

[97] NetzPolitik, “Facebook Custom Audience illegal without explicit user consent, Bavarian Data Protection Authority rules,” Ingo Dachwitz, April 16, 2019, https://netzpolitik.org/2019/facebook-custom-audience-illegal-without-explicit-user-consent-bavarian-dpa-rules/.
[98] Meta Business Help Center, “Best practices when using customer information for a Custom Audience,” https://www.facebook.com/business/help/606443329504150?id=2469097953376494.
[99] NetzPolitik, “Facebook Custom Audience illegal without explicit user consent, Bavarian Data Protection Authority rules,” Ingo Dachwitz, April 16, 2019, https://netzpolitik.org/2019/facebook-custom-audience-illegal-without-explicit-user-consent-bavarian-dpa-rules/.
[100] Meta, “Meta for Developers,” https://developers.facebook.com/docs/marketing-api/audiences/guides/custom-audiences/#hash.
[101] Virtual Meeting with Congressional staff and Meta officials, March 15, 2023. [Notes on file with Senator Warren’s office].
[102] *Id.*
[103] Virtual Meeting with Congressional Staff and Google officials, March 21, 2023. [Notes on file with Senator Warren’s office].
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] Princeton University, “De-anonymizing Web Browsing Data with Social Networks,” Jessica Su, Sharad Goel, Ansh Shukla, and Arvind Narayanan, 2017, p. 8, https://www.cs.princeton.edu/~arvindn/publications/browsing-history-deanonymization.pdf.
[108] Letter from TaxSlayer Counsel Christopher J. Armstrong to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren’s office].
[109] *Id.*
[110] Meta for Developers, “Automatic Configuration,” https://developers.facebook.com/docs/meta-pixel/advanced/#automatic-configuration.
[111] Letter from TaxSlayer Counsel Christopher J. Armstrong to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren’s office].
[112] *Id.*
[113] Meta Business Help Center, “About advanced matching for web,” https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[114] Letter from TaxSlayer Counsel Christopher J. Armstrong to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren’s office].
[115] *Id.*
[116] *Id.*
[117] Virtual meeting with Congressional staff and TaxSlayer officials, February 27, 2023. [Notes on file with Senator Warren’s office].
[118] *Id.*
[119] Letter from H&R Block Chief Government Relations Officer Tom Gannon to Senator Elizabeth Warren, January 3, 2023. [On file with Senator Warren’s office].

[120] Letter from TaxAct President Curtis Campbell and Chairman Dermot Halpin to Senator Elizabeth Warren, January 3, 2023. [On file with Senator Warren's office].

[121] *Id.*

[122] Letter from TaxSlayer Counsel Christopher J. Armstrong to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren's office].

[123] *Id.*

[124] Virtual meeting with Congressional staff and TaxSlayer officials, February 27, 2023. [Notes on file with Senator Warren's office].

[125] *Id.*

[126] TaxSlayer, "TaxSlayer Encourages Americans to 'File Fearlessly' with New Campaign and Product Enhancements," press release, January 5, 2022, https://www.taxslayer.com/media-room/prdetails?articleID=122509.

[127] Virtual meeting with Congressional staff and H&R Block officials, March 2, 2023. [Note on file with Senator Warren's office].

[128] *Id.*

[129] *Id.*

[130] Letter from Meta Vice President of U.S. Public Policy Kevin Martin to Senator Elizabeth Warren, January 12, 2023. [Notes on file with Senator Warren's office].

[131] *Id.*

[132] *Id.*

[133] John Doe & Jane Doe v. Meta Platforms, Inc., 3:22-cv-07557 (N.D. Cal. Dec. 1, 2022), at 9.

[134] The Markup, "Tax Filing Websites Have Been Sending Users' Financial Information to Facebook," Simon Fondrie-Teitler, Angie Waller, and Colin Lecher, November 22, 2022, https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook.

  In another instance, Meta's policies also did nothing to prevent hospitals' from sending patient information to Meta via the Pixel. The Markup, "Facebook is Receiving Sensitive Medical Information from Hospital Websites," Todd Feathers, Simon Fondrie-Teitler, Angie Waller, and Surya Mattu, June 16, 2022, https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

  Furthermore, a report by the New York State Department of Financial Services (NYDFS) came to the same conclusion. In response to reports that Facebook was receiving sensitive health data from popular mobile apps, NYDFS opened an investigation and its final report noted that despite Facebook's policies, the company "routinely obtained sensitive data… contrary to its own policies," and that "Facebook's internal controls on this issue have been very limited and were not effective at enforcing Facebook's policy or preventing the receipt of sensitive data." See New York State Department of Financial Services, "Report on Investigation of Facebook Inc. Data Privacy Concerns, February 18, 2021, p. 7, https://perma.cc/G7YJ-7AE5. The report concluded that "[m]erely stating a rule… has little meaning if the rule is not enforced, and the unfortunate fact is that Facebook does little to track whether… developers are violating this rule and takes no real action against developers that do." Id., pp. 7-8.

[135] Letter from Meta Vice President of U.S. Public Policy Kevin Martin to Senator Elizabeth Warren, January 12, 2023. [On file with Senator Warren's office].

[136] Id.

[137] See, e.g., Meta Business Help Center, "About Sensitive Financial Information," https://www.facebook.com/business/help/2770378636585929; Meta Business Help Center, "About Restricted Meta Business Tools Data," https://www.facebook.com/business/help/1057016521436966; Meta Business Help Center, "About Sensitive Health Information," https://www.facebook.com/business/help/361948878201809; Meta Business Help Center, "About Personally Identifiable Information (Contact Information)," https://www.facebook.com/business/help/876665706470981; Meta Business Help Center, "Troubleshoot Facebook Business Tools Data Policy Violations," https://www.facebook.com/business/help/414614186228298.

[138] The Markup, "Applied for Student Aid Online? Facebook Saw You," Surya Mattu and Colin Lecher, April 28, 2022, https://themarkup.org/pixel-hunt/2022/04/28/applied-for-student-aid-online-facebook-saw-you.

[139] See Meta Business Help Center, "How to set up and install a Meta Pixel," https://www.facebook.com/business/help/952192354843755?id=1205376682832142.

[140] Letter from Meta Vice President of U.S. Public Policy Kevin Martin to Senator Elizabeth Warren, January 12, 2023. [On file with Senator Warren's office].

[141] *Id.*

[142] Meta Business Help Center, "About Restricted Meta Business Tools Data," https://www.facebook.com/business/help/1057016521436966; Meta Business Help Center, "About Sensitive Financial Information," https://www.facebook.com/business/help/2770378636585929; Meta Business Help Center, "About Sensitive Health Information," https://www.facebook.com/business/help/361948878201809; Meta Business Help Center, "About Personally Identifiable Information (Contact Information)," https://www.facebook.com/business/help/876665706470981?id=188852726110565.

[143] Meta Business Help Center, "About Sensitive Financial Information," https://www.facebook.com/business/help/2770378636585929.

[144] *Id.*

[145] Virtual Meeting with Congressional staff and Meta officials, March 15, 2023. [Notes on file with Senator Warren's office].

[146] *Id.* For discussion of Meta filtration system notifications, see also Declaration of Tobias Wooldridge in Support of Defendant Meta Platforms, Inc.'s Opposition to Plaintiffs' Motion for Preliminary Injunction, Meta Platforms Inc., In re Meta Pixel Healthcare Litigation Case No. 3:22-cv-3580-WHO (Doe), (October 17, 2022), pgs. 2-3, https://dd80b675424c132b90b3-e48385e382d2e5d17821a5e1d8e4c86b.ssl.cf1.rackcdn.com/external/usdiscand322cv3580d125588732e4366oppositionresponsere46motionforpreliminaryi-2.pdf.

[147] Facebook, "ABP Privacy Infra, Long Range Investment [A/C Priv]," internal memo, https://www.documentcloud.org/documents/21716382-facebook-data-lineage-internal-document.

[148] *Id.*, 1.

[149] Letter from Google Vice President of Government Affairs and Public Policy, US and Canada to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren's office].

[150] *Id.*

[151] *Id.*

[152] Google Analytics Help, "[GA4] Policy requirements for Google Analytics Advertising Features," https://support.google.com/analytics/answer/2700409?hl=en&topic=2611283.

[153] Letter from Google Vice President of Government Affairs and Public Policy, US and Canada to Senator Elizabeth Warren, January 17, 2023. [On file with Senator Warren's office]; see also Google Advertising Help, "Personalized advertising," https://support.google.com/adspolicy/answer/143465#547.
[154] Virtual Meeting with Congressional Staff and Google officials, March 21, 2023. [Notes on file with Senator Warren's office].
[155] Id. See also Google Analytics Help, "[GA4] Introduction to audiences in Google Analytics," https://support.google.com/analytics/answer/12799087.
[156] Virtual Meeting with Congressional Staff and Google officials, March 21, 2023. [Notes on file with Senator Warren's office].
[157] *Id.*
[158] U.S.C. 7216(a).
[159] *Id.*
[160] *Id.*
[161] 26 U.S.C. § 7216(b)(3).
[162] 26 C.F.R. 301.7216-1(b)(2)(i)(A) and (B).
[163] 26 C.F.R. 301.7216-1(b)(2)(iii).
[164] Letter from TaxAct President Curtis Campbell and Chairman Dermot Halpin to Senator Elizabeth Warren, January 3, 2023. [On file with Senator Warren's office].
[165] 26 C.F.R. 301.7216-1(b)(3)(i).
[166] 26 C.F.R. 301.7216-1(b)(3)(i)(D).
[167] Procedurally Taxing, "The Facebook Pixel and Unauthorized Use and Disclosure of Tax Return and Tax Return Information," Nina Olson, November 29, 2022, https://procedurallytaxing.com/the-facebook-pixel-and-unauthorized-use-and-disclosure-of-tax-return-and-tax-return-information/.
[168] 26 C.F.R. 301.7216-1(b)(5).
[169] 26 C.F.R. 301.7216-3(a)(1).
[170] *Id.*
[171] 26 C.F.R. 301.7216-3(a)(3)(i)(A).
[172] 26 C.F.R. 301.7216-3(a)(3)(B).
[173] *Id.*
[174] 26 C.F.R. 301.7216-3(a)(3)(C).
[175] 26 C.F.R. 301.7216-3(a)(3)(D).
[176] 26 C.F.R. 301.7216-3(b)(5).
[177] Procedurally Taxing, "The Facebook Pixel and Unauthorized Use and Disclosure of Tax Return and Tax Return Information," Nina Olson, November 29, 2022, https://procedurallytaxing.com/the-facebook-pixel-and-unauthorized-use-and-disclosure-of-tax-return-and-tax-return-information/; 26 C.F.R. 301.7216-3(c)(1).
[178] IRS Rev. Proc. 2013-14, p. 10, https://www.irs.gov/pub/irs-drop/rp-13-14.pdf; 26 C.F.R. 301.7216-3(a)(3)(ii).
[179] CBS News, "Tax time! 10 most common IRS forms explained," Daniel Gross, April 10, 2015, https://www.cbsnews.com/media/tax-time-10-most-common-irs-forms-explained/.

[180] (1) A taxpayer's electronic consent to each separate disclosure or separate use of TRI must be contained on a "single page or separate window;" (2) All of the text placed on each consent form screen "must pertain solely to the disclosure or use of [TRI] authorized by the consent, except for computer navigation tools;" (3) The text of the consent must be at least the same size as the normal or standard body text used by the website or software package; (4) Each consent screen must be able to be signed and dated by the taxpayer; and (5) Each consent must include specific language informing the taxpayer as to the risks of disclosure, the voluntary nature of the consent, and the duration of the consent. See IRS Rev. Proc. 2013-14, pp. 13-14, United States Trade Representative, "Indo-Pacific Economic Framework for Prosperity (IPEF) Pillar I – Trade," September 2022, https://ustr.gov/sites/default/files/2022-09/IPEF%20Pillar%201%20Ministerial%20Text%20(Trade%20Pillar)_FOR%20PUBLIC%20RELEASE%20(1).pdf.

[181] TaxAct Privacy Policy, https://www.taxact.com/privacy-policy (last updated January 1, 2023) ("We use the information from Google Analytics to improve our site and services;" "To better assess and optimize our marketing activities, we may use a tool called the 'Meta Pixel' operated by Meta."); TaxAct Privacy Policy, https://web.archive.org/web/20220809074553/https://www.taxact.com/privacy-policy (web archive August 9, 2022).

[182] The Markup, "Tax Filing Websites Have Been Sending Users' Financial Information to Facebook," Simon Fondrie-Teitler, Angie Waller, and Colin Lecher, November 22, 2022, https://themarkup.org/pixel-hunt/2022/11/22/tax-filing-websites-have-been-sending-users-financial-information-to-facebook.

[183] TaxSlayer Account Creation Landing Page, https://id.taxslayer.com/identity/Account/Register?returnUrl=%2Fidentity%2Fconnect%2Fauthorize%3Fclient_id%3Dts_my_account_react_client%26redirect_uri%3Dhttps%253A%252F%252Fwww.taxslayer.com%252Fmyaccount%252Fauthentication%252Fcallback%26response_type%3Dcode%26scope%3Dopenid%2520profile%2520email%2520phone%2520customerinfo%2520consumer.services.webbff%2520offline_access%26state%3D3c83dd2037a344088de9fb9b833e17f0%26code_challenge%3DVsG62GQ_J-UaCT3Am0uCI_UvUSZrrp4nMCnUP1Zf6vg%26code_challenge_method%3DS256%26response_mode%3Dquery%26acr_values%3DaffiliateId%253Aundefined%2520forceLogin%253Atrue.

[184] IRS Rev. Proc. 2013-14, pp. 7-8, https://www.irs.gov/pub/irs-drop/rp-13-14.pdf.

[185] Virtual meeting with Congressional staff and TaxSlayer officials, February 27, 2023. [Notes on file with Senator Warren's office].

[186] TaxSlayer Privacy Policy, https://web.archive.org/web/20220527122709/https://www.taxslayer.com/policies/privacy, (web archive, May 27, 2022).

[187] *Id.*

[188] *Id.*

[189] TaxSlayer Privacy Policy, https://www.taxslayer.com/policies/privacy/, (last updated March 2, 2023).

[190] *Id.*

[191] TaxSlayer Opt Out of Cookies and Similar Technologies https://www.taxslayer.com/policies/opt-out/?_ga=2.263761804.1683894233.1680097392-1531522522.1680097392, (last updated March 3, 2023).

[192] TaxSlayer Privacy Policy, https://www.taxslayer.com/policies/privacy/, (last updated March 2, 2023).

[193] *Id.*

[194] IRS Rev. Proc. 2013-14, pp. 4-8, https://www.irs.gov/pub/irs-drop/rp-13-14.pdf.

[195] H&R Block Digital Privacy Notice, p. 3, https://www.hrblock.com/universal/digital-online-mobile-privacy-principles/.

[196] *Id.*

[197] *Id.*, 4.

[198] *Id.*, 6.

[199] *Id.*, 7.

[200] *Id.*, 8.

[201] *Id.*, 11.

[202] *Id.*, 12.

[203] IRS Rev. Proc. 2013-14, p. 8, https://www.irs.gov/pub/irs-drop/rp-13-14.pdf.

[204] Id., 7.

[205] H&R Block Personalized Services, LLC, https://www.hrbpersonalizedservices.com/info/index.html.

[206] H&R Block Personalized Services Online Privacy Notice, p. 1, https://www.hrbpersonalizedservices.com/info/privacynotice.pdf.

[207] IRS Rev. Proc. 2013-14, p. 10, https://www.irs.gov/pub/irs-drop/rp-13-14.pdf.

[208] 26 C.F.R. 301.7216-2(d)(1).

[209] 26 U.S.C. 7216(a)(1)(2).

[210] 26 C.F.R. 301.7216-2(d)(2).

[211] 26 C.F.R. 301.7216-2(n)(1).

[212] Id.

[213] IRS Rev. Rul. 2010-42010-1, at p. 16.

[214] Meta, "Maximize media performance with data," https://www.facebook.com/business/goals/maximize-media-performance-with-data.

[215] 26 C.F.R. 301.7216-2(o)(1).

[216] *Id.*

[217] *Id.*

[218] *Id.*

[219] *Id.*

The Offices of Senators
Elizabeth Warren, Ron Wyden, Richard Blumenthal, Tammy
Duckworth, Bernie Sanders, and Sheldon Whitehouse, and
Representative Katie Porter