1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    PEDRO RIOS, et al.,                     Case No.  25-cv-03530-EMC

8                   Plaintiffs,

9         v.                                 **ORDER DENYING MOTION TO
                                             COMPEL ARBITRATION**
10   HRB DIGITAL LLC, et al.,

11                  Defendants.              Docket No. 18

12

13                    I.        **INTRODUCTION**

14        Plaintiffs Pedro Rios, Jr. and Christian Marquez filed this putative class action against

15   HRB Digital, LLC and HRB Tax Group, Inc. (collectively, "HRB" or "Defendants") alleging

16   Defendants unlawfully intercepted and disclosed their confidential information.  Dkt. 1, Complaint

17   ("Compl.").  Defendants filed the instant Motion to Compel Arbitration pursuant to the Federal

18   Arbitration Act.  Dkt. 18, Motion to Compel Arbitration ("MTC").  Defendants contend that the

19   case should be sent to arbitration because HRB's Online Services Agreement ("OSA") contains an

20   arbitration agreement.  *Id.* at 2.

21        Having considered the parties' briefs and accompanying submissions, as well as oral

22   argument, the Court hereby **DENIES** the Defendants' motion.

23                    II.       **FACTS AND BACKGROUND**

24   A.   Collection and Disclosure of Taxpayer Data

25        Plaintiffs filed this putative class action alleging that HRB unlawfully intercepted and

26   disclosed confidential taxpayer information to Meta Platforms, Inc. and Google LLC through the

27   use of tracking pixels embedded in H&R Block's online tax preparation platform.  Compl. ¶¶ 1–6.

28   According to Plaintiffs, these pixels captured and transmitted sensitive tax return data, including

United States District Court
Northern District of California

names, identifiers, health savings account contributions, scholarships, tuition expenses, and information regarding dependents, income categories, and tax credits, all without users' consent. *Id.* ¶ 4.  Plaintiffs further allege that HRB intentionally deployed Meta's Pixel and Google's analytics code with default settings that triggered the disclosure of page-title information reflecting the substance of taxpayers' filings, thereby monetizing tax-return data by using it for targeted advertising and marketing purposes.  *See id.* ¶¶ 6, 62–64.  Plaintiffs allege that the pixels were implemented in a manner that caused every single taxpayer who used the HRB websites for filing their taxes to risk having at least some of their data shared.  *Id.* ¶ 8.

Plaintiffs assert claims for this interception and disclosure of taxpayer data under the Electronic Communications Privacy Act, California's Invasion of Privacy Act, California's Unfair Competition Law, and the California Consumer Legal Remedies Act.  Plaintiffs seek damages, private and public injunctive relief, and declaratory relief on behalf of a putative nationwide class.

B.    The Online Services Agreement

HRB requires customers who use its online tax preparation platform to agree to its Online Services Agreement ("OSA").  Both new users opening an account, and returning users logging in, are required to agree to the OSA.  Dkt. 20, ("Schuessler Decl.") ¶ 2.  Returning users are presented with a "Returning Client Acknowledgement Screen" that states, "We've updated our terms & policies."  *Id.* ¶ 7, Ex. 2.  The user must then click a checkbox and accede to the following acknowledgment: "I agree to the terms and conditions of the . . . Online Services Agreement, which includes the requirement that any dispute be resolved through binding arbitration."  *Id.*  The user may click the green, underlined hyperlink "Online Services Agreement" in the text immediately next to the check box to review the complete OSA.  *Id.*  The user may not click the "Next" button to move past the Returning Client Acknowledgement Screen without first clicking the check box agreeing to the terms of the OSA.  *Id.* ¶ 8.

Both Plaintiffs Rios and Marquez accepted the OSA in January 2024.  *Id.* ¶ 10.

C.    The Arbitration Agreement

Section 11 of the OSA is titled "**ARBITRATION IF A DISPUTE ARISES ("Arbitration Agreement").**"  Section 11 contains an arbitration provision stating that "all

disputes and claims between you and the H&R Parties shall be resolved through binding individual arbitration" administered by the American Arbitration Association ("AAA").

The OSA permits users to opt-out of the arbitration agreement within 30 days by either filling out an online form or sending a signed letter. Schuessler Decl., Ex. 4 ("OSA") ¶ 11.1. Users who opt out, however, are still subject to any prior arbitration agreements entered into with HRB. *Id.* ("If you opt out of this Arbitration Agreement, any prior arbitration agreement shall remain in force and effect.").

Users who do not opt out, but who wish to raise a claim, are subject to multiple procedural prerequisites:

*First*, before initiating arbitration, a consumer must engage in an "informal resolution" process (the "Informal Settlement Conference"). *Id.* ¶ 11.2. The OSA requires that the claimant provide HRB with a written Notice of Dispute ("Notice") identifying the claimant, describing the dispute, and stating the relief sought. After submission, the parties must attempt to resolve the dispute informally for at least 60 days before arbitration may be pursued. *Id.* Users may be represented by counsel, though users must submit a signed statement authorizing HRB to disclose the users' confidential tax and account records to the user's counsel. *Id.* The provision requiring this Informal Settlement Conference also states that the statute of limitations for any claims and relief set forth in the Notice of Dispute will be tolled during this Informal Settlement Conference period and while any pre-arbitration procedures are ongoing, so long as the Notice of Dispute is a "fully complete Notice." *Id.* The OSA states that the Notice and Informal Settlement Conference provide a meaningful chance to resolve disputes informally before proceeding to arbitration. *Id.*

*Second*, all arbitrations must proceed on an individual basis. *Id.* ¶ 11.4. Users who agree to the OSA waive their right to a trial by jury or to participate in a class action lawsuit or class action arbitration. *Id.* Users or HRB may, however, elect to bring an individual claim to small claims court "as long as it is brought and maintained as an individualized claim and is not removed or appealed to a court of general jurisdiction." *Id.* ¶ 11.1.

*Third*, and most critically to this case, the OSA includes a mass arbitration and bellwether protocol that applies any time 25 or more claimants submit Notices or seek to file arbitrations

United States District Court
Northern District of California

United States District Court
Northern District of California

"raising similar claims," or where the users "are represented by the same or coordinated counsel." *Id.* ¶ 11.6. In such instances, the OSA imposes a "staged bellwether" process. *Id.* Under the agreement's procedures, each side selects 10 test cases (for a total of 20 cases) to proceed first in arbitration and to be resolved individually by different arbitrators from each claimant's home state. *Id.* During this time, no other cases may be filed in arbitration and the AAA is prohibited from accepting, assessing, demanding fees for, or administering arbitrations. *Id.* Only after each of those arbitrations are resolved can the next set of 20 cases proceed. *Id.* After completion of the first two rounds wherein arbitration of all 40 cases is completed, a total of 50 cases may be filed in subsequent rounds and arbitrators who were assigned cases in previous rounds may be appointed to new cases. *Id.* But each round (and all cases therein) must be completed before proceeding to the next round. The provision prescribing this bellwether process includes a note that users "agree to this process even though it may delay the arbitration of [their] claim." *Id.* The provision also states that arbitrators are "encouraged to resolve the cases within 120 days of appointment or as swiftly as possible, consistent with principles of fundamental fairness," though the provision does not set an enforceable deadline for arbitrators. *See id.* Nor does the mass arbitration provision provide claimants with any recourse or accountability mechanisms for arbitrator delays, and nothing in the OSA suggests that individual arbitrators can remedy delays caused by other arbitrators or HRB. *See id.* Delay in any one or more cases in each round will therefore delay the start of the next round.

The arbitration agreement contains a severability clause. *Id.* ¶ 11.7. Unlike many modern arbitration agreements, the arbitration agreement does *not* include a delegation provision assigning questions of arbitrability to the arbitrator. *See id.* ¶ 11.

With regard to the visibility and prominence of the OSA and embedded arbitration agreement, Plaintiffs allege that the OSA is a "complex, 21-page single-spaced document, drafted in small font and dense legalese that is difficult for ordinary laypersons to understand. The actual terms are not seen by website users unless one clicks on hyperlink to access the OSA." Compl. ¶ 20. Defendants point out that, with respect to accessing the OSA, when Plaintiffs logged into their respective accounts, "they each clicked a check box next to an acknowledgement stating: I agree

1    to the terms and conditions of the . . . <u>Online Services Agreement</u>.  MTC at 3.  Defendants state

2    that the phrase "Online Services Agreement" was a green, underlined hyperlink immediately next

3    to the check box.  *Id.*; Schuessler Decl., Ex. 2.  Users could not click the "Next" button at the

4    bottom of the screen to move past the screen without first clicking the check box; instead, the

5    screen would display a red error message requiring the user to agree to the terms and conditions,

6    including the OSA.  *Id.*; Schuessler Decl., Ex. 3.  Defendants do not deny that the OSA itself is a

7    21-page single-spaced document.

8    D.    <u>Procedural History</u>

9          Counsel for Plaintiffs allege that they sent a Pre-Filing Notice of Dispute Letter ("Pre-

10    Filing Letter") via first class certified mail to the HRB address specified in the OSA.  Dkt. 25,

11    Opposition to Motion to Compel ("Opp. to MTC") at 4.  The Pre-Filing Letter raised privacy law

12    claims on behalf of the named plaintiffs, as well as approximately 2,480 other claimants — all of

13    whom were represented by Plaintiffs' counsel.  *Id.*  The Pre-Filing letter did not seek collective

14    resolution, which is prohibited under the OSA, but individual claims instead.  *Id.*; *see* OSA ¶ 11.4.

15    The Pre-Filing Letter contained three ShareFile links: (1) a list of all Claimants, their names, email

16    addresses, phone numbers, mailing addresses, and first five digits of their Social Security

17    numbers; (2) 2,481 individually signed Notices of Dispute specifying each individual claimant's

18    legal claims, relief sought, and all other requisite information pursuant to the OSA ¶ 11.2; and (3)

19    2,481 individually signed Consents to Disclose Tax Information to Attorneys ("Tax Consent

20    forms") authorizing HRB to share each claimant's tax information with counsel as required for

21    counsel to participate in the Informal Settlement Conference.  Opp. to MTC at 4; Dkt. 26,

22    ("Ellersick Decl.") Ex. 3.

23          In response to the Pre-Filing Letter, HRB informed Plaintiffs' counsel that the Pre-Filing

24    Notice of Dispute was "improper and ineffective."  Opp. to MTC at 4–5; Ellersick Decl. Ex. 8.

25    HRB responded to the Pre-Filing Letter by asserting that the Notices of Dispute did not comply

26    with the OSA because claimants were required to individually and separately mail each Notice of

27    Dispute.  *Id.*  No such provision is expressed in the terms of the OSA.  *See* OSA ¶ 11.2 (only

28    requiring "[a] party who intends to seek arbitration" to "first mail a written Notice of Dispute

United States District Court
Northern District of California

1    ('Notice') to the other party").

2        The parties corresponded over whether the Notices of Dispute were actually defective for

3    over a month.  Opp. to MTC at 5.  HRB also informed Plaintiffs' counsel that claimants each had

4    to separately execute a specific Tax Consent Form provided by HRB, rather than the ones that

5    Plaintiffs' counsel sent.  *Id.*; Ellersick Decl. Ex. 10.  Plaintiffs allege that this conduct reflects

6    HRB's practice of manufacturing delays to obstruct arbitration.  Opp. to MTC at 6.

7        On December 5, 2024, HRB finally "agree[d] to accept service of [the] Notices of Dispute

8    sent on behalf of 2,481 claimants . . . *without waiving any rights and expressly reserving all*

9    *rights*."  *Id.* (emphasis added); Ellersick Decl. Ex. 12.  HRB stated that it would review

10    submissions and send responses "including requests for informal settlement conferences," but

11    HRB maintained that claimants must execute the Tax Consent forms provided by HRB.  *Id.*

12        Plaintiffs filed their Complaint on April 22, 2025.  Defendants moved to compel arbitration

13    and stay the action under the Federal Arbitration Act ("FAA").  Plaintiffs oppose, arguing (1) that

14    HRB's arbitration provision is procedurally and substantively unconscionable and thus

15    unenforceable; and (2) that the FAA does not apply to the OSA's mass arbitration protocol, and

16    that the class action waiver is thus unenforceable under California law.

17    ### III.    LEGAL STANDARD

18        Per the FAA, a written contractual provision to arbitrate is "valid, irrevocable, and

19    enforceable, save upon such grounds as exist at law or in equity for the revocation of any

20    contract."  9 U.S.C. § 2.  The "final clause of § 2 . . . permits agreements to arbitrate to be

21    invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability."

22    *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 432 (9th Cir. 2015) (internal citation

23    omitted).  As the FAA "leaves no place for the exercise of discretion by a district court," this

24    Court is "limited to determining . . . whether a valid agreement to arbitrate exists."  *Chiron Corp.*

25    *v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

26        Defendants "as the part[ies] seeking to compel arbitration[] must prove the existence of a

27    valid agreement by a preponderance of the evidence."  *Wilson v. Huuuge, Inc.*, 944 F.3d 1212,

28    1219 (9th Cir. 2019); *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (stating

that under California law "the party opposing arbitration bears the burden of proving any defense, such as unconscionability"). Federal courts "apply ordinary state-law principles that govern the formation of contracts" to determine whether a valid agreement to arbitrate exists. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "In California, [g]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state." *Hansen v. Ticketmaster Ent., Inc.*, 2020 WL 7319358, at *2 (N.D. Cal. Dec. 11, 2020) (Chen, J.) (internal citation omitted).

## IV.    DISCUSSION

A.    Valid Assent to the OSA and Absence of Delegation Provision

The parties do not dispute that Plaintiffs agreed to the OSA by clicking the checkbox on the Returning Users Screen. An enforceable online contract exists when a consumer has "actual knowledge of the agreement" or "inquiry notice" of it, which is found when "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

A reasonably conspicuous notice is "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* A hyperlink may properly "disclose terms" to a reasonably prudent user, but "the fact that a hyperlink is present must be readily apparent," meaning that it must be "sufficiently set apart from the surrounding text." *Id.* at 857 (internal citation omitted). Unambiguous manifestation of assent may be established via "[a] user's click of a button . . . only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.*

A clickwrap agreement on a website "presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Id.* at 856. Clickwrap agreements provide consumers with "notice of the terms," and a consumer "'knows or has reason to know that the other party may infer from his conduct that he assents' to those terms," so "courts have routinely found clickwrap agreements enforceable." *Id.* "At the

other end of the spectrum are so-called 'browsewrap' agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.*

Given the set up here, Plaintiffs do not contest their assent to the OSA. Instead, the Plaintiffs challenge enforceability of the arbitration provision, arguing that the OSA itself, as a 21-page dense legal document, contributed to oppression and surprise and the unenforceability of the arbitration agreement.

The Court notes that the OSA does *not* contain a delegation provision, and Defendants concede that the OSA differs in this regard from the arbitration agreement in *Pandolfi v. AviaGames*, No. 23-cv-05971-EMC, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024), *aff'd* No. 24-5817, 2025 WL 2463742 (9th Cir. Aug. 27, 2025) (mem.). *See* MTC at 22 ("For example, this Court in *Pandolfi* deemed three provisions substantively unconscionable: the delegation provision, the bellwether procedures, and a contractual limitations period. . . . The OSA's arbitration agreement, by contrast, does not contain a delegation provision . . . ."). In the absence of a delegation provision in an arbitration clause, the court — and not an arbitrator —resolves Plaintiffs' unconscionability challenges. *See, e.g.*, *First Options of Chi., Inc.*, 514 U.S. at 944 (holding that there must be "clear and unmistakable" evidence that the "parties agreed to arbitrate arbitrability"); *Sandoval-Ryan v. Oleander Holdings LLC*, 58 Cal.App.5th 217, 223 (Cal. Ct. App. 2020) (ruling that courts "presume that the parties intend *courts*, not arbitrators, to decide threshold issues of arbitrability" and a delegation clause must be "clear and unmistakable") (italics in original).

Accordingly, the Court turns to the question of unconscionability.

B.    Unconscionability of Arbitration Agreement

Plaintiffs, as the party resisting enforcement of the arbitration agreement, bear the burden of establishing unconscionability. *Ramirez v. Charter Comm'ns, Inc.*, 16 Cal.5th 478, 492 (Cal. 2024). To render an arbitration agreement invalid, the Court must find that the agreement is tainted by *both* procedural and substantive unconscionability, in at least some quantity. *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013) (internal citation omitted); *Heckman v.*

*Live Nation Ent., Inc.*, 120 F.4th 670, 681 (9th Cir. 2024).  Courts, however, "apply a sliding scale analysis under which 'the more substantively oppressive [a] term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'"  *Ramirez*, 16 Cal.5th at 493.

Procedural unconscionability concerns "the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power."  *Id.* at 492 (quoting *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal.4th 223, 246 (Cal. 2012)).

Substantive unconscionability focuses less on the circumstances of contract drafting and instead considers "the fairness of an agreement's actual terms."  *Id.* at 493 (quoting *Pinnacle*, 55 Cal.4th at 246).  The primary concern here is whether the contract will create unfair or one-sided results that "reallocate risks in an objectively unreasonable or unexpected manner."  *Id.* (quoting *Serpa v. Cal. Surety Investigations, Inc.*, 215 Cal.App.4th 695, 703 (Cal. Ct. App. 2013)).

1.  Procedural Unconscionability

In determining whether an arbitration agreement is procedurally unconscionable, "we first ask 'whether the contract is one of adhesion.'"  *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1089 (9th Cir. 2024) (quoting *OTO, LLC v. Kho*, 8 Cal.5th 111, 126 (Cal. 2019).  An arbitration agreement "is at least minimally procedurally unconscionable if it is a contract of adhesion."  *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1034 (N.D. Cal. July 1, 2022) (Chen, J.).  Second, regardless of whether the contract is adhesive, the court examines whether an arbitration agreement "involves more than 'minimal' procedural unconscionability"; in particular, the court considers "'whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required.'"  *Ronderos*, 114 F.4th at 1090 (quoting *OTO*, 8 Cal.5th at 126); *Poublon*, 846 F.3d at 1262 (explaining two-prong test and stating that "[t]he procedural element of unconscionability focuses on 'oppression or surprise due to unequal bargaining power.'") (quoting *Pinnacle*, 55 Cal.4th at 246).  The Court's inquiry into oppression or surprise includes examining whether the agreement includes a "lack of negotiation and meaningful choice" and whether provisions were "hidden within a prolix printed form."  *OTO*, 8

United States District Court
Northern District of California

1   Cal.5th at 126.  Analysis of procedural unconscionability is highly dependent on context, and

2   often "requires inquiry into the 'commercial setting, purpose, and effect'" of the provision.

3   *Sanchez v. Valencia Holding Co., LLC*, 61 Cal.4th 899, 911–12 (Cal. 2015).

4        Because of the significant showing of substantive unconscionability, as discussed below,

5   the Court need only find a modest degree of procedural unconscionability to render the arbitration

6   agreement unenforceable.  *See Armendariz v. Found. Health Psychare Servs., Inc.*, 24 Cal.4th 83,

7   114 (Cal. 2000); *Sanchez*, 61 Cal.4th at 910.  The record here reflects more than the required

8   modicum of procedural unconscionability.

9        First, as to adhesion, the arbitration agreement appears in a standard-form OSA drafted by

10   HRB and presented as a non-negotiable condition of using its online platform.  The commercial

11   setting, often during the height of tax season, leaves consumers with little practical ability to reject

12   arbitration, establishing at least a minimal degree of procedural unconscionability.  Although HRB

13   points to the 30-day opt-out provision, that feature does not cure adhesion for a multitude of

14   reasons.  The opt-out is buried within a lengthy, dense agreement and imposes ongoing burdens,

15   including the requirement that consumers submit a new opt-out request each year to avoid being

16   bound by successive versions of the arbitration agreement.  Thus, even users who once opted out

17   may be swept back into arbitration unless they repeatedly navigate the process annually.  And, as

18   addressed below, the existence of an opt-out provision is not dispositive of the procedural

19   unconscionability question.

20        Second, the OSA contains surprises.  The OSA is a lengthy, 21-page, single-spaced

21   contract, and the arbitration provision is embedded deep within the dense text, beginning on page

22   15.  And while consumers might expect a standard arbitration clause in an online contract,

23   particularly in view of the fact that the arbitration clause is well flagged, the *content* of the clause

24   is not something an ordinary consumer would expect.  They would not reasonably anticipate

25   HRB's complex bellwether and batching scheme, which prevents claimants from even *filing* their

26   claims if "25 or more" similar claims are submitted by coordinated counsel.  Reasonable

27   consumers would not anticipate that the identity of their yet-unknown attorneys, and the number

28   of other claimants that the attorneys represent, could comprise a substantial obstructive hurdle in

10

United States District Court
Northern District of California

1    the path toward resolving their dispute with HRB.

2        The surprise is compounded by how the agreement described the timing of arbitrations.

3    The OSA acknowledges only that mass arbitration "may" cause delay, but then assures users that

4    arbitrators are "encouraged" to resolve cases within 120 days. In practice, however, claims are

5    likely to languish for years under HRB's mass arbitration protocol. The reference to a 120-day

6    timeline therefore instills a false sense of efficiency, masking the real possibility of protracted

7    delay. These hidden disadvantages, unapparent from the contract's face, amplify surprise.

8        Moreover, to underscore the uncertainty and surprise, HRB layered numerous implied

9    hurdles that obstruct claimants from succeeding in their claims. For example, when Plaintiffs'

10   counsel sent a comprehensive notice enclosing thousands of individually signed dispute forms and

11   consents via certified mail, HRB insisted that each claimant had to send an individual envelope,

12   even though nothing in the OSA mandated such a procedure. Even when HRB finally accepted

13   the mass notice, it did so only while "reserving all rights," possibly including the right to later

14   contest tolling, thereby creating further uncertainty and delay.

15       Finally, the OSA is oppressive. To determine whether an agreement is oppressive, courts

16   consider factors including the amount of time the assenting party was given to consider the

17   proposed contract, the amount and type of pressure exerted on the assenting party to sign the

18   proposed contract, the length of the proposed contract and the length and complexity of the

19   challenged provisions, the education and experience of the assenting party, and whether the

20   assenting party's review of the proposed contract was aided by an attorney. *OTO*, 8 Cal.5th at

21   126–27. Here, the OSA was imposed by HRB with no opportunity for consumers to negotiate or

22   modify its terms. Consumers faced a dense 21-page agreement in the midst of tax season and with

23   the looming threat of IRS penalties, were assured of an illusory "120-day" resolution period, and

24   could not reasonably foresee that their ability to pursue claims would depend on the identity of

25   their attorney or the number of other claimants represented by their attorney as a result of a

26   complicated and unusual bellwether sequencing provision.

27       Taken together, these factors demonstrate a significant degree of procedural

28   unconscionability. The Court next considers whether the OSA's opt-out provision meaningfully

mitigates these defects.

a.  <u>The Arbitration Agreement Opt-Out is Not Dispositive</u>

HRB relies heavily on the OSA's thirty-day opt-out provision, arguing that its availability forecloses any finding of procedural unconscionability.  Dkt. 34, Reply In Support of Motion to Compel ("Reply Brief") at 1 ("Plaintiffs cannot show procedural unconscionability because they had the right to opt out of arbitration.").  Defendants cite *Mohamed v. Uber Techs.*, 848 F.3d 1201 (9th Cir. 2016), arguing that the ability to opt out defeated any claim of procedural unconscionability, even if the opt-out process was burdensome in practice.[1]  Reply Brief at 4.  But *Mohamed*'s analysis addressed the effect of opt-out provisions on the adhesive nature of the contract.  *See Mohamed*, 848 F.3d at 1211.  The Ninth Circuit subsequently clarified in *Poublon* that, as noted above, the Court's evaluation of procedural unconscionability involves a two-prong inquiry: in addition to assessing adhesion, federal courts may alternatively find an agreement procedurally unconscionable where "there are other indications of oppression or surprise that would lead California courts to conclude that the degree of procedural unconscionability is high." *See* 846 F.3d 1261–62; *see also Baghdasarian v. Macy's Inc.*, No. 24-3438, 2025 WL 999082, at *2 (9th Cir. Apr. 3, 2025) (mem.) (evaluating both adhesion and "the totality of circumstances" to assess procedural unconscionability).  Thus, the existence of an opt-out clause does not automatically render an arbitration agreement procedurally conscionable; even if an agreement is not adhesive, it can still be found sufficiently surprise-laden or oppressive to implicate procedural unconscionability.

To the extent Defendants argue that the opt-out provision is dispositive not only of the adhesion prong, but the entirety of the procedural unconscionability question, *Mohamed* did not so hold.  In any event, if one were to read *Mohamed* as broadly as Defendants do, the Court takes notice of the fact that, in the decade since *Mohamed*, California appellate courts have consistently

---

[1] In *Mohamed*, the Ninth Circuit reversed this Court's holding that, based on the California Supreme Court's ruling in *Gentry v. Super. Ct.*, 42 Cal.4th 443 (Cal. 2007), the right to opt out is not necessarily fatal to an assertion of adhesiveness.  *Id.*  The Ninth Circuit reiterated that an earlier panel had held in *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198 (9th Cir. 2002), that an opt out was dispositive in determining adhesiveness, and that this Court and the panel in *Mohamed* was bound by *Ahmed*.  *Id.*

United States District Court
Northern District of California

and unanimously rejected the notion that an opt-out provision categorically insulates arbitration agreements from a finding or procedural unconscionability.  *See, e.g.*, *Swain v. LaserAway Med. Grp., Inc.*, 57 Cal.App.5th 59, 69 (Cal. Ct. App. 2020) (holding that "an opt out provision does not insulate an arbitration agreement from a finding of procedural unconscionability") (citing *Gentry*, 42 Cal.4th at 470); *Haydon v. Elegance at Dublin, LLC*, 97 Cal.App.5th 1280, 1288–89 (Cal. Ct. App. 2023) (30-day opt-out insufficient where arbitration provision was confusingly presented and imposed under temporal and financial pressure); *Johnson v. Stoneridge Creek Pleasanton CCRC LLC*, No. A-165800, 2023 WL 7125117, at *2–3 (Cal. Ct. App. Oct. 30, 2023) (affirming that, contrary to defendant's expansive interpretation of *Mohamed*, "[u]nder California law, 'an opt-out provision does not insulate an arbitration agreement from a finding of procedural unconscionability,'" and holding that an opt-out was ineffective where consumers faced pressure not to exercise it); *Booker v. Charter Comm'ns, LLC*, No. B322812, 2025 WL 1910954, at *6 (Cal. Ct. App. July 11, 2025) (emphasizing that state courts are not bound by defendant's broad reading of *Mohamed* or other "[o]pinions of lower federal courts" where the California Supreme Court "has held that procedural unconscionability is not necessarily eliminated by an opt-out opportunity"); *Smith v. Folsom Invs., L.P.*, No. C097549, 2023 WL 8794888, at *4 (Cal. Ct. App. Dec. 20, 2023) (finding opt-out inadequate because it did not provide an "authentic informed choice" where plaintiff lacked meaningful alternatives and provisions were buried without disclosure); *Arnold v. Antelope Manufactured Home Cmty., LP*, No. C097244, 2024 WL 1081934, at *5 (Cal. Ct. App. Mar. 13, 2024) (rejecting opt-out where plaintiff faced economic stress, had limited education, and defendant failed to explain arbitration or provide time to review agreement).[2]  Thus, Defendants' expansive reading of *Mohamed* — that an opt-out clause categorically shields an agreement from a finding of procedural unconscionability — is not consistent with California law.

---

[2] Nor have other state appellate courts embraced the categorical rule from *Mohamed*. The New Mexico Court of Appeals in *Pedregon v. Amazon.com, Inc.*, 2023 WL 357736 (N.M. Ct. App. 2023), for example, declined to hold that an opt-out cured procedural unconscionability, noting the cumbersome opt-out process and the rarity of consumer opt-outs as evidence that the provision was "meaningless . . . to all or almost all customers." *Id.* at *3.

1    Where, as here, the California Supreme Court has not in the interim again addressed the

2    issue subsequent to its decision in *Gentry*, federal courts in diversity cases are obliged to "follow

3    decisions of the California Court of Appeal unless there is convincing evidence that the California

4    Supreme Court would hold otherwise." *Hill v. Walmart Inc.*, 32 F.4th 811, 816 (9th Cir. 2022);

5    *see also In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990).  Applying this principle, the Ninth

6    Circuit has at times revisited and overruled its own precedent (without taking the matter en banc)

7    when intervening California intermediate appellate decisions provide convincing evidence of how

8    the state high court would rule — even in the absence of direct controlling authority from the

9    California Supreme Court.  *See In re Watts*, 298 F.3d 1077, 1082–83 (9th Cir. 2002) ("We are

10   bound to follow *Smith* and *Teaman* [California appellate court cases] absent convincing evidence

11   that the California Supreme Court would reject the interpretation of section 704.950(c) by these

12   two courts. . . . In reexamining our interpretation of section 704.950(c) in light of *Smith* and

13   *Teaman*, we conclude that, if confronted with the issue, the California Supreme Court would

14   follow the rationale of  *Smith* and *Teaman* and not the approach that we adopted in *Jones*.");

15   *Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1155 (9th Cir. 2019) (holding that Ninth Circuit was

16   "bound to follow the rulings of intermediate state court 'absent convincing evidence that the

17   California Supreme Court would reject th[ose] interpretation[s]'" and that, because intermediate

18   appellate court decisions provided "a reasonable statutory interpretation . . . and was consistent

19   with legislative history," a prior Ninth Circuit decision "was overruled by intervening California

20   [appellate] case law").

21   Here, every California appellate court decision addressing the issue has rejected

22   Defendants' broad reading of *Mohamed* – some expressly.  *See, e.g.*, *Johnson*, 2023 WL 7125117,

23   at *2–3 (repudiating defendant's sweeping interpretation of *Mohamed* that an opt-out provision

24   insulates an arbitration agreement from a finding of procedural unconscionability); *Booker*, 2025

25   WL 1910954, at *6 (refusing to apply defendant's broad reading of *Mohamed* in light of

26   California Supreme Court authority holding that opt-out provisions do not categorically insulate

27   arbitration agreements from a finding of procedural unconscionability).  This, plus the fact that

28   these intervening appellate decisions are not only unanimous but are entirely consonant with the

1    prior California Supreme Court's decision in *Gentry*, constitutes a convincing indication that the

2    California Supreme Court would hold that an opt out provision does not categorically obviate

3    procedural unconscionability.  There is no "convincing evidence" that the Supreme Court would

4    rule to the contrary.  *Hill*, 32 F.4th at 816.

5           In sum, this Court is bound by both the Ninth Circuit's decision in *Poublon* and the clear

6    directive of intervening California appellate decisions which make clear that the opt-out provision

7    is not categorically dispositive of procedural unconscionability.  Consistent with the views of the

8    California courts and the proper reading of *Mohamed*, the Court therefore treats HRB's opt-out

9    provision as only one factor in the procedural unconscionability analysis; it is not outcome-

10   determinative.  As discussed above, surprise and oppression remain central considerations,

11   particularly where, as here, consumers faced a dense 21-page agreement in the midst of tax season,

12   were assured of an illusory "120-day" resolution period, and could not reasonably foresee that

13   their ability to pursue claims would depend on the identity of their attorney or the number of other

14   claimants represented by their attorney.  Moreover, while an opt-out can mitigate the oppressive

15   effect, here the opt-out itself is burdensome and potentially illusory for the reasons stated above.

16   Considering the compounding factors, the opt-out provision does not preclude a finding of

17   procedural unconscionability, and for the reason stated above, the Court finds there is a modest

18   degree of procedural unconscionability.

19          2.    Substantive Unconscionability

20          Under California law, courts inquiring into unconscionability apply a sliding scale: the

21   more substantively oppressive the contract term, the less evidence of procedural unconscionability

22   is required, and vice versa.  *Sanchez*, 61 Cal.4th at 910; *Chavarria*, 733 F.3d at 922.  Here,

23   Plaintiffs have shown a moderate degree of procedural unconscionability and, when combined

24   with the significant degree of substantive unconscionability, the arbitration clause is

25   unenforceable.

26          "Substantive unconscionability pertains to the fairness of an agreement's actual terms and

27   to assessments of whether they are overly harsh or one-sided."  *Pinnacle*, 55 Cal.4th at 246.  The

28   substantive unconscionability inquiry analyzes whether a contractual term is "overly harsh,"

1    "unduly oppressive," or "so one-sided as to shock the conscience." *Sanchez*, 61 Cal.4th at 910

2    (citations omitted).  Unconscionability requires unfairness beyond a "simple old-fashioned bad

3    bargain." *Id.* at 911.

4          Two aspects of the arbitration provision weigh heavily in favor of finding substantive

5    unconscionability: the staged bellwether process, and the statute of limitations tolling provision.

6                    a.    Mass Arbitration Provision and Staged Bellwether Process

7          The OSA's mandated process for resolving mass arbitrations is almost certain to impose

8    unreasonable delays.  The bellwether provision is triggered when 25 or more claimants submit

9    Notices "raising similar claims and are represented by the same or coordinated counsel."  OSA ¶

10   11.6.  This provision sets a cap on the number of arbitrations that may proceed against HRB at any

11   given time — in the meantime, "no other cases may be filed in arbitration, and the AAA shall not

12   accept, assess or demand fees for, or administer arbitrations." *Id.*  The process operates in

13   sequential rounds, such that no new tranche of arbitration claims may be filed until *every* case in

14   the prior round has been completed.  As a result, the slowest case in a given round sets the pace for

15   all others, and any delay in one arbitration halts progress for all remaining claimants and would-be

16   claimants who are barred from filing until their turn arrives.

17         Although the mass arbitration provision encourages arbitrators to resolve cases within 120

18   days, even that idealistic timeline could impose a 13-year timeline to resolve a batch of 2,000

19   Notices.  Opp. to MTC at 10.  Even assuming that most arbitrations proceed efficiently, a single

20   outlier or protracted case can hold up hundreds of other claims indefinitely.  Thus, claimants are at

21   risk of significant delays under the mass arbitration protocol, and even if claimants opt out of

22   future arbitration agreements, they are still bound by their prior agreements.  OSA ¶ 11.1.  HRB's

23   mass arbitration provision states that the OSA scheme "may delay the arbitration" of claims, *id.* ¶

24   11.6, but no consumer expects to wait a decade or longer to adjudicate low-dollar claims.  Opp. to

25   MTC at 10.

26         Although the mass arbitration provision encourages efficient resolution of claims, it

27   provides no recourse, oversight, or other accountability procedures in the event of delay by an

28   arbitrator either by the AAA, HRB, or individual claimants.  *See* OSA ¶ 11.  No provision of the

16

1    OSA provides arbitrators with discretion to address delays or to undo terms of the OSA.  *See id.*

2    Rather, even the most efficient arbitrators may be saddled by delays imposed by other arbitrators

3    or the parties in other proceedings.  Thus, the mass arbitration protocol "sets a cap on the number

4    of arbitrations against [HRB] that may proceed at one time," *MacClelland*, 609 F. Supp. 3d at

5    1040, but provides no mechanism for relief when unreasonable delays occur.  As a result,

6    claimants forced to wait on the sidelines are entirely dependent on the pace and efficiency of other

7    claimants, arbitrators, and HRB in resolving totally separate disputes.  The Ninth Circuit has so

8    held in a similar case.  *See Pandolfi*, No. 23-cv-05971-EMC, 2024 WL 4051754, at *11–12 (N.D.

9    Cal. Sept. 4, 2024), *aff'd*, No. 24-5817, 2025 WL 2463742 (9th Cir. Aug. 27, 2025) (mem.)

10    (finding bellwether provision substantively unconscionable where sequential rounds of arbitration

11    created systemic delay).

12         These consequences from the OSA's staged bellwether process are likely to contribute to

13    significant delays.  "That prospect of delay" itself may have a "chilling effect on [claimants],

14    deterring them from vindicating their rights."  *Id.* at *6; *see also Pandolfi*, 2025 WL 2463742, at

15    *2 (emphasizing the one-sided effect of delays in chilling the initiation of claims, with those

16    delays "likely only apply[ing] to claims brought by players, not Avia").  Thus, the mass arbitration

17    provision itself creates the risk of de facto waiver of valid claims, weighing heavily in favor of

18    finding substantive unconscionability.

19         To provide a real-world illustration of how the mass arbitration provision operates in

20    practice, Plaintiffs submitted the declaration of Stephen Tillery, whose firm represents more than

21    25,000 clients with claims against HRB.  Tillery Decl. ¶¶ 1–2.  Mr. Tillery attested that, although

22    his firm filed Consumer Demands for Arbitration for 10 clients in October 2024, as of August 1,

23    2025, none of those cases had proceed to an arbitration hearing, with the earliest hearings not

24    scheduled until late-2025 or early-2026.  *Id.* ¶ 4.  Defendants dispute aspects of the Tillery

25    Declaration and have submitted reply declarations from their counsel and in-house attorneys.  *See*

26    Dkt. 35–37, Murdock, Ostfeld, and Gilman Declarations.  Plaintiffs have objected to the

27    declarations as improper reply evidence.  Dkt. 41, Objections to Reply Evidence.  Without

28    resolving those disputes, the record demonstrates that processing and arbitrating batches of 20 or

United States District Court
Northern District of California

17

1    50 claims at a time is bound to result in impediments and delays. This practical reality

2    underscores the structural risks of delay inherent in HRB's staged bellwether process, with those

3    risks weighing in favor of finding substantive unconscionability.

4        *Second*, the mass arbitration protocol and staged bellwether process may interfere with

5    claimants' right to counsel of their choosing. By automatically imposing the bellwether procedure

6    anytime 25 or more claimants are represented by the same or coordinated counsel, the mass

7    arbitration provision may induce claimants to avoid the bellwether provision altogether by finding

8    different counsel. *See Pandolfi*, 2024 WL 4051754, at *11, *aff'd*, 2025 WL 2463742. As this

9    Court previously noted, would-be claimants may struggle to find counsel willing to represent a

10    single or small number of similarly situated clients seeking small claims against HRB. *Id.*; *see*

11    Dkt. 27, ("Marquez Decl.") ¶¶ 8–9; Dkt. 28, ("Rios Decl.") ¶¶ 8–9. Moreover, many plaintiff-side

12    firms may specialize in bringing claims like the privacy violations alleged here. Forcing claimants

13    to avoid experienced counsel in favor of less qualified or experienced representation — simply to

14    sidestep mass arbitration delays — imposes an unjustifiable cost manufactured by HRB for its sole

15    benefit.

16        *Third*, the above defects are not cured by the arbitration agreements' small-claims carve

17    out, which allows either party to elect to have their claim decided by a small claims court. *See*

18    OSA ¶ 11.1. Small claims proceedings are not a substitute for litigation in a court of general

19    jurisdiction. Claimants may be ineligible because their damages exceed the jurisdictional cap. *See*

20    Cal. Civ. Proc. Code § 116.221. Those who qualify face sharply limited (potentially nonexistent)

21    discovery and truncated procedures. *See Rosenberg v. Super. Ct.*, 67 Cal.App.4th 860, 868 (Cal.

22    Ct. App. 1998). And in many jurisdictions, litigants cannot be represented by counsel in small

23    claims matters. *See Prudential Ins. Co. of Am. v. Small Claims Ct. of City & Cnty. of S.F.*, 76

24    Cal.App.2d 379, 383–84 (Cal. Ct. App. 1946). Especially for technically complex privacy claims,

25    like those raised in the Complaint, a small claims proceeding risks depriving consumers of the

26    forum, tools, or procedures to prove their cases and obtain relief. Accordingly, the OSA's small

27    claims carveout is an illusory alternative that does not cure the arbitration agreement's

28    substantively unconscionable provisions.

United States District Court
Northern District of California

Defendants compare HRB's bellwether scheme to multidistrict litigation ("MDL") bellwethers, arguing that MDL trials "have proven remarkably effective at achieving settlements." MTC at 19.  The analogy is unpersuasive.  In an MDL, plaintiffs actually file their cases, obtain procedural rights, and proceed under active judicial management — with discovery, motion practice, public dockets, and trial dates.  MDL bellwethers do not wholly bar plaintiffs from filing thousands of claims until earlier tranches finish.  Rather, all claims are on file, and representative cases proceed to trial as part of the judicially managed process.  By contrast, HRB's mass arbitration protocol prevents claimants from filing their claims at all until prior tranches have been completed, ceding control of the pace of adjudication to other claimants, arbitrators, and to HRB itself.  The distinction is particularly stark because the limits in HRB's process are of HRB's own making.  HRB has introduced no evidence that the number of arbitrations that can be conducted simultaneously is inherently constrained by the AAA or any arbitral forum.  Instead, the staged bellwether cap of 20 or 50 cases at a time appears to be a design choice, at best, to control HRB's costs, and at worst, to thwart the adjudication of valid claims.  Having selected arbitration as the forum, HRB cannot shed responsibility for that choice and impose, as a matter of volition rather than necessity, a process that delays claimants' ability to adjudicate their disputes so that HRB can manage its own expenses.  This volitional design contrasts with the MDL bellwether process, which is driven by the limited resources of the public judiciary and the practical realities of managing thousands of cases in federal court.  Unlike the MDL process, which is constrained by real-world limitations of judicial resources, the constraint here is manufactured.

           b.      <u>Statute of Limitations Tolling</u>

The second critical deficiency in the arbitration provision concerns the OSA's tolling provisions.  The OSA contains two provisions related to tolling of the statute of limitations.  *First*, OSA ¶ 11.2(B) states:

> Any applicable statute of limitations will be tolled for the claims and relief set forth in the Notice during the period between the date that either you or we send the other a ***fully complete Notice***, until the later of (1) 60 days after receipt of the Notice; or (2) if a Settlement Conference is timely required, 30 days after completion of the Settlement Conference (the "Informal Resolution Period").

(Emphasis added).

Second, OSA ¶ 11.6 states:

> If this section 11.6 applies to a Notice, the statute of limitations applicable to the claims and relief set forth in that Notice shall be tolled from the beginning date of the Informal Resolution Period until that Notice is selected for a bellwether proceeding, withdrawn, or otherwise resolved.

Defendants argue that these tolling provisions are sufficient to ensure that no claimant risks forfeiture of claims during the pendency of the mass arbitration bellwether process. *See* MTC at 16. But the record suggests otherwise. Plaintiffs submit evidence that on October 17, 2024, HRB responded to Plaintiffs' counsel that the Notices were "improper and ineffective." Ellersick Decl. at Ex. 8. Although HRB subsequently accepted service of the Notices sent on behalf of 2,481 claimants, it did so "without waiving any rights and expressly reserving all rights." *Id.* at Ex. 12; Opp. to MTC at 6.

The structure of the OSA makes tolling contingent on HRB's receipt of a "fully complete Notice." *See* OSA ¶ 11.2. Whether a Notice is "fully complete" is not defined by any objective criteria, and seems instead to be subject to HRB's exclusive interpretation. HRB's initial refusal to recognize the validity of Plaintiffs' Notices, coupled with its reservation of rights even after acceptance, creates an unacceptable level of uncertainty as to whether tolling in fact applies. The mass arbitration provision in OSA ¶ 11.6 contains a broader tolling clause without the "fully complete" language, but the apparent disjunction between Paragraphs 11.2 and 11.6 provides HRB with an opportunity to dispute the appropriateness of tolling whenever it deems a Notice incomplete.

This uncertainty is not solely theoretical. Claimants such as Plaintiffs Rios and Marquez have explained that despite retaining counsel and attempting to initiate arbitration, their claims have not advanced and they are concerned about delays. Rios Decl. ¶¶ 3–4; Marquez Decl. ¶¶ 3–4. As noted above, counsel for other claimants confirm that cases filed as early as Fall 2024 remain pending, with hearings not scheduled until late-2025 or 2026. Tillery Decl. ¶ 4. Given the potential for years-long delays, the availability of reliable tolling is essential.

1    HRB contends that "it is up to a court or arbitrator, not defendants, to decide whether a

2    claimant has met" the requirements of a "fully complete Notice." MTC at 10. That is true on its

3    face, but the fact that HRB has expressly reserved the right to challenge the adequacy of Notices

4    means that claimants face continued risk that HRB will seek to defeat claims as untimely after

5    prolonged delays imposed by the bellwether process. HRB's unilateral reservation of rights to

6    attack statute of limitations tolling weighs in favor of finding substantive unconscionability.

7    Provisions that impose forfeiture risks through delays or technical hurdles may be substantively

8    unconscionable. *See MacClelland*, 609 F. Supp. 3d at 1042 (ruling in the context of delays that

9    "[d]elaying the ability of one to vindicate a legal claim by years . . . 'conflict[s] with one of the

10    basic principles of our legal system — justice delayed is justice denied.' Terms that 'contravene

11    the public interest or public policy' are substantively unconscionable").

12    Finally, the tolling scheme appears asymmetrical. The tolling provisions do not prevent

13    HRB from asserting statute of limitations defenses if it succeeds in persuading an arbitrator that a

14    Notice was incomplete. By contrast, claimants have no comparable mechanism: the OSA does not

15    empower arbitrators to remedy delays caused by other arbitrators, claimants, or HRB in the

16    bellwether process, nor does it provide claimants any recourse or judicial review if HRB

17    challenges tolling. *See* OSA ¶¶ 11.2, 11.6.

18    Accordingly, claimants may find themselves wholly unable to vindicate their claims by

19    operation of the OSA's ambiguous, subjective, and asymmetrical tolling provisions. Although

20    Plaintiffs' statutory claims may carry multi-year limitations periods, those protections are

21    meaningless under the OSA's arbitration scheme, which can delay the filing of claims for years

22    and which conditions tolling on HRB's approval of Notices and its willingness to refrain from

23    challenging their completeness in arbitration. Thus, putative claimants risk forfeiture of their

24    claims through no fault of their own. The combination of protracted delays and uncertain tolling

25    creates precisely the "harsh" or "one-sided" outcome that courts seek to prevent.

26    3.    Severability

27    "If a California court concludes that a contract contains one or more unconscionable

28    clause, it may: (1) refuse to enforce a contract that was 'unconscionable at the time it was made';

21

United States District Court
Northern District of California

1  (2) 'enforce the remainder of the contract without the unconscionable clause'; or (3) 'limit the

2  application of any unconscionable clause as to avoid any unconscionable result.' *Poublon*, 846

3  F.3d at 1272.  "A court may 'refuse to enforce the entire agreement' only when it is 'permeated'

4  by unconscionability." *Id.* (quoting *Armendariz v. Found. Health Psychare Servs., Inc.*, 24

5  Cal.4th 83, 122 (Cal. 2000)); *see also Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp.

6  3d 1168, 1191 (N.D. Cal. 2020) (Chen, J.).  The remaining issue related to unconscionability

7  concerns whether the Court should sever the unconscionable terms, in which case arbitration may

8  proceed without those terms.

9       Here, the unconscionable terms are not "merely collateral to the main purpose of the

10  arbitration agreement.  Rather, these provisions are designed to structurally and systemically make

11  arbitration an inferior forum." *Pandolfi*, 2024 WL 4051754, at *13, *aff'd* 2025 WL 2463742

12  (mem.).  Not only would severance potentially maintain the chilling effect of the arbitration

13  agreement and confusion about statute of limitations tolling, it would contribute to a patchwork

14  agreement that, at best, leads to confusion and, at worst, permits HRB and other similarly situated

15  companies to continue to chill users' otherwise arbitrable claims.  *See id.*

16       Because unconscionability permeates the entire arbitration agreement, severance would be

17  an ineffective half-measure or, potentially, a reward for bad faith corporate actors.  Accordingly,

18  the Court refuses to sever the arbitration clause, finding the entire arbitration agreement

19  unenforceable instead.

20       Because the MTC is unconscionable and thus unenforceable, the Court does not need to

21  proceed to Plaintiff's arguments about FAA preemption and the applicability of *Discover Bank v.*

22  *Super. Ct.*, 36 Cal.4th 148 (Cal. 2005).  *Cf. Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670,

23  689–90 (9th Cir. 2024); *id.* at 692–93 (VanDyke, J., concurring) (applying California law instead

24  of the FAA where arbitration procedure did not comport with the FAA's intent to promote

25  bilateral arbitration of individual claims).

26  ///

27  ///

28  ///

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.     CONCLUSION

For the foregoing reasons, the HRB Defendants' motion to compel arbitration is **DENIED**. This order disposes of Docket No. 18.

**IT IS SO ORDERED**.

Dated: October 27, 2025

_____
EDWARD M. CHEN
United States District Judge